UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRONX INDEPENDENT LIVING SERVICES, a nonprofit organization, DISABLED IN ACTION OF METROPOLITAN NEW YORK, a nonprofit organization, ROBERT HARDY, an individual, and RODOLFO DIAZ, an individual, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>METROPOLITAN TRANSPORTATION AUTHORITY, a public benefit corporation, THOMAS PRENDERGAST, in his official capacity as chairman and chief executive officer of the Metropolitan Transportation Authority, NEW YORK CITY TRANSIT AUTHORITY, a public benefit corporation, and VERONIQUE HAKIM, in her official capacity as president of the New York City Transit Authority,<br><br>Defendants. | No. 16-CV-5023 (ER) |

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. STATEMENT OF FACTS.....................................................................3

    A.    The MTA Failed To Construct Elevators During Their
            Comprehensive Renovation As Required By Law .............................3

    B.    In Failing To Construct Elevators At The Middletown
            Road Station, The MTA Discriminates Against Many
            People With Mobility Disabilities...........................................................5

            1.    The MTA's Failure To Install Elevators At The
                     Middletown Road Station Harms Individuals With
                     Mobility Disabilities Who Have Reason To Travel
                     To This Area Of The Bronx.........................................................5

            2.    The MTA's Failure To Install Elevators At The
                     Middletown Road Station Frustrates The Mission
                     Of BILS And Causes BILS To Expend Resources
                     To Address Such Discrimination.................................................7

            3.    The MTA's Failure To Install Elevators At The
                     Middletown Road Station Frustrates The Mission
                     Of DIA And Causes DIA To Expend Resources To
                     Address Such Discrimination .....................................................8

III. THE PUTATIVE CLASS...................................................................10

IV. LEGAL ARGUMENT.........................................................................10

    A.    Legal Standards For Class Certification Under Rule 23....................10

    B.    The Class Meets All Of The Requirements Of Rule 23 .....................11

            1.    The Class Is So Numerous That Joinder Is
                     Impracticable..............................................................................11

            2.    Class Members Share Common Questions Of Fact
                     And Law.......................................................................................14

**3.**  The Individual Plaintiffs' Claims Are Typical Of The Class. ................................................................15

**4.**  The Plaintiffs And Proposed Class Counsel Will Adequately Represent The Interests Of The Putative Class .................................................................17

**5.**  Members Of The Putative Class Are Readily Ascertainable Although This Implied Requirement Is Less Relevant To Rule 23(b)(2) Classes..............................19

    a.  Ascertainability Is Not Germane To Rule 23(b)(2) Classes ...........................................19

    b.  The Class Is Ascertainable .............................................20

**6.**  The Putative Class Satisfies The Conditions Of Rule 23(b)(2)...................................................................21

C.  The MTA's Challenge To The Plaintiffs' Standing Is An Inappropriate Argument Against Class Certification And Will Fail Because All Four Plaintiffs Have Established Facts Sufficient to Demonstrate Standing...........................................22

V. CONCLUSION .................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Alexander A. ex rel. Barr v. Novello*,
   210 F.R.D. 27 (E.D.N.Y. 2002) ........................................................................... 12

*Baby Neal ex rel. Kanter v. Casey*,
   43 F.3d 48 (3d Cir. 1994) ................................................................................... 15

*Bakalar v. Vavra*,
   237 F.R.D. 59 (S.D.N.Y. 2006) ........................................................................... 20

*Brooklyn Ctr for Indep. of the Disabled v. Bloomberg*,
   290 F.R.D 409 (S.D.N.Y. 2012) .................................................................... *passim*

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
   287 F.R.D. 240 (S.D.N.Y. 2012) ......................................................................... 22

*Cupolo v. Bay Area Rapid Transit*,
   5 F. Supp. 2d 1078 (N.D. Cal. 1997) ................................................................. 3, 4

*Denney v. Deutsche Bank AG*,
   443 F.3d 253 (2d Cir. 2006) ............................................................................... 22

*Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*,
   635 F.3d 87 (3d Cir. 2011) ................................................................................. 4, 5

*Floyd v. City of New York*,
   283 F.R.D. 153 (S.D.N.Y. 2012) ............................................................... 11, 19, 20

*Friedman-Katz v. Lindt & Sprungli (USA), Inc.*,
   270 F.R.D. 150 (S.D.N.Y. 2010) ......................................................................... 21

*Gortat v. Capala Bros., Inc.*,
   No. 07-CV-3629, 2010 WL 1423018 (E.D.N.Y. 2010) ......................................... 20

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982).......................................................................................... 24

*Hill v. City of New York*,
   136 F. Supp. 3d 304 (E.D.N.Y. 2015) ................................................................. 12

*In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act
   (ERISA) Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................................... 12

*In re Initial Pub. Offerings Secs. Litig.,*
  471 F.3d 24 (2d Cir. 2006) ................................................................ 11

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.,*
  209 F.R.D. 323 (S.D.N.Y. 2002) ....................................................... 20

*In re Petrobras Sec.,*
  862 F.3d 250 (2d Cir. 2017) ............................................... 11, 19, 20

*In re Scotts EZ Seed Litig.,*
  304 F.R.D. 397 (S.D.N.Y. 2015) ....................................................... 16

*In re Vitamin C Antitrust Litig.,*
  279 F.R.D. 90 (E.D.N.Y. 2012) ......................................................... 19

*Ligon v. City of New York,*
  288 F.R.D. 72 (S.D.N.Y. 2013) ......................................................... 19

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................ 23

*M.G. v. New York City Dep't of Educ.,*
  162 F. Supp. 3d 216 (S.D.N.Y. 2016) ......................................... 11, 16

*Marisol A. by Forbes v. Giuliani,*
  929 F.Supp. 662 (S.D.N.Y 1996) ...................................................... 25

*Marisol A. v. Giuliani,*
  126 F.3d 372, 376 (2d Cir. 1997) ...................................... 14, 19, 21

*Neff v. VIA Metro. Transit Auth.,*
  179 F.R.D. 185 (W.D. Tex. 1998) ....................................................... 3

*People United for Children, Inc. v. City of New York,* No.
  99 CIV. 0648 RJWKTD, 2003 WL 22056930 (S.D.N.Y. Sept. 3, 2003) ............................... 15

*Ramirez v. Riverbay Corp.,*
  39 F. Supp. 3d 354 (S.D.N.Y. 2014) ................................................. 11

*Robidoux v. Celani,*
  987 F.2d 931 (2d Cir.1993) ............................................................... 13

*Rodriguez v. It's Just Lunch, Int'l,*
  300 F.R.D. 125(S.D.N.Y. 2014) ......................................................... 23

*Shepard v. Rhea,*
  No. 12-CV-7220 RLE, 2014 WL 5801415 (S.D.N.Y. Nov. 7, 2014) ........................... 21

*Spagnola v. Chubb Corp.*,
   264 F.R.D. 76 (S.D.N.Y. 2010) ................................................................ 20

*Stinson v. City of New York*,
   282 F.R.D. 360 (S.D.N.Y. 2012) .............................................................. 17

*Sykes v. Mel Harris & Assocs., LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012) .............................................................. 14

*Taxis for All Campaign et al. v. New York City Taxi and Limo. Comm.*,
   No. 11-CV-0237 (S.D.N.Y Sept. 29, 2015) .............................................. 19

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008) ..................................................................... 11

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................. 11

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................. 23

**Statutes**

42 U.S.C. § 12131(a) ........................................................................................ 4

42 U.S.C. § 12147(a) ........................................................................................ 4

42 U.S.C. § 12149(a) ........................................................................................ 4

**Regulations**

28 C.F.R. § 35.104 ........................................................................................... 4

49 C.F.R. § 37.43(a)(1) .................................................................................... 4

**Rules**

Fed. R. Civ. P. 23 ............................................................................................ 23

Fed. R. Civ. P. 23(a) ............................................................................... 3, 10, 11

Fed. R. Civ. P. 23(a)(2) ............................................................................ 16, 17

Fed. R. Civ. P. 23(a)(3) ............................................................................ 17, 19

Fed. R. Civ. P. 23(a)(4) ................................................................................ 19

Fed. R. Civ. P. 23(b) ..................................................................................... 11

Fed. R. Civ. P. 23(b)(2)..................................................................................... *passim*

N.Y.C. Admin. Code § 8-107(4)(a) ............................................................... 5

**Other Authorities**

1966 Rules Advisory Committee Notes,
    39 F.R.D. 69........................................................................................ 21, 22

7A Charles Alan Wright et al.,
    *Federal Practice and Procedure* § 1763 (3d ed. updated April 2017)..................................... 15

Accessible Stations in the MTA Network,
    http://web.mta.info/accessibility/stations.htm#bronx (last visited Feb. 20, 2018) .................... 2

Annual Subway Ridership,
    http://web.mta.info/nyct/facts/ridership/ridership_sub_annual.htm (last visited
    February 26, 2018)................................................................................... 13

Audit Report on New York City Transit's Efforts to Inspect and Repair Elevators and Escalators (2017),
    at 8,
    https://comptroller.nyc.gov/wp-content/uploads/documents/MD16_103A.pdf ................................7

*More Than 6 Million Customers Ride Subways on Five Separate Days in
    September*, (Oct. 22nd, 2014),
    http://www.mta.info/news-subway-new-york-city-transit-ridership-record- .......................... 13

Nationwide, 26.6% of individuals with disabilities are living in poverty as
    compared to 10.9% of individuals without disabilities. *See* Erickson, W., Lee,
    C., von Schrader, S. (2017). Disability Statistics from the American
    Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute
    (YTI). Retrieved from Cornell University Disability Statistics website:
    www.disabilitystatistics.org (select ACS topic "Poverty," search disability type
    "any disability" and year "2016")................................................................ 14

New York City Mayor's Office for People with Disabilities, New York City
    People with Disabilities Statistics (2016),
    http://www1.nyc.gov/assets/mopd/downloads/pdf/selected-characteristics-
    disabled-population.pdf. .......................................................................... 13

Newberg on Class Actions
    § 3:55 (5th ed updated Dec. 2017).............................................................. 18

U.S. Census Bureau, American Community Survey, 2016 American Community
    Survey 1-Year Estimates, Table S1810: Disability Characteristics, ......................... 13

# MEMORANDUM OF LAW

### I.      INTRODUCTION

This civil rights case seeks to remedy the illegal conduct of the Metropolitan Transportation Authority ("MTA") and the New York City Transit Authority ("NYC Transit") (collectively, the "MTA"). In October 2013, the MTA conducted an extensive and costly renovation at the Middletown Road subway station in the Bronx. While the renovation included sweeping upgrades throughout the station, it did not include installing elevators at the station, leaving the station unusable for passengers with mobility disabilities. This glaring omission violates long-established federal and local civil rights law.

The Middletown Road station is an elevated station on the 6 Line. The neighborhood surrounding the station includes many businesses, residences, and other hallmarks of city life. Within a half-mile of the Middletown Road station, there are restaurants and bars, several schools, houses of worship, a post office, and a park. Burke Rehabilitation Clinic ("Burke"), an outpatient rehabilitation center that serves many patients with disabilities, and SteppingStone Day School ("SteppingStone"), a preschool that focuses on serving children with disabilities, are located directly across the street from the Middletown Road station.

The MTA's defiance of relevant civil rights laws is particularly egregious in light of the overall inaccessibility of New York City's subway system. Only 24% of the system's 472 service line stations are accessible to individuals with mobility disabilities.[1] The 6 Line in the Bronx, which includes the Middletown Road station, is 89% inaccessible. Of the 18 stations on the 6 Line in the Bronx, only two are accessible.[2] The distance between those two stations, Hunts

---

[1] New York City ranks a distant last among the country's ten largest metro systems in terms of their percentage of accessible stations.

[2] Accessible Stations in the MTA Network, http://web.mta.info/accessibility/stations.htm#bronx (last visited Feb. 20, 2018).

Point Avenue and Pelham Bay Park, is a distance of approximately 110 blocks, or 4.4 miles, with ten inaccessible stations located in between. Individuals with mobility disabilities who live, work, or travel in this area are thus effectively precluded from using New York City's most popular, efficient, and cost-effective mode of transportation. This exclusion unjustly hinders them in pursuing their daily activities, such as commuting to work or school, accessing healthcare, shopping, attending houses of worship, visiting friends and family, and otherwise participating in their communities.

The MTA blatantly violated federal and local civil rights laws during the nearly ten years of planning the Middletown Road subway station renovation, and in failing to install elevators during that renovation. These violations have had a discriminatory effect on the over 100,000 Bronx residents, as well as over 500,000 New York City residents, with mobility disabilities. The Plaintiffs[3] seek to represent those individuals in this class action. The named Individual Plaintiffs are ideal representatives of this class because, like the putative class members, they have mobility disabilities and require elevators at the Middletown Road station in order to access the station. Similarly, the named Organizational Plaintiffs are capable of representing the proposed class because their members and constituents experience this same harm, forcing them to divert resources to address the MTA's ongoing discrimination.

A class action is the most efficient and least burdensome way to adjudicate the proposed class's claims. Courts routinely certify classes in similar cases involving the denial of access to transportation facilities to people with disabilities, and, like the classes in those cases, Plaintiffs

---

[3] Plaintiffs in this action are two individuals, Robert Hardy and Rodolfo Diaz (the "Individual Plaintiffs"), and two organizations, Bronx Independent Living Services ("BILS") and Disabled In Action of Metropolitan New York ("DIA") (the "Organizational Plaintiffs").

here meet all of the certification requirements set forth under Federal Rules of Civil Procedure 23(a) and 23(b)(2).[4]

## II.   STATEMENT OF FACTS

### A.   The MTA Failed To Construct Elevators During Their Comprehensive Renovation As Required By Law.

Between October 5, 2013 and May 4, 2014, the MTA closed the Middletown Road station in both directions, Defendants' Answer ¶ 38, for an extensive $26.6 million renovation.[5] The renovation included replacing floors, walls, ceilings, facilities, and equipment; replacing structural steel framing for the station mezzanine and track through-span structures, reconstructing platform edges, and repairing concrete platforms and corroded steel.[6] Moreover, the MTA completely destroyed and rebuilt all of the station's street and platform stairways which had previously been in a state of disrepair.[7] These alterations, in particular the replacement of the stairs, ensured that riders without disabilities were able to utilize the station safely.[8]

However, despite the MTA's knowledge that large numbers of people with disabilities live in or frequent the area around the Middletown Road station,[9] the MTA did not consider installing elevators at the Middletown Road station during the nearly ten years during which the renovation was planned. Indeed, the MTA only completed an initial analysis regarding the

---

[4] *See, e.g.*, *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1080 (N.D. Cal. 1997); *Neff v. VIA Metro. Transit Auth.*, 179 F.R.D. 185, 196 (W.D. Tex. 1998).
[5] Declaration of Michelle Caiola in Support of Pls.' Mot. for Class Certification ("Caiola Decl."), Ex. D, D032483.
[6] Caiola Decl., Ex. E, D032521
[7] Caiola Decl., Ex. F, D005846
[8] *See* Caiola Decl., Ex. H, Deposition of Gricelda Cespedes, 48:15-50:15; 64:18-24.
[9] Caiola Decl., Ex. G, Letter from Will Carry to Marc Albrecht (Mar. 10, 2014), D013305 ("The Middletown Road location was prioritized for this project because it is served by bus routes with especially high ridership by seniors and people with disabilities.").

installation of elevators after the United States Department of Transportation ("DOT") asked it to do so when the MTA sought federal funding for the project. This funding was eventually denied.

As a public entity running the New York subway system, the MTA is indisputably subject to the Americans with Disabilities Act ("ADA") generally and the ADA's public transportation standards and regulations specifically.[10] DOT regulations implementing the ADA make clear

> that when a public entity alters . . . part of an existing facility used in providing designated public transportation services in a way that affects or could affect the usability of the facility or part of the facility, the entity shall make the alterations . . . in such a manner, and to the maximum extent feasible, that the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.

49 C.F.R. § 37.43(a)(1); *see also* 42 U.S.C. § 12147(a); 42 U.S.C. § 12149(a); *Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 635 F.3d 87, 92 (3d Cir. 2011) ("[I]f a public entity chooses to make changes rising to the level of 'alterations' to a facility, it ordinarily must use that opportunity to make the altered part of the facility accessible, as well."). Furthermore, "[u]sability in this context should be given an expansive, remedial construction and should be broadly defined to include renovations which affect the use of a facility, and not simply changes which relate directly to access." *Disabled in Action of Penn.*, 635 F.3d at 93 (internal citations and quotations marks omitted). The MTA's extensive renovations, which included total replacement of all staircases, affected the station's "usability." The MTA thus violated their legal requirement to ensure that the Middletown Road subway station was readily accessible to individuals with disabilities by failing to include vertical accessibility as part of that

---

[10] The MTA and NYC Transit are public entities within the meaning of the ADA. *See* 42 U.S.C. § 12131(a); 28 C.F.R. § 35.104; *see also Bay Area Rapid Transit*, 5 F. Supp. 2d at 1083 (holding that the Bay Area Rapid Transit subway system constituted a covered program under the ADA and Section 504 of the Rehabilitation Act of 1974 ("Section 504")).

renovation.[11]

**B.** **In Failing To Construct Elevators At The Middletown Road Station, The MTA Discriminates Against Many People With Mobility Disabilities.**

    **1.** The MTA's Failure To Install Elevators At The Middletown Road Station Harms Individuals With Mobility Disabilities Who Have Reason To Travel To This Area Of The Bronx.

The MTA's failure to install elevators at the Middletown Road station harms individuals with mobility disabilities who live, work, or visit this area of the Bronx for various purposes and activities. *See* Decl. of Brett Eisenberg in Supp. of Pls.' Mot. for Class Certification ("Eisenberg Decl.") ¶¶ 10-12; Decl. of Dustin Jones in Supp. of Pls.' Mot. for Class Certification ("Jones Decl.") ¶¶ 5-7; Decl. of Rodolfo Diaz in Supp. of Pls.' Mot. for Class Certification ("Diaz Decl.") ¶ 17, 19; Decl. of Robert Hardy in Supp. of Pls.' Mot. for Class Certification ("Hardy Decl.") ¶¶ 5, 10; Decl. of Crystal Rivera in Supp. of Pls.' Mot. for Class Certification ("Rivera Decl.") ¶¶ 13-17; Decl. of Anthony Lebron in Supp. of Pls.' Mot. for Class Certification ("Lebron Decl.") ¶¶ 8-11; Decl. of Daniel Porro in Supp. of Pls.' Mot. for Class Certification ("Porro Decl.") ¶¶ 10-11; Decl. of Edith Prentiss in Supp. of Pls.' Mot. for Class Certification ("Prentiss Decl.") ¶¶ 11-13, 17-18. Individuals who cannot access the subway system without elevators are unable to use the Middletown Road station, or access the subway system generally from this point, and must therefore rely on less convenient forms of transportation in lieu of this option. Caiola Decl. Ex. I, Deposition of Brett Eisenberg ("Eisenberg Dep.") 165:14-165:17;

---

[11] Section 504 of the Rehabilitation Act claims are co-extensive with the ADA, and the New York City Human Rights Law ("NYCHRL") requires every facility to be accessible. *See* N.Y.C. Admin. Code § 8-107(4)(a) ("It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . .").

Jones Decl. ¶ 7; Diaz Decl. ¶ 19; Hardy Decl. ¶¶ 18-22; Rivera Decl. ¶¶ 15-16; Prentiss Decl. ¶ 14.

Due to the widespread inaccessibility of the 6 Line in the Bronx, including at the Middletown Road station, many putative class members are forced to rely on Access-A-Ride, New York City's paratransit system, which requires users to schedule rides 24 hours in advance and often travels via circuitous routes resulting in longer travel times. Eisenberg Decl. ¶ 11; Jones Decl. ¶ 7; Caiola Decl. Ex. J, Deposition of Rodolfo Diaz ("Diaz Dep.") 51:07-51:13; Caiola Decl. Ex. K, Deposition of Robert Hardy ("Hardy Dep.") 13:14-14:12; Rivera Decl. ¶ 16. In some cases, putative class members are completely deterred from traveling to this section of the Bronx due to their inability to travel there using the subway system. Decl. of Jessica Tambor in Supp. of Pls.' Mot. for Class Certification ("Tambor Decl.") ¶ 8; Jones Decl. ¶¶ 10-12; Rivera Decl. ¶ 9; Decl. of Joseph Parenteau in Supp. of Pls.' Mot. for Class Certification ("Parenteau Decl.") ¶¶ 11-19. They therefore miss personal and professional opportunities solely because of the MTA's failure to install sufficient elevators on the 6 Line, including at the Middletown Road station.

The harm caused by the inaccessibility of the Middletown Road station extends beyond individuals who use wheelchairs. For instance, individuals with mobility disabilities who use other assistive devices and are limited in their ability to climb stairs cannot use Middletown Road station without enduring considerable difficulties such as protracted pain and aggravated symptoms. Porro Decl. ¶ 7; Lebron Decl. ¶¶ 4, 10.

Large gaps between accessible subway stations, such as the large gap between accessible subway stations on the 6 Line in the Bronx, causes additional harm to individuals with mobility

6

disabilities when elevators are out of service.[12] When putative class members arrive at an

accessible subway station and discover the station's elevator is out of service, they are often

forced to travel miles out of their way to the next accessible subway station simply to exit the

subway system. Jones Decl. ¶ 9; Rivera Decl. ¶¶ 10-12. Putative class members are thus often

deterred from taking the subway because of elevator unreliability and the dearth of accessible

subway stations along certain subway lines, including the 6 Line in the Bronx. This further

compounds the harm they experience as the result of the MTA's discriminatory conduct. Diaz

Dep. 54:11-54:20; Rivera Decl. ¶¶ 10-12.

> **2.** <u>The MTA's Failure To Install Elevators At The Middletown Road Station
> Frustrates The Mission Of BILS And Causes BILS To Expend Resources To
> Address Such Discrimination.</u>

Organizational Plaintiff Bronx Independent Living Services ("BILS") is a consumer-

based, nonprofit independent living center that provides services and advocacy for individuals

with disabilities. Eisenberg Decl. ¶ 4. BILS' mission is to ensure full integration, independence,

and equal opportunity for all people with disabilities by removing barriers to the social,

economic, cultural, and civic life of the community. Eisenberg Dep. 42:02-42:11. As a central

component of that mission, BILS consistently invests time and resources into advocating for

equal access to transportation for persons with disabilities in the Bronx, including access at the

Middletown Road station. Eisenberg Dep. 55:09-56:6, 68:05-69:13; 89:18-90:07; Caiola Decl.

Ex. L, Deposition of Soji Adu ("Adu Dep.") 62:21-63:01.

Numerous BILS constituents are negatively affected by the Middletown Road station's

lack of elevators. In 2016 alone, BILS served 2,200 Bronx-based consumers. Eisenberg Dep.

---

[12] Elevator outages, which are often unplanned, are a chronic problem in the MTA's subway system. *See* Audit Report on New York City Transit's Efforts to Inspect and Repair Elevators and Escalators (2017), at 8, https://comptroller.nyc.gov/wp-content/uploads/documents/MD16_103A.pdf ("As a result of these deficiencies NYCT cannot ensure that its 407 elevators and escalators are presently, and will continue to be, in good operating condition.").

134:18-135:13. Approximately 230 of those consumers have a mobility disability, and several of these consumers would use the Middletown Road station if it was accessible. *See* Eisenberg Dep. 156:19-158:10. It is accordingly clear that at least some BILS constituents have been harmed as a direct result of the MTA's discriminatory conduct, giving them standing to sue in their own right.

Moreover, both BILS' board of directors and staff are made up of a majority of people with disabilities. Eisenberg Dep. 151:08-151:23. Several BILS staff members with mobility disabilities travel periodically in the course of business to locations around the Middletown Road station and are thus harmed by its inaccessibility. Eisenberg Dep. 164:03-166:01; Rivera Decl. ¶ 15. For example, BILS staff member Crystal Rivera, who has a mobility disability and uses an electric wheelchair, has previously attended meetings at the Adult Career and Continuing Education Services ("ACCES") office on Zerega Avenue, located near the Middletown Road station, as part of her work at BILS and will resume routine meetings at ACCES in March of 2018. Rivera Decl. ¶¶ 13-15. If the Middletown Road station were accessible, she would have a direct route to the ACCES office from her home in Harlem. *Id*. at ¶ 15. Ms. Rivera will instead be forced to rely on less convenient methods of transportation, costing her time she would otherwise dedicate to her other duties at BILS. *Id*. at ¶¶ 16-17.

In sum, BILS has and continues to spend time and resources advocating for greater access to transportation due to the inaccessibility of the Middletown Road station. Eisenberg Dep. 68:05-70:16; Eisenberg Decl. 25-28. BILS thus has a clear and immediate interest in the vertical accessibility of the Middletown Road station, in common with the members of the putative class.

    **3.** <u>The MTA's Failure To Install Elevators At The Middletown Road Station Frustrates The Mission Of DIA And Causes DIA To Expend Resources To Address Such Discrimination.</u>

Organizational Plaintiff Disabled In Action of Metropolitan New York ("DIA") is a nonprofit civil rights membership organization, committed to ending discrimination against all people with disabilities. Caiola Decl. Ex. M, Deposition of Anthony Trocchia ("Trocchia Dep.") 42:09-42:11; Prentiss Decl. ¶ 6. DIA consists primarily of and is directed by people with disabilities. Prentiss Decl. ¶ 4. DIA has approximately 200 dues-paying members, of which about 40 live in the Bronx. Caiola Decl. Ex. N, Deposition of Edith Prentiss ("Prentiss Dep.") 67:05-68:07. The majority of the 40 DIA members who live in the Bronx have a mobility disability, and many are affected by the inaccessibility of the Middletown Road station. Prentiss Dep. 139:17-140:08.

One of those members is Robert Hardy, who lives in the Bronx and would use the Middletown Road station for various purposes, including for transportation to DIA board meetings, if that station were accessible. Hardy Dep. 167:11-170:07; Hardy Decl. ¶ 5. DIA board meetings are held near the 23rd Street Station, an accessible station on the 6 Line, and this route would be the most convenient way for Mr. Hardy to travel to DIA meetings. Hardy Decl. ¶¶ 5, 19.

Edith Prentiss, the current president of DIA, has traveled on three separate occasions in the past year to the area around the Middletown Road station in order to meet with Assemblyman Luis Sepulveda. Prentiss Decl. ¶ 12. Because Ms. Prentiss has a mobility disability, she could not take the subway to these meetings and was instead forced to travel on three buses in order to reach her final destination. Prentiss Dep. 114:03-114:07. Ms. Prentiss was also deterred from attending a baby shower in the vicinity of the Middletown Road station because of the limited accessible transportation options in this area of the Bronx. Prentiss Dep. 112:16-113:11.

To achieve its mission, DIA has expended and continues to expend substantial time and resources on advocacy concerning policies and practices that affect New York City residents

with disabilities seeking equal access to transportation, including at the Middletown Road station. Prentiss Dep. 63:14-63:23. In particular, DIA has devoted substantial resources and time toward advocating for increased subway accessibility, especially in cases where stations undergo renovations or are part of so-called "transportation deserts," areas of New York City that have large gaps between accessible stations. *Id*. at 45:08-45:18; 52:22-54:02. DIA is therefore clearly diverting time and resources that could be expended on their other initiatives in order to combat the inaccessibility of the Middletown Road station and is thus harmed by the MTA's failure to make that station accessible. *Id*. at 63:04-63:13.

### III.     THE PUTATIVE CLASS

Consistent with Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs respectfully request that the Court certify a class consisting of all persons with mobility disabilities who cannot currently use the Middletown Road station because of accessibility barriers at that station and who would use the station if it were made accessible. Plaintiffs seek only injunctive and declaratory relief on behalf of the class. Plaintiffs do not seek damages.

### IV.     LEGAL ARGUMENT

#### A.     Legal Standards For Class Certification Under Rule 23

Under Rule 23(a), class certification is proper if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

In addition to satisfying the requirements of Rule 23(a), the class must be certifiable under one of the three subdivisions of Rule 23(b). In this instance, the Plaintiffs seek certification under subdivision (b)(2), which provides that class certification is warranted if "the party

opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

Classes seeking certification in the Second Circuit typically must also meet an implied requirement of ascertainability beyond these four express requirements. *See In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). However, this implied requirement is less applicable to Rule 23(b)(2) classes because, as this Court has held, "it would be illogical to require precise ascertainability in a suit that seeks no class damages." *Floyd v. City of New York*, 283 F.R.D. 153, 172 (S.D.N.Y. 2012).

Each of these requirements must be met by a preponderance of the evidence. *See Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 202 (2d Cir. 2008) (clarifying that a preponderance of the evidence is the threshold for determining whether a class merits certification under Rule 23). "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal citations omitted). However, the "court should not assess any aspect of the merits unrelated to a Rule 23 requirement." *Ramirez v. Riverbay Corp.*, 39 F. Supp. 3d 354, 362 (S.D.N.Y. 2014) (citing *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

As set forth below, Plaintiffs' allegations that the MTA did not comply with relevant disability access laws during the Middletown Road station renovation readily satisfy the evidentiary standard for each of the Rule 23 requirements.

**B.**     **The Class Meets All Of The Requirements Of Rule 23.**

     **1.**     The Class Is So Numerous That Joinder Is Impracticable.

A class consisting of 40 or more members raises a presumption that numerosity has been satisfied. *See, e.g.*, *M.G. v. New York City Dep't of Educ.*, 162 F. Supp. 3d 216, 232 (S.D.N.Y. 2016) ("In the Second Circuit, sufficient numerosity can be presumed at a level of forty members or more."). However, "[p]laintiffs need not set forth an exact class size to establish numerosity," *In re Bank of Am. Corp. Sec., Derivative, & Employee Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 138 (S.D.N.Y. 2012), and "[a] class action may proceed upon estimates as to the size of the proposed class." *Alexander A. ex rel. Barr v. Novello*, 210 F.R.D. 27, 33 (E.D.N.Y. 2002). Moreover, "the Second Circuit has relaxed the numerosity requirement where, as here, the putative class seeks injunctive and declaratory relief pursuant to Rule 23(b)(2)." *Hill v. City of New York*, 136 F. Supp. 3d 304, 353 (E.D.N.Y. 2015) (internal citations and quotation marks omitted).

Under the Rule 23 standard, the class proposed in this action is undoubtedly numerous enough to merit certification. Data from the United States Census American Community Survey conducted in 2016 indicates that 115,964 Bronx residents have a mobility disability.[13] In fact, New York City informed the MTA in correspondence related to the Middletown Road station project that numerous people with disabilities use public transportation near the Middletown Road station. *See* Caiola Decl., Ex. G, D013305. The Mayor's Office for People with Disabilities found that 21% of New York City residents with disabilities reside in the Bronx and an estimated

---

[13] U.S. Census Bureau, American Community Survey, 2016 American Community Survey 1-Year Estimates, Table S1810: Disability Characteristics, https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (last visited Feb. 21, 2018), (under "Topics", Select "People" and then "Disability"; run search, then select "Table S1810" and then enter "Bronx Borough" under "Add/Remove Geographies"). To determine the number of members in a proposed class, courts may consider statistical data. *See, e.g.*, *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,* 290 F.R.D. 409, 418 (S.D.N.Y. 2012) (relying on the 2008 American Community Survey data from the United States Census Bureau to conclude that the proposed class consists of roughly 900,000 New Yorkers with disabilities and that "the proposed class [therefore] easily satisfies the numerosity requirement").

99,000 wheelchair users reside in the five boroughs of New York City.[14] Even if the number of wheelchair users in the Bronx was proportional to the City as a whole, it would indicate that roughly 20,790 wheelchair users reside in the Bronx. Furthermore, the MTA's own data indicates that 598,447 riders used the Middletown Road station during 2016.[15] Even if only .01% of that figure, or 60 additional individuals, have a mobility disability and are therefore deterred from using the station, numerosity is readily satisfied.

Further, the putative class does not consist solely of individuals residing within the Bronx. The MTA's subway system is of vital importance to the system's approximately six million daily riders.[16] The system's expansive and inherently connective nature means that all of the 554,287 non-institutionalized New York City residents who have a mobility-related disability,[17] as well as visitors who have a mobility-related disability, whether they are commuters or tourists, are members of the putative class. Each of these individuals is being denied the freedom and flexibility of travel to any station, a privilege that the rest of the subway-riding population has been given. Numerosity is therefore easily satisfied.

In addition to the sheer number of class members at issue, various other factors weigh in favor of certification in this case. *See Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir.1993)

---

[14] *See* New York City Mayor's Office for People with Disabilities, New York City People with Disabilities Statistics (2016), http://www1.nyc.gov/assets/mopd/downloads/pdf/selected-characteristics-disabled-population.pdf.

[15] *See* Annual Subway Ridership, http://web.mta.info/nyct/facts/ridership/ridership_sub_annual.htm (last visited February 26, 2018).

[16] *See More Than 6 Million Customers Ride Subways on Five Separate Days in September*, (Oct. 22nd, 2014), http://www.mta.info/news-subway-new-york-city-transit-ridership-record-breaking/2014/10/22/more-6-million-customers-ride ("Newly available figures show 6,106,694 customers rode the subway on Tuesday, Sept. 23, making it the highest ridership ever . . . 'New Yorkers and visitors alike continue to vote with their feet, recognizing that riding the subway is the most efficient way to get around town,' said MTA Chairman and CEO Thomas F. Prendergast.").

[17] U.S. Census Bureau, American Community Survey, 2016 American Community Survey 1-Year Estimates, Table S1810: Disability Characteristics, https://factfinder.census.gov/faces/nav/jsf/pages/searchresults.xhtml?refresh=t (last visited Feb. 21, 2018), under "Topics", Select "People" and then "Disability"; run search, then select "Table S1810" and then enter "New York City" under "Add/Remove Geographies").

(listing additional relevant factors). All putative class members would benefit, immediately and long into the future, from the injunctive relief sought—the installation of elevators at the Middletown Road station. Therefore, resolving this issue through one class-action suit, as opposed to numerous individual suits seeking identical remedies, promotes judicial economy. Also, as described above, members of the putative class are dispersed throughout the Bronx and New York City as a whole, and include visitors to the area as well. Lastly, individuals with disabilities disproportionately live in poverty and have limited financial resources.[18] Many members of the putative class do not possess the legal savvy or resources to bring individual suits against the MTA in vindication of their rights. Proceeding as a class is not just efficient in this case, but particularly suitable for adjudicating the claims of this large and readily defined putative class.

### 2. Class Members Share Common Questions Of Fact And Law.

Rule 23(a)(2) requires that questions of law or fact be common to the class. *See Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). To meet the commonality requirement, class member questions need not be identical; it is sufficient that there are common issues of fact or law that affect all members. *See Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 419 (S.D.N.Y. 2012) ("Here, at issue is a City-wide policy and its alleged failure to take into account the needs of disabled citizens. This issue is common to the putative class because it challenges acts and omission of the [City] that are not specific to any particular Plaintiff.") (internal quotations omitted); *see also Sykes v. Mel Harris & Assocs., LLC*, 285

---

[18] Nationwide, 26.6% of individuals with disabilities are living in poverty as compared to 10.9% of individuals without disabilities. *See* Erickson, W., Lee, C., von Schrader, S. (2017). Disability Statistics from the American Community Survey (ACS). Ithaca, NY: Cornell University Yang-Tan Institute (YTI). Retrieved from Cornell University Disability Statistics website: www.disabilitystatistics.org (select ACS topic "Poverty," search disability type "any disability" and year "2016").

F.R.D. 279, 286 (S.D.N.Y. 2012) ("The Rule does not require all questions of law or fact to be common. Indeed, even a single common question will suffice.").

Actions for injunctive relief, such as the present action, are particularly likely to involve the commonalities demanded under this standard. *See, e.g.*, *Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 57 (3d Cir. 1994) (noting that "because they do not also involve an individualized inquiry for the determination of damage awards, injunctive actions by their very nature often present common questions satisfying Rule 23(a)(2)") (internal quotations omitted); *People United for Children, Inc. v. City of New York*, No. 99 CIV. 0648 RJWKTD, 2003 WL 22056930, at *2 (S.D.N.Y. Sept. 3, 2003) ("[T]here is an assumption of commonality and typicality where plaintiffs seek certification of an injunctive class") (citing *Baby Neal*, 43 F.3d at 57); *see also* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1763, at 247 (3d ed. updated April 2017) ("[C]lass suits for injunctive or declaratory relief by their very nature often present common questions satisfying Rule 23(a)(2).").

Here, as in other public transportation cases alleging disability discrimination, the core legal issue pertains to the MTA's conduct:  the MTA's failure to construct elevators while altering the station in a manner that affects its usability. The claims revolve entirely around the MTA's actions, not Plaintiffs' individual circumstances. Moreover, all Plaintiffs seek and benefit from a common remedy. Because these violations equally and similarly impact all class members, the legal and factual questions they raise are best addressed in a single class action, rather than in a multitude of individual suits addressing an identical question. Accordingly, the putative class satisfies Rule 23(a)(2)'s commonality requirement.

    **3.**    <u>The Individual Plaintiffs' Claims Are Typical Of The Class.</u>

The putative class meets the typicality requirement if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3).

Since typicality overlaps with commonality, a finding of commonality usually supports a finding of typicality. *See M.G.*, 162 F. Supp. 3d at 240-41 (noting that commonality and typicality requirements typically "merge" into one another).

Courts have held that typicality is satisfied when "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Bloomberg*, 290 F.R.D. at 419. When the alleged unlawful conduct impacts both the named plaintiff and the class sought to be represented, the typicality requirement is still met. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405-06 (S.D.N.Y. 2015) ("Minor variations in the fact patterns underlying the individual claims do not preclude a finding of typicality.") (internal citations omitted). Instead, Rule 23(a)(3) requires "only that the disputed issues of law or fact occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other members of the proposed class." *Id.* at 406.

Here, both the Individual Plaintiffs and putative class members have disabilities that make the use of stairs difficult or impossible, and therefore are currently unable to use the Middletown Road subway station. Both the Individual Plaintiffs and putative class members would utilize the Middletown Road subway station if it were wheelchair-accessible for myriad transportation purposes: to commute to work, travel to other transit centers, attend community events, and accomplish a number of daily tasks. The Individual Plaintiffs and putative class members are both currently forced to seek out alternative and less effective forms of transportation, such as buses or paratransit, because they cannot utilize the Middletown Road station.

The Plaintiffs' claims also align with those of putative class members in that (1) both allege violations of the ADA, Section 504, and the NYCHRL; (2) both argue that the MTA was legally obligated to install elevators during the renovation of Middleton Road station; and (3)

both allege that the MTA has not made the accommodations legally required under the NYCHRL to allow persons with mobility disabilities the ability to utilize the services offered at the Middletown Road station. Thus, the Plaintiffs' claims and putative class member claims share identical legal theories, consistent with the typicality standards outlined by the Second Circuit.

Overall, because the Plaintiffs have experienced the same harm, advance the same legal theories, and seek the same declaratory and injunctive relief as all members of the class, the putative class satisfies the Rule 23(a)(3) typicality requirement.

> **4.** <u>The Plaintiffs And Proposed Class Counsel Will Adequately Represent The Interests Of The Putative Class.</u>

Rule 23(a)(4) requires representative plaintiffs and class counsel to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To determine if adequacy has been met, this Court examines two factors: whether "1) [plaintiffs'] interests are antagonistic to the interest of other members of the class and 2) [plaintiffs'] attorneys are qualified, experienced and able to conduct the litigation." *Bloomberg*, 290 F.R.D. at 419. "In order to defeat class certification, there must be a showing of a genuine conflict between the proposed class representative's interests and those of the other members of the class, and only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Stinson v. City of New York*, 282 F.R.D. 360, 371 (S.D.N.Y. 2012) (internal citations and quotations omitted). Absent evidence to the contrary, adequate representation is usually presumed. *See* Newberg on Class Actions § 3:55 (5th ed. updated Dec. 2017).

Here, Plaintiffs Hardy and Diaz are dedicated to protecting the interests of the class and achieving the common goal of all class members by requiring the MTA to make the Middletown Road station accessible to persons with mobility disabilities. Hardy Decl. ¶¶ 25-27; Diaz Decl. ¶¶ 21-23. Remedying the access problems that Mr. Hardy and Mr. Diaz presently face at the

Middletown Road station will benefit all putative class members, demonstrating the compatibility of the Plaintiffs' interests with the interests of the class as a whole.

The putative class representatives' decision to only seek system-wide injunctive relief further highlights their commitment to vindicating the rights of the class they seek to represent. Hardy Decl. ¶ 26; Diaz Decl. ¶ 22.The fundamental relief sought in this action, the construction of elevators at Middletown Road station in order to make the station usable by persons with mobility disabilities, is in the interest of both class representatives and the putative class as a whole, obviating any notion of conflict between the two.

Additionally, the Organizational Plaintiffs have a rich history of working to improve the lives of persons with disabilities, have expended significant time and resources responding to problems their constituents face as a result of inaccessible transportation, and are committed to the common goal of improving the accessibility of the New York City subway system, including the Middletown Road station. Eisenberg Decl. ¶¶ 4-5, 8; Prentiss Decl. ¶¶ 4, 6, 45-46.

The putative class counsel clearly meets the requirements of Rule 23(a)(4) as well. Disability Rights Advocates ("DRA") is a renowned not-for-profit law firm with extensive experience litigating class action lawsuits involving disability rights and have litigated disability rights cases since DRA's founding in 1993. Caiola Decl. ¶ 4. DRA has been certified as class counsel in numerous civil rights cases, and its systemic reform litigation, in areas such as public transportation, voting access, and emergency preparedness, has benefited countless persons with disabilities. Caiola Decl. ¶¶ 5-6. The qualifications, resources, and experience of the proposed class counsel are more than sufficient to satisfy the demands of Rule 23(a)(4). *See, e.g.*, *Bloomberg*, 290 F.R.D. at 419 (certifying DRA as class counsel in a case alleging systemic failures to address the needs of persons with disabilities during disaster and emergency preparedness planning); *Taxis for All Campaign v. New York City Taxi and Limo. Comm.*, No.

11-CV-0237 (S.D.N.Y. Sept. 29, 2015) (advising court of stipulation of settlement in case in which DRA represented a class of disabled individuals alleging the denial of meaningful access to the New York City taxicab system).

>    **5.**   Members Of The Putative Class Are Readily Ascertainable, Although This Implied Requirement Is Less Relevant To Rule 23(b)(2) Classes.

>    **a.**   **Ascertainability Is Not Germane To Rule 23(b)(2) Classes.**

Although the Second Circuit has recognized an implied condition of ascertainability in various cases, *see In re Petrobras Sec.*, 862 F.3d at 269, courts in the Second Circuit have stated that "it is not clear that the ascertainability requirement applies to Rule 23(b)(2) class actions, however, as notice is not obligatory and the relief sought is injunctive rather than compensatory." *Bloomberg*, 290 F.R.D. at 419 n.3. This is particularly so when a putative class, like the putative class here, seeks only injunctive relief. *Ligon v. City of New York*, 288 F.R.D. 72, 83 (S.D.N.Y. 2013) ("Rule 23 does not demand ascertainability. This implied requirement is a judicial creation meant to ensure that class definitions are workable when members of the class will be entitled to damages or require notice for another reason."); *see also In re Vitamin C Antitrust Litig.*, 279 F.R.D. 90, 116 (E.D.N.Y. 2012) ("The ascertainability requirement is less important in a Rule 23(b)(2) class, since a chief objective of this rule is to provide broad injunctive relief to 'large and amorphous' classes not capable of certification under Rule 23(b)(3)") (quoting *Marisol A.*, 126 F.3d at 378).

In another recent case certifying a broad class,[19] this Court explained why the ascertainability requirement does not comport with classes seeking injunctive relief, stating: "Drafters of the Rule specifically envisioned the use of (b)(2) classes 'in the civil-rights field

---

[19] The class in *Floyd* consisted of: "all persons who . . . have been, or in the future will be, subjected to the New York Police Department's policies and/or widespread customs or practices of stopping, or stopping and frisking, . . . including . . . on the basis of being Black or Latino." *Floyd*, 283 F.R.D. at 160.

where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.'" *Floyd*, 283 F.R.D at 171 (quoting Fed. R. Civ. P. 23 1966 Advisory Committee Note).

      **b.**    **The Class Is Ascertainable**

      The Second Circuit standard for ascertainability "is not demanding." *Gortat v. Capala Bros., Inc.*, No. 07-CV-3629, 2010 WL 1423018, at *2 (E.D.N.Y. 2010). It requires merely "that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Sec.*, 862 F.3d at 264.

      Here, members of the putative class are readily defined, both in terms of their disabilities and by their geographic scope, as individuals with mobility disabilities who would use the Middletown Road subway station if it were made accessible. Determining whether an individual has a mobility disability and whether an individual would utilize a subway station entails a straightforward, factual analysis based on objective criteria. Because mobility disabilities and subway usage are both objective inquires, this suit does not raise concerns that lead courts to conclude ascertainability cannot be met. *See Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 97 (S.D.N.Y. 2010) ("Where any criterion is subjective, e.g., state of mind, the class is not ascertainable." (quoting *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 209 F.R.D. 323, 337 (S.D.N.Y. 2002))). In addition, identifying putative class members will not require "numerous fact-intensive inquiries" by the court." *Bakalar v. Vavra*, 237 F.R.D. 59, 64 (S.D.N.Y. 2006) ("Class membership must be readily identifiable such that a court can determine who is in the class and bound by its ruling without engaging in numerous fact-intensive inquiries.").

      The facts in this case are comparable to the facts in *Bloomberg*, where the court found a class consisting of "all persons with disabilities in the City of New York who have been and are

being denied the benefits and advantages of New York City's emergency preparedness program" to be sufficiently ascertainable. *See Bloomberg*, 290 F.R.D at 419 n.3 ("Here, there is a clear enough delineation of the class for the Court to determine whether a particular individual is a member in this case."). As in *Bloomberg*, all putative class members have a disability and cannot utilize a service being offered by a public entity due to that disability. Accordingly, the Court here can readily determine whether an individual is a member of our putative class if the Court were to hold such a determination to be necessary at some point in time.[20]

      **6.**    <u>The Putative Class Satisfies The Conditions Of Rule 23(b)(2).</u>

     A class is certifiable under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). Class certification under Rule 23(b)(2) is especially appropriate when "litigants seek[] institutional reform in the form of injunctive relief." *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 692 (S.D.N.Y. 1996), *aff'd sub nom. Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997); *see also* 1966 Rules Advisory Committee Notes, 39 F.R.D. 69, 102 (1966). ("Indeed, [t]his subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature . . . is appropriate."). Class actions intended to vindicate members' civil rights exemplify these types of cases. *See Shepard v. Rhea*, No. 12-CV-7220 RLE, 2014 WL 5801415, at *6 (S.D.N.Y. Nov. 7, 2014) ("A plaintiff class seeking classwide structural relief that would clearly redound to the benefits of each class member is the paradigmatic Rule 23(b)(2) class

---

[20] Even where ascertainability is required, members need not be ascertained prior to class certification. *See Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 154 (S.D.N.Y. 2010) ("While class members need not actually be ascertained prior to certification, a court must determine that the class will be ascertainable at some stage of the proceedings.").

action.") (internal citations and quotations omitted); 1966 Rules Advisory Committee Notes, 39 F.R.D. at 102 ("Illustrative [of this subdivision] are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.").

The claims raised by this case mirror these conditions. Consistent with the requirement that Defendants' behavior be generally applicable to the class, the MTA's disregard of their legal obligation to make the Middletown Road station accessible during the station renovation entirely denies all putative class members station access, obviating the need for any individualized assessments in determining the extent of the MTA's liability. Further, Plaintiffs seek only injunctive and declaratory relief to remedy the exclusion of all putative class members from the Middletown Road station, requiring the MTA to make the station accessible for individuals with mobility disabilities. Because this relief would benefit all persons with mobility disabilities who would use this station if it were made accessible, Plaintiffs are definitively seeking to vindicate the rights of a numerous class of persons who have faced identical discrimination. *See, e.g.*, 1966 Rules Advisory Committee Notes, 39 F.R.D. at 102. Thus, certification of the putative class under Rule 23(b)(2) is proper.

**C.**     **The MTA's Challenge To The Plaintiffs' Standing Is An Inappropriate Argument Against Class Certification And Will Fail Because All Four Plaintiffs Have Established Facts Sufficient to Demonstrate Standing.**

While standing "is a threshold question—antecedent to class certification—that requires plaintiffs to have been personally injured," "plaintiffs are not required to prove injury-in-fact at the class certification stage." *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 287 F.R.D. 240, 244 (S.D.N.Y. 2012), *superseded on other grounds*, 290 F.R.D. 409 (S.D.N.Y. 2012) (internal citations and quotations omitted). Instead, at the class certification stage, "plaintiffs need only properly allege such an injury." *Id*.; *see also Denney v. Deutsche Bank AG*, 443 F.3d

253, 263 (2d Cir. 2006) ("For purposes of standing, we 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975))); *Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 146 (S.D.N.Y. 2014) ("There is no dispute that based on the factual allegations in the complaint, Berkowitz has Article III standing. Berkowitz need not make any further showing as to standing at this stage. . . . the Court does not—and indeed is prohibited from— evaluating the merits now.").

Sufficient evidence exists in the record to establish standing for all Plaintiffs. Plaintiffs have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotations omitted).

Mr. Diaz is a longtime Bronx resident, Diaz Decl. ¶ 2, who owns a MetroCard and regularly takes the subway system. Diaz Dep. 45:19-22, 55:05-57:17. Mr. Diaz is frequently deterred from taking the subway to the Middletown Road station and to other destinations in the Bronx because that area has so few accessible stations. Diaz Decl. ¶ 17. For example, in December 2017, Mr. Diaz traveled to the area around the station to a attend Social Security Disability Insurance doctor's appointment and assessment, but was unable to travel to the appointment via subway due to accessibility concerns. Diaz Decl. ¶ 15. Mr. Diaz is also seeking employment in the Bronx, making it likely that he will need to travel to areas served by the 6 Line, including near Middletown Road, in order to attend job interviews. Diaz Decl. ¶ 17. Because the 6 Line is so inaccessible, it is likely that Mr. Diaz will be deterred from using the subway to travel to interviews throughout the Bronx and will therefore suffer further harm due to the MTA's failure to install an elevator at the Middletown Road station.

Mr. Hardy has resided in the Bronx for the last fifteen years. Hardy Dep. 26:10-26:13. If the Middletown Road station were accessible it would be the most convenient accessible station for Mr. Hardy. Hardy Dep. 167:11-170:07. Mr. Hardy could utilize the Middletown Road station to travel to monthly DIA Board meetings, as DIA's headquarters is located right near the accessible 23rd Street station on the 6 Line and therefore would require no transfers. Hardy Decl. ¶ 5. However, because he cannot access the Middletown Road station, Mr. Hardy is forced to use Access-A-Ride, a less convenient form of transportation. Hardy Decl. ¶¶ 18-19. Mr. Hardy would utilize the Middletown Road station with his personal care attendant to catch a bus in order to travel to Co-Op City. Hardy Decl. ¶¶ 8, 24. However, because he cannot use the Middletown Road station, he continues to be harmed by the MTA's disregard for relevant civil rights laws during their renovation of that station.

Both DIA and BILS have expended resources advocating for increased public transportation accessibility, including at the Middletown Road station, Prentiss Decl. ¶ 40; Eisenberg Dep. 43:22-44:09, and therefore have suffered an injury in fact necessary to confer standing.[21] Additionally, because there are BILS constituents and DIA members who have mobility disabilities and are harmed by the inaccessibility of the Middletown Road station, Prentiss Dep. 139:17-140:03; Eisenberg Dep. 164:03-166:01, both of these organizations have associational standing to sue in their own right.[22] The facts provided above are offered

---

[21] *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 365 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide housing counseling and referral services—with a consequent drain on the organization's resources—there can be no question that the organization has suffered the requisite injury in fact.").

[22] *Bloomberg*, 290 F.R.D. at 416 ("As alleged in the complaint, [BCID] is a membership organization; its members include people with disabilities, who have standing in their own right …; the interests it seeks to protect are germane to its purpose, which is to provid[e] services and advocacy toward independent living for individuals with disabilities; and neither the claims asserted nor the relief requested require the participation of individual members, as the complaint seeks city-wide injunctive relief rather than damages. . . . [D]efendants' sole argument in the face of these allegations is that BCID has refused to

summarily because the question of standing is not the subject of this motion.[23] However, the

record is replete with further evidence establishing standing for all four Plaintiffs.

### V.        CONCLUSION

Accordingly, the Court should grant Plaintiffs' motion to certify the class, make the

Plaintiffs the class representatives, and appoint DRA as class counsel.


Dated:  February 28, 2018          Respectfully submitted,
        New York, New York

_____
Michelle Caiola (MC2110)
Rebecca Rodgers (RR1349)
Rebecca Serbin (RS0096)
DISABILITY RIGHTS ADVOCATES
675 Third Avenue, Suite 2216
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636
mcaiola@dralegal.org
rrodgers@dralegal.org
rserbin@dralegal.org

---

identify any of its members by name. Defendants have pointed to no cases suggesting that there is such a
requirement for purposes of establishing standing, however. At this stage, it is enough that BCID alleges
that it is a membership organization and that its members include people with disabilities.")
[23] Plaintiffs would request the opportunity to more fully brief the issue of standing if it would assist the
Court.