UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

BRONX INDEPENDENT LIVING
SERVICES, a nonprofit organization;
DISABLED IN ACTION OF
METROPOLITAN NEW YORK, a nonprofit
organization; ROBERT HARDY, an individual;
and RODOLFO DIAZ, an individual; on behalf
of themselves and all others similarly situated,

Plaintiffs,
-against-

METROPOLITAN TRANSPORTATION
AUTHORITY, a public benefit corporation;
THOMAS PRENDERGAST, in his official
capacity as chairman and chief executive officer
of the Metropolitan Transportation Authority;
NEW YORK CITY TRANSIT AUTHORITY, a
public benefit corporation; and VERONIQUE
HAKIM, in her official capacity as president of
the New York City Transit Authority;

Defendants.

No. 16-CV-5023 (ER)

UNITED STATES OF AMERICA,
Plaintiff-Intervenor,

-against-

METROPOLITAN TRANSPORTATION
AUTHORITY and NEW YORK CITY
TRANSIT AUTHORITY
Defendants.

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

I.      Introduction ................................................................................................. 1

II.     Statement of Relevant Facts ....................................................................... 5

III.    Legal Standard ............................................................................................ 8

IV.     Statutory And Regulatory Background ....................................................... 9

V.      Argument ................................................................................................... 11

        A.      Binding Interpretive Guidance Establishes That Replacing
                Stairways, As The MTA Did At Middletown Road Station, Alters
                A Station's Path Of Travel In Ways That Affect Usability. ................................ 12

        B.      The Federal Transit Administration Has Already Found That The
                MTA Altered The Path Of Travel At Middletown Road In Ways
                That Triggered The Accessible Alterations Rule .................................................... 15

        C.      Relevant Precedent Also Establishes That The MTA Altered
                Middletown Road's Path Of Travel In Ways That Triggered The
                Accessible Alterations Rule. ................................................................................ 15

                1.      In Establishing A Prima Facie Case That The MTA Made
                        Alterations To The Path Of Travel At Middletown Road,
                        Plaintiffs Have A Light Burden. ............................................................ 15

                2.      In Demolishing And Rebuilding Every Stairway, The MTA
                        Altered Middletown Road Station's Path Of Travel ............................... 16

                3.      The MTA's Alterations Of Middletown Road's Path Of
                        Travel Indisputably Affected The Usability Of That Path ....................... 20

VI.     Conclusion ................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................................................ 8

*Auer v. Robbins*,
   519 U.S. 452 (1997)............................................................................. 12, 14, 15, 21

*Bragdon v. Abbott*,
   524 U.S. 624 (1998)............................................................................................ 15

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000)............................................................................................ 12

*de la Rosa v. 597 Broadway Dev. Corp.*,
   No. 13CV7999 (LAK) (MHD), 2015 WL 7351540, (S.D.N.Y. Aug. 4, 2015),
   *report and recommendation adopted in part*,
   No. 13-CV-7999 (LAK), 2015 WL 7308661 (S.D.N.Y. Nov. 19, 2015).................... 18, 19, 20

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*,
   635 F.3d 87 (3d Cir. 2011) ................................................................... 17, 18, 19, 22

*Henrietta D. v. Bloomberg*,
   331 F.3d 261 (2d Cir. 2003) .................................................................................. 9

*Kinney v. Yerusalim*,
   9 F.3d 1067, 1073 (3d Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994)................... 22

*Lemmons v. Ace Hardware Corp.*,
   No. 12-CV-03936-JST, 2014 WL 3107842, (N.D. Cal. July 3, 2014)..................... 18

*Long Island Care at Home, Ltd. v. Coke*,
   551 U.S. 158 (2007)....................................................................................... 14, 15

*Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*,
   475 U.S. 574 (1986).............................................................................................. 9

*Roberts v. Royal Atl. Corp.*,
   542 F.3d 363 (2d Cir. 2008) ......................................................................... passim

*Rosa v. 600 Broadway Partners, LLC*,
   175 F. Supp. 3d 191 (S.D.N.Y. 2016) ............................................................... 18, 19

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944)............................................................................................ 15

**Statutes**

42 U.S.C. § 12101(b)(1) ............................................................................................ 9

42 U.S.C. § 12141 ..................................................................................................... 9

42 U.S.C. § 12146 ................................................................................................... 10

42 U.S.C. § 12147(a) ............................................................................. 2, 10, 11, 23

42 U.S.C. § 12147(b)(1) ......................................................................................... 10

42 U.S.C. § 12149 ............................................................................................... 9, 12

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 8

**Regulations**

28 C.F.R. § 36.402 .................................................................................................. 17

36 C.F.R. Part 1191, App. B ................................................................................... 16

49 C.F.R. Part 37 ...................................................................................................... 9

49 C.F.R. Part 37 App. D .......................................................................... 9, 10, 19

49 C.F.R. § 37.3 ...................................................................................... 16, 17, 19

49 C.F.R. § 37.9 ..................................................................................................... 16

49 C.F.R. § 37.9(a) ................................................................................................. 10

49 C.F.R. § 37.11(a) ............................................................................................... 12

49 C.F.R. § 37.15 ................................................................................................... 13

49 C.F.R. § 37.41(a) ............................................................................................... 10

49 C.F.R. § 37.43(a)(1) .................................................................................... passim

49 C.F.R. §37.43(a) ................................................................................................ 23

49 C.F.R. § 37.43(a)(2) ..................................................................................... 10, 11

49 C.F.R. 37, App. A .............................................................................................. 10

**Other Authorities**

Americans with Disabilities Act: Final Circular,
 80 Fed. Reg. at 60224 .................................................................................................. 13

Chicago Transit Authority, *All Stations Accessibility Program*,
 http://www.transitchicago.com/accessibility/asap.aspx. .......................................... 3

Chicago Transit Authority Rail ("L") System Map,
 https://www.transitchicago.com/assets/1/6/ctamap_Lsystem.pdf ............................. 3

Department of Justice Title III Technical Assistance Manual at III-6.1000................................ 21

Erickson, W., et al., Cornell University Yang Tan Institute on Employment and
 Disability, *2014 Disability Status Report: United States* (2016),
 http://www.disabilitystatistics.org/StatusReports/2014-PDF/2014-
 StatusReport_US.pdf ................................................................................................. 3

Federal Transit Administration, "Circular C 7410.1 – 'Americans With
 Disabilities Act (ADA): Guidance'" (November 4, 2015) ............................... passim

Final Rule, Nondiscrimination on the Basis of Disability by Public
 Accommodations and in Commercial Facilities,
 56 Fed.Reg. 35,544, 35,581 (July 26, 1991)............................................................ 21

H. Rep. No. 485(III), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990
 U.S.C.C.A.N. 445, 487 ................................................................... 2, 10, 20, 21

Massachusetts Bay Transportation Authority,
 https://cdn.mbtace.com/sites/default/files/maps/2018-04-map-rapid-transit-key-
 bus-v31a.pdf ............................................................................................................. 3

Metro System Map,
 https://www.wmata.com/schedules/maps/upload/2017-System-Map.pdf................ 3

New York City, *Mayor de Blasio Announces Total NYC Visitors Surpasses 60
 Million for First Time* (Dec. 19, 2016),
 http://www1.nyc.gov/office-of-the-mayor/news/963-16/mayor-de-blasio-total-
 nyc-visitors-surpasses-60-million-first-time............................................................. 3

S. Rep. No. 101-116, at 13 (1989) ..................................................................................... 9

Southeastern Pennsylvania Transportation Authority,
 http://www.septa.org/maps/transit/bsl.html, http://www.septa.org/service/mfl/ ...... 3

"The station renewal project at Middletown Road Station . . . includes 'alterations' to the path of travel [. . . and] the magnitude of the project constitutes an improvement to the overall usability of the station." -- Federal Transportation Administration Letter to New York City Transit Authority.

## I.  INTRODUCTION

Plaintiffs move for partial summary judgment because Defendants' recent renovation of the Middletown Road station—including the demolition and reconstruction of every existing stairway at the station—altered the station's path of travel in ways affecting usability, thereby triggering an obligation under the Americans with Disabilities Act ("ADA") to make that altered path "readily accessible" to the "maximum extent feasible." Defendants' dispute this obligation. This motion simply seeks a ruling that Defendants' renovation of the Middletown Road station triggered this legal requirement.[1]

The material facts  are not disputed, and interpretive guidance from both the Federal Transit Administration (FTA) and the Department of Transportation (DOT) is clear that transit agencies making stairway renovations of this sort must install elevators, ramps, or other "level-change" mechanisms unless it is technically infeasible to do so. Indeed, the FTA has already found that this obligation was triggered by the work done at Middletown Road.

In October 2013, the Metropolitan Transit Authority (MTA) and its subsidiary the New York City Transit Authority (NYCT) (collectively "Defendants" or the "MTA") began a massive project to renovate Middletown Road station in the Bronx, on the 6 Line.[2] This project altered and improved almost every part of the station, and cost $26.6 million. Many portions of the station  were completely demolished and rebuilt, including each of the stairway structures that provided the only path of travel between the street, the station mezzanine, and the platform.

---

[1] Whether it was feasible to make that path of travel readily accessible is not at issue in this motion.

[2] The 6 Line runs from Pelham Bay Park in the Bronx to City Hall in Manhattan.

When Middletown Road reopened seven months later, it was much more usable for most of the MTA's riders. However, it was still completely unusable for people with disabilities who could not climb or descend its stairs. [3,4]

By demolishing and rebuilding the existing path of travel between the street, mezzanine, and platform on both the northbound and southbound sides of Middletown Road without installing an elevator, the MTA guaranteed that very large numbers of people with disabilities would be barred from using the station for decades to come. The MTA thus perpetuated the extreme inaccessibility of what is already the most inaccessible subway system in America.

The MTA's construction triggered the "Accessible Alterations Rule" under the ADA and its implementing regulations, which requires that:

> When a public entity alters an existing facility or part of an existing facility . . . in a way that affects or could affect the usability of the facility or part of the facility, the entity shall make the alterations (or ensure that the alterations are made) in such a manner, to the maximum extent feasible, that the altered portions of the facility are *readily accessible to and usable by* individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations. [5]

49 C.F.R. § 37.43(a)(1) (emphasis added); *see also* 42 U.S.C. § 12147(a).

By extensively renovating Middletown Road and demolishing and rebuilding all of its existing stairways, Defendants altered that facility's path of travel and affected its usability.

---

[3] This group encompasses not only people who use wheelchairs, walkers, scooters, and other mobility devices, but also those who have heart or lung conditions, arthritis, or a host of other disabilities that make travel by stairs difficult, dangerous, or impossible.

[4] This continued exclusion is especially egregious because, as the New York City Department of Transportation has noted, the area surrounding Middletown station is "served by bus routes with especially high ridership by seniors and people with disabilities." Declaration of Michelle Caiola ("Caiola Decl."), Ex. A, Letter from Will Carry to Marc Albrecht (Mar. 10, 2014), D013305.

[5] This obligation is rooted in two key legislative observations. First, the ADA is "geared to the future— the goal being that, over time, access will be the rule rather than the exception." H. Rep. No. 485(III), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 487.  Second, that "[i]t simply makes no sense to alter premises in a manner that does not consider access." *Id.*

2

There is no factual dispute regarding the scope of the construction.  Thus the Accessible

Alterations Rule applies.  Indeed, the Federal Transit Administration has already conducted a

thorough review of the work done at Middletown Road, and made this exact determination.

### People Served By The 6 Line Have A Critical Need For Accessible Stations

The subway is a lifeline for both New Yorkers and visitors. It is a cost-effective and

quick way to reach work, school, medical care, and every other aspect of community life.

However, the MTA has failed to make this lifeline available to people who cannot use stairs, thus

making their daily lives dramatically more difficult. Of the 472 New York City stations, only

112 (24%) are accessible. This makes New York City's subway system the least accessible in

any major U.S. city, by far.[6,7]

---

[6] By contrast, the system in Washington, D.C. is 100% accessible, *see* Metro System Map, https://www.wmata.com/schedules/maps/upload/2017-System-Map.pdf; as are 74% of stations in Boston, *see* Massachusetts Bay Transportation Authority, https://cdn.mbtace.com/sites/default/files/maps/2018-04-map-rapid-transit-key-bus-v31a.pdf; and 68% of stations in Philadelphia, *see* Southeastern Pennsylvania Transportation Authority, http://www.septa.org/maps/transit/bsl.html, http://www.septa.org/service/mfl/. Similarly, Chicago's subway system—the country's second oldest and fourth largest—is already 67% accessible, *see* Chicago Transit Authority Rail ("L") System Map, https://www.transitchicago.com/assets/1/6/ctamap_Lsystem.pdf. Moreover, the Chicago Transit Authority has a plan to make *every* station in the city accessible within the next 20 years. Chicago Transit Authority, *All Stations Accessibility Program*, http://www.transitchicago.com/accessibility/asap.aspx. Defendants have no such plan for New York City's subways.

[7] The inaccessibility of New York City's subway system excludes huge numbers of people: roughly 7% of the United States population reports having a disability that makes walking or climbing stairs seriously difficult or impossible. *See* Erickson, W., et al., Cornell University Yang Tan Institute on Employment and Disability, *2014 Disability Status Report: United States* (2016) at 3,5, http://www.disabilitystatistics.org/StatusReports/2014-PDF/2014-StatusReport_US.pdf. Well over half a million such individuals reside within New York City, and nearly 116,000 live in the Bronx. *See* Pls.' Mot. for Class Cert., ECF No 52 at 12-13. Applying the 7% nationwide mobility disability prevalence rate to New York City's 60 million annual visitors, several million more people with such disabilities visit the City each year for work and leisure. *See* New York City, *Mayor de Blasio Announces Total NYC Visitors Surpasses 60 Million for First Time* (Dec. 19, 2016), http://www1.nyc.gov/office-of-the-mayor/news/963-16/mayor-de-blasio-total-nyc-visitors-surpasses-60-million-first-time.

The subway is even less accessible in the Bronx, where large numbers of the City's disabled, elderly, minority, and low-income residents reside. Of the Bronx's 68 subway stations, only 11 (16%) can be used by people with mobility disabilities.

The section of the 6 Line in the Bronx is worse still. Of the 18 Bronx stations along this line, only 2 (11%) are accessible. In the approximately 110 blocks between these two stations (containing 10 subway stops) people with disabilities have no way of entering or leaving a 6 Line station.



Thus, the 6 Line in the Bronx is a segregated system, completely unavailable to tens of thousands of potential users. And yet, for the people that live along the Bronx's eastern and southern edge—many of whom are elderly, disabled, or low-income—this unusable subway line is often the only one within walking distance. If Defendants had installed elevators at Middletown Road, the station could have become a key access point in this otherwise inaccessible part of the subway system. By failing to do so, the MTA instead ensured the 6 Line's continued inaccessibility, greatly reducing residents' access to jobs, hospitals,

schools, shopping, government services, and cultural activities, and deterring people with disabilities from traveling to this part of the Bronx.[8]

The MTA's Middletown Road renovations were not an isolated event. As many as 54 stations had "upcoming stair work" as of 2012, and it is reported that many more stations are scheduled to undergo similar renovations in the coming years.[9] A clear decision from this Court will provide guidance to the MTA regarding its obligations under the Accessible Alterations Rule, at Middletown Road and elsewhere, and will help ensure that people with disabilities are not continually excluded from the City's subway stations long into the future, even as the agency spends millions of dollars on improvements for everyone else.

Therefore, Plaintiffs respectfully request that the Court grant their motion for partial summary judgment, and find that the MTA's recent and extensive Middletown Road renovations altered the station's path of travel and usability in ways that triggered the Accessible Alterations Rule. This motion concerns only this important threshold question, and does not ask the Court to make a final determination regarding liability, or what an appropriate remedy would be.

## II.  STATEMENT OF RELEVANT FACTS

New York City's subway system—which is constructed, maintained, and operated by Defendants MTA and NYCT—connects millions of people each day to jobs, schools, parks, shops, cultural events, and everything else that the City has to offer. It is the largest and most heavily-used in the United States. It is also the least accessible.

---

[8] This inaccessibility also harms vast numbers of subway users *without* disabilities, such as parents with strollers, tourists and travelers with luggage, shoppers with heavy bags, and many others. Thus, the continued inaccessibility of the City's subway stations has a profound negative impact on commerce and quality of life citywide.

[9] *See* Caiola Decl., Ex. B, D005810-14 (listing 54 stations with "upcoming stair work").

Middletown Road, near the northeast end of the 6 Line in the Bronx, is one of the MTA's elevated stations—its two-level mezzanine and platform structure sits atop the road for which it is named—and to board a train at this location passengers must climb one of two stairways from the street up to the mezzanine (where tickets are sold), and then climb another set of stairs from the mezzanine to either train platform. (Pls.' Statement of Undisputed Facts (hereinafter "SOF") ¶¶ 1-3.) To reach the street after disembarking, passengers must follow this route in reverse. (*Id.*)

In October 2013, Defendants began a $26.6 million project to renovate this station. *See* SOF ¶¶ 4. Middletown Road was selected for this work as the result of Defendants' periodic station condition assessments, which found that several parts of the station—including its stairways—had deteriorated. SOF ¶¶ 6-7.

According to these assessments, Middletown Road's pre-renovation street-to-mezzanine stairs had corroded structural steel "stringers," corroded landing support steel, and at least one spalled concrete support column. SOF ¶ 13. The wooden stairs themselves were "decayed and cracked," and by 2012, many of the steel treads sitting atop them were also cracked or loose. *Id.* In addition, the wood-and-steel canopies that shielded these stairs from the elements were found to be decayed, rusted, and leaking. *Id.*

Middletown Road's pre-renovation mezzanine-to-platform stairs were in even worse condition. SOF ¶¶ 12, 14-16. One had cracked risers, loose treads, cracked concrete support structures, and "heavily corroded" stringers with "up to 100% section loss" (meaning that, in some places, the stringer was rusted through). SOF ¶ 14.  Another had cracked risers, loose treads, and a heavily corroded guardrail support that was so rusted it had "no connection" with the steel structure below. SOF ¶ 15.  A third had a "cracked and spalled" concrete support curb with "exposed rusted reinforcement," stringers that were "heavily corroded with several small

6

holes and a crack near the top landing," a loose guardrail post, loose treads, and cracked risers. SOF ¶ 16. A fourth was not assessed in 2012, but had cracked curbs, rusted steel beams, "decayed and cracked" wooden stairs, and loose steal treads when it was inspected in 2008. SOF ¶ 12.

     As part of the MTA's Middletown Road station renovation project, Defendants completely destroyed and rebuilt each of these existing stairways, along with any attendant canopies and railings. SOF ¶ 17. In doing so, Defendants brought them into a state of "good repair," and made them safer for passengers to use. SOF ¶ 18.

     In addition, Defendants repaired "corroded steel throughout the station;" replaced the mezzanine floors, walls, and roof; resurfaced the mezzanine platform; reconstructed the platform edges; replaced the roof and gutters of the platform canopies; performed extensive renovations on the "track through-span" over which trains run; and installed new artwork and lighting throughout the station. SOF ¶ 8. Some of these renovations involved modification or replacement of the station's load-bearing structures. SOF ¶ 9.

     Middletown Road station was closed for approximately seven months as a result of this work. SOF ¶ 5. However, despite MTA's extensive and costly renovations, the station's reconstructed stairways remain the only path to or from the platform, and thus, people whose disabilities prevent them from using stairs still cannot enter or leave the station. SOF ¶¶ 1-3.

     After a "thorough review" of the work at Middletown Road station and "consultation with the relevant parties," the Federal Transit Authority (FTA) found that the modifications made as part of the MTA's Middletown Road station renewal project "such as repairing structural steel, replacing floors and walls, and replacing street and platform stairs at the station" constituted "'alterations' to the path of the travel, such that [the agency] was required to make the station accessible to the maximum extent feasible, regardless of the cost of doing so." SOF ¶ 19. The FTA

also found that "the magnitude of the [station renewal] project constitute[d] an improvement to the overall usability of this station." SOF ¶ 20. This finding is consistent with formal guidance from both the Federal Transit Administration (FTA) and the Department of Transportation (DOT). *See* § V(A), *below*; *see also* SOF ¶¶ 21-22.

Notably, when planning the Middletown Road project, the MTA did not seriously explore ways of making the station's path of travel "readily accessible" to the "maximum extent feasible" (through the installation of a lift, elevator, or other accessible means of vertical access), as the ADA's Accessible Alterations Rule requires. Indeed, from the time it first began developing a plan for the renovation of Middletown Road in 2003, the MTA has been clear that "no elevators [would] be provided at this station." Caiola Decl., Ex. C, D000193. In fact, Defendants did not even perform an *initial* analysis of the feasibility of installing elevators at Middletown Road until April of 2013, a mere six months before construction began.[10] Caiola Decl., Ex. N, D000006. Between 2003 and April of 2013—a period that encompassed virtually the entire planning process—Defendants made only what they describe as a "very crude" "guesstimate" regarding whether elevators could feasibly be installed at Middletown Road. Caiola Decl., Ex. G, 70:10-78:16.

### III.   LEGAL STANDARD

A moving party is entitled to summary judgment if they show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to an issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish a genuine dispute sufficient to warrant trial, the

---

[10] The contract to renovate Middletown Road station was awarded only a month after this initial study, in May of 2013. Caiola Decl., Ex. M, D064790.

nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party must set forth "specific facts showing there is a genuine issue for trial." *Id.* at 587.

## IV.    STATUTORY AND REGULATORY BACKGROUND

The Americans with Disabilities Act ("ADA") was intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Courts construe the language of the ADA broadly to advance this remedial purpose. *See, e.g.*, *Henrietta D. v. Bloomberg*, 331 F.3d 261, 279 (2d Cir. 2003).

Title II of the ADA ("Title II") prohibits discrimination in the benefits, services, programs, and activities of public entities, and Part B of this title applies specifically to discrimination in public transportation. *See* 42 U.S.C. §§ 12141-12165 (Title II, Part B). Part B's broad statutory provisions are supplemented by the Department of Transportation's ("DOT") implementing regulations, and by accompanying guidance. *See* 42 U.S.C. § 12149 (authority to issue regulations); 49 C.F.R. Part 37 (DOT regulations); 49 C.F.R. Part 37, App. D (appendix explaining the DOT's construction and interpretation of provisions of 49 C.F.R. Part 37).

In enacting the ADA, Congress recognized that accessible public transportation was "the linchpin which enables people with disabilities to be integrated and mainstreamed into society." S. Rep. No. 101-116, at 13 (1989).  In other words, accessible transit is in many ways a prerequisite to every other right that the ADA seeks to guarantee.

For this reason, the ADA contains several provisions aimed at increasing the accessibility of public transit stations and systems, over time.[11,12] First, newly-constructed public transit facilities must be made "readily accessible to and usable by" people with disabilities, as must a transit system's designated "key stations." 42 U.S.C. § 12146 (accessibility of new stations); 49 C.F.R. § 37.41(a) (same); 42 U.S.C. § 12147(b)(1) (accessibility of "key stations"); 49 C.F.R. §§ 37.47, *et seq.* (same). Second, where a public entity alters an existing transit facility in a way that "affects or could affect the usability of or access to an area of the facility containing a primary function," the path of travel, bathrooms, telephones, and drinking fountains serving the altered area must be made readily accessible as well, provided that the cost of doing so is not disproportionate to the cost and scope of the overall alteration. 42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(2). Third, where an entity alters all or part of an existing transit facility in ways that "affect or could affect the usability of the facility or part thereof," it must ensure that *the altered portion itself* is "readily accessible to and usable by individuals with disabilities" to the "maximum extent feasible."[13] 42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(1).

---

[11] To be considered "readily accessible to and usable by individuals with disabilities" under any of the following provisions, a transportation facility must meet *both* the requirements of the Department of Transportation's implementing regulations, 49 C.F.R. Part 37, and the technical scoping requirements of the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"), as modified by the Department of Transportation (hereinafter, the "DOT Standards"). *See* 49 C.F.R. § 37.9(a); *see also* 49 C.F.R. 37, App. A (DOT modifications to ADAAG).

[12] The ADA was drafted to require only "modest expenditures to provide access in existing facilities, while requiring all new construction to be accessible." H. Rep. No. 485(III), 101st Cong., 2d Sess. at 63 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 487. However, Congress was clear that "[t]he rationale for making new construction accessible applie[d] with equal force to alterations" because the provisions governing alterations applied only "to situations where the [. . .] facility itself has chosen to alter the premises." *Id.*

[13] The phrase "maximum extent feasible" means that "all changes that are possible must be made," and is intended to provide exception only for "the occasional case in which the nature of an existing facility" makes full accessibility "virtually impossible." 49 C.F.R. Part 37, App. D; *see also Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 372 (2d Cir. 2008) (describing defendant's burden, in establishing infeasability). A courts' feasibility inquiry is "backward-looking," and asks whether an entity made "maximally feasible

This motion concerns only the last of these provisions – the requirement to ensure that altered areas themselves are readily accessible, to the maximum extent feasible. This obligation is referred to as the ADA's "Accessible Alteration Rule."

Unlike the "primary function" provisions at 42 U.S.C. § 12147(a) and 49 C.F.R. § 37.43(a)(2), which take disproportionate costs into account, the ADA's Accessible Alterations Rule does "not ask the court to make a judgment involving costs and benefits." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 371 (2d Cir. 2008) (considering analogous provision in Title III of the ADA, which prohibits discrimination in public accommodations). Rather, it requires entities to make altered areas "accessible even if the cost of doing so—financial or otherwise—is high." *Id.*

## V.  ARGUMENT

When a public entity such as the MTA alters all or part of an existing transit facility in ways that "affect or could affect the usability of the facility or part thereof," it must ensure that those alterations are made in compliance with the Accessible Alterations Rule.  42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(1). Failure to do so constitutes discrimination under both Title II of the ADA, and section 504 of the Rehabilitation Act of 1973. 42 U.S.C. § 12147(a); *see also* 49 C.F.R. § 37.43(a)(1).

There can be no genuine dispute that, in demolishing and rebuilding the existing stairways, railings, and canopies at Middletown Road station during its station renewal project, the MTA altered portions of that facility (specifically, all of the vertical portions of its path of travel) in ways that affected their usability, thereby triggering the Accessible Alterations Rule. *See* 42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(1). Indeed, formal guidance from both the Federal Transit Authority (FTA) and the Department of Transportation (DOT) states that

---

efforts to achieve the requisite level of accessibility" "*at the time*" that renovations were being made. *Roberts*, 542 F.3d at 375 (emphasis added).

stairway replacement will always be an alteration affecting usability, and the FTA has already

found that the MTA's Middletown Road project altered the station's path of travel in ways that

triggered the Accessible Alterations Rule. Thus, Plaintiffs respectfully request that the Court

grant their motion for summary judgment on this point.

A.     **Binding Interpretive Guidance Establishes That Replacing Stairways, As The MTA Did At Middletown Road Station, Alters A Station's Path Of Travel In Ways That Affect Usability.**

The DOT, and its subsidiary agency the FTA, are the federal entities charged with

implementing and enforcing the transit related provisions of Title II. *See* 42 U.S.C. § 12149

(implementation); 49 C.F.R. § 37.11(a) (enforcement).[14]  As such, their "fair and considered"

interpretation of any ambiguity in the ADA's Accessible Alterations rule is "controlling unless

plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461

(1997); *id.* at 463; *Christensen v. Harris Cty.*, 529 U.S. 576, 588 (2000) (*Auer* deference

warranted only when the language of the regulation is ambiguous").

The DOT and FTA's formal interpretive guidance on the Accessible Alterations Rule—

contained in FTA Circular C 4710.1—is clear that "when a transit agency undertakes a station

renovation project that includes *replacing the staircases leading to and from the station platform*,

resurfacing concrete staircases, replacing a significant number of stair treads or risers, or

replacing an escalator, the end result must be an accessible station entrance[,] unless an analysis

of site-specific conditions demonstrates that it is technically infeasible." Federal Transit

Administration, "Circular C 7410.1 – 'Americans With Disabilities Act (ADA): Guidance'"

(November 4, 2015) at § 3.4.3 (emphasis added).  This guidance is also clear that in such

---

[14] This enforcement scheme is explained in more detail in an August 2005 joint memorandum promulgated by the DOT and the DOJ, which is available at https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/DOJ_FTA_ADA_MOU_0.pdf.

instances "the path of travel itself" is "the area that is undergoing alterations," and that "in most cases," making that path readily accessible "will involve the installation of elevators." *Id.*

Circular C 4710.1 clarifies how the Accessible Alterations Rule applies to renovations affecting a station's path of travel. Furthermore, this clarification is neither plainly erroneous, nor plainly inconsistent with the Accessible Alterations Rule. *Compare* 49 C.F.R. § 37.43(a)(1) *with* FTA Circular C 7410.1 § 3.4.3.  Rather, it represents the DOT and FTA's recognition of two truths. First, it recognizes that replacing or otherwise extensively renovating a stairway or escalator will always be an alteration affecting usability.[15] Second, it recognizes that when an entity alters the stairs or escalators that provide the only path between the levels of a transit facility, it is altering the path of travel itself.

The interpretations and guidance contained in FTA Circular C 4710.1 are the official position of the DOT. *See* 49 C.F.R. § 37.15 (describing how official guidance is designated); FTA Circular C 7410.1 at 1 (designating as official, under heading "49 CFR §37.15 REVIEW"). The circular was developed following an extensive notice and comment process, in full coordination with the Department of Transportation, and in consultation with both the Department of Justice and the United States Architectural and Transportation Barriers Compliance Board. *See* Americans with Disabilities Act: Final Circular, 80 Fed. Reg. at 60224-25. In issuing the circular, the FTA was clear that it established no new requirements. *Id.* at 60225. It merely represented the "current regulations, guidance, and policy positions of DOT and FTA." *Id.* Indeed, the FTA was already enforcing the Accessible Alterations Rule according to

---

[15] In § 3.4.2 of Circular C 4710.1, the FTA clarified that that "a facility or part of a facility does not have to be 'unusable' for [a subsequent] alteration to affect usability," and that even "resurfacing a platform or a stairway are alterations that make the platform or stairway safer and easier to use." Circular C 4710.1 at § 3.4.2.

the above-described interpretations in 2011, well before Circular C 4710.1 was issued. *See id.* at 60230 (describing past FTA finding of non-compliance where transit agency replaced stairs but failed to consider the feasibility of making path accessible).

Accordingly, there can be no doubt that the interpretations in Circular C 4710.1—including those regarding the effect stairway replacement has upon a station's path of travel, and the Accessible Alterations Rule obligations that attach as a result—represent the FTA and DOT's "fair and considered judgment" on the scope and application of their own implementing regulations. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 171 (2007) (deferring to agency interpretation, where agency's "course of action indicates that the interpretation . . . reflects its considered views"); *Auer*, 519 U.S. at 462 (same).  Such "fair and considered" interpretations are controlling upon this Court. *Auer*, 519 U.S. at 461-62.

Moreover, the FTA's circular is consistent with interpretive guidance from the DOT. In May 2016, the DOT's Office of General Counsel issued a formal Legal Opinion in response to New York City Transit (NYCT)'s assertion that it was "not required to install an elevator when it replaces staircases with new staircases." SOF ¶ 21. In this document, the DOT soundly rejected NYCT's position, finding that such staircase replacement would always be "an 'alteration' that 'affects or could affect . . . usability,'" thus triggering the obligation to install an "accessible means of vertical access" whenever it is feasible to do so.  SOF ¶ 22. As an articulation of the DOT's "fair and considered judgment" on the scope and application of the Accessible Alterations Rule, this Legal Opinion is also controlling upon this Court. *See Auer*, 519 U.S. at 462 (deferring to implementing agency interpretation articulated in amicus brief); *Long Island Care at Home, Ltd.*, 551 U.S. 158 at 171 (deferring to implementing agency interpretation articulated in internal "Advisory Memorandum").

14

**B.**    **The Federal Transit Administration Has Already Found That The MTA Altered The Path Of Travel At Middletown Road In Ways That Triggered The Accessible Alterations Rule.**

In a July 8, 2014 letter to Defendants, the FTA found (after a "thorough review and "consultation with the relevant parties") that "repairing structural steel, replacing floors and walls, and replacing street and platform stairs at the station" constituted "'alterations' to the path of the travel, such that MTA was "required to *make the station accessible* to the maximum extent feasible, regardless of the cost of doing so." SOF ¶ 19 (emphasis added). The FTA also found that the magnitude of the [station renewal] project constitute[d] an improvement to the overall usability of this station." *Id.*

As a well-reasoned conclusion that is fully consistent with the DOT and FTA interpretations described above, this finding is also controlling under *Auer. See Auer*, 519 U.S. at 462; *Long Island Care*, 551 U.S. at 171. In addition, these "well-reasoned views" represent "a body of experience and informed judgment" to which this Court "may properly resort for guidance" *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998) (quoting *Skidmore v. Swift & Co*., 323 U.S. 134, 139–140 (1944)). In doing so, this Court should find, as the FTA has already done, that the demolition and reconstruction of Middletown Road station's existing stairways was an alteration affecting the usability of the station's path of travel (specifically, the vertical portions of that path), which triggered the Accessible Alterations Rule.

**C.**    **Relevant Precedent Also Establishes That The MTA Altered Middletown Road's Path Of Travel In Ways That Triggered The Accessible Alterations Rule.**

   1.    In Establishing A Prima Facie Case That The MTA Made Alterations To The Path Of Travel At Middletown Road, Plaintiffs Have A Light Burden.

To state a prima facie case that an alteration has occurred, a plaintiff need only identify "a modification to a facility" and make a "facially plausible demonstration that the modification

15

is an alteration under the ADA."[16] *Roberts*, 542 F.3d at 371. "The defendant then bears the burden of persuasion to establish that the modification is in fact not an alteration." *Id.*  The MTA cannot meet this burden.

2.   In Demolishing And Rebuilding Every Stairway, The MTA Altered Middletown Road Station's Path Of Travel.

Under DOT regulations implementing Title II of the ADA, alterations to existing transit facilities include, but are not limited to, "remodeling, renovation, rehabilitation, reconstruction . . . changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions." 49 C.F.R. § 37.3. "[R]esurfacing of circulation paths" is also an alteration. *See* 36 C.F.R. Part 1191, App. B (ADAAG) at § 106.5 (defining "alteration" and "circulation path"); 49 C.F.R. § 37.9 (adopting ADAAG).

There is no dispute that the vast majority of the changes made to Middletown Road station as part of the MTA's project—including demolishing and rebuilding stairways; repairing corroded steel throughout the station; replacing the mezzanine floors, walls, and roof; resurfacing the mezzanine platform; reconstructing the platform edges; replacing the roof and gutters of the platform canopies; and renovating the "track through-span" over which trains run—fall squarely within this definition of "alterations". *See* SOF ¶¶ 8-9, 17; *see also* 49 C.F.R. § 37.3.

There can also be no genuine dispute that, in reconstructing all of Middletown Road station's existing stairways, MTA altered the stations' path of travel.

---

[16] In determining whether a modification is an alteration, courts may (but need not) consider several factors, including: "1. The overall cost of the modification relative to the size (physical and financial) of the facility or relevant part thereof. 2. The scope of the modification (including what portion of the facility or relevant part thereof was modified. 3. The reason for the modification (including whether the goal is maintenance or improvement, and whether it is to change the purpose or function of the facility. 4. Whether the modification affects only the facility's surfaces or also structural attachments and fixtures that are part of the realty." *Roberts*, 542 F.3d at 370. This list is of factors is non-exhaustive, and other considerations may be relevant. *See id.* at 370 n.5.

This is confirmed by case law. For example, in *Roberts*, the Second Circuit found that kitchen and bathroom renovations in a condominium complex were alterations affecting usability within the meaning of analogous DOJ regulations.[17] *Roberts*, 542 F.3d at 374.

The Third Circuit has also found that the demolition and replacement of stairs at the entrance to one of Philadelphia's "SEPTA" subway stations, and the replacement of an escalators' internal mechanisms in another, were alterations within the meaning of DOT regulations, even where no modifications had been made to the stations' load-bearing structures. *See Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 635 F.3d 87, 90-91 (3d Cir. 2011) (work performed); *id.* at 94 (finding that work constituted "alterations"). In coming to this conclusion, the Third Circuit observed that the "*complete replacement of a stairway* or total overhaul of an escalator *should . . . be considered 'remodeling, renovation, rehabilitation [or] reconstruction' in the ordinary sense of those words*"—that is, that such work was an "alteration" by the plain language of the DOT's definition. *See id.* at 93 (emphasis added).

Because neither of these SEPTA station entrances had been "readily accessible" when they were altered, the Third Circuit further found that the transit agency "violated Title II of the ADA . . . by not making those portions of its facilities [readily] accessible when it undertook to make alterations at those locations." *Id.* at 97.  In other words, by altering the vertical elements of its paths of travel (the stairs and escalators), the transit agency triggered an obligation to

---

[17] Because *Roberts* concerned the accessibility of a public accommodation brought under Title III of the ADA, the court looked to DOJ regulations, rather than the DOT regulations applicable here. *See id.* However, since the language of these regulatory provisions is substantially identical, *Roberts* and other cases interpreting Title III's alteration provisions are relevant to the present case. *Compare* 28 C.F.R. § 36.402 (DOJ provisions) *with* 49 C.F.R. § 37.3; 49 C.F.R. § 37.43(a)(1) (DOT provisions).

ensure that those entire *portions* of its facilities—the paths between street and station—were readily accessible to the maximum extent feasible. [18]   *See id.*

The renovations made at Middletown Road station are similar to those at issue in the *SEPTA* case, and are the sort of work that courts have found to be alterations. *See*, *e.g*., *de la Rosa v. 597 Broadway Dev. Corp.*, No. 13CV7999 (LAK) (MHD), 2015 WL 7351540, at *10 (S.D.N.Y. Aug. 4, 2015), *report and recommendation adopted in part,* No. 13-CV-7999 (LAK), 2015 WL 7308661 (S.D.N.Y. Nov. 19, 2015) (closure of pre-existing wall-openings between two units was an alteration); *see also Rosa v. 600 Broadway Partners, LLC*, 175 F. Supp. 3d 191, 207 (S.D.N.Y. 2016) (renovations involving stairs and other elements were alterations because they "involved much more than mere maintenance, and went far beyond the building's surface"); *Lemmons v. Ace Hardware Corp.*, No. 12-CV-03936-JST, 2014 WL 3107842, at *8 (N.D. Cal. July 3, 2014) (citing *Roberts*, and finding that seismic retrofit  was an alteration affecting the usability of an existing store).

Nearly all of the work done as part of the Middletown Road station project, including demolishing and replacing the stations' stairs, is an alteration according to this precedent. *See, e.g.*, *Disabled in Action*, 635 F.3d at 93 (finding that the "complete replacement of a stairway or total overhaul of an escalator should" be considered an alteration under the plain language of 49

---

[18] The court found that the transit agency could be required to install an elevator at one of these locations, even though doing so would not ultimately provide people with disabilities with access to the platform (because, while the vertical path from entrance to mezzanine had been altered by the reconstruction of that stairway, the path from mezzanine to platform had not). *See id*. at 97 n.14. In so doing, the Third Circuit affirmed the district court's finding that the ADA is an "incremental statute," and that an elevator could be required as a result of a stairway reconstruction even if it would not result in immediate and full accessibility. *See id.*  As the district court reasoned, when SEPTA *did* eventually alter its mezzanine to platform path and install an elevator there as well, people with disabilities would "find an accessible exit waiting for them at the mezzanine level." *Id.*

C.F.R. § 37.3); *see also Roberts*, 542 F.3d at 374 (comprehensive bathroom and kitchen renovations were alterations).

    This work plainly amounted to "much more than mere maintenance," and went "far beyond the [station's] surface." *See 600 Broadway*, 175 F. Supp. 3d at 207. It also indisputably affected almost every part of the Middletown, and cost a significant sum—over $26.6 million. SOF ¶ 4.  The structural nature, cost, and sheer scope of this work all weigh in favor of a finding that the Middletown project altered many portions of the station. *See Roberts*, 542 F.3d at 370 (listing optional factors to consider).

    Moreover, it is indisputable that the station's path of travel was among the areas altered. As another court in this district has observed, the "regulatory language and intent" of the ADA "dictate that [courts] view the term 'altered portions' in a functional manner." *597 Broadway*, 2015 WL 7351540 at *11; *see also* Federal Transit Administration Circular C 7410.1 at § 3.4.3 (stairway replacement alters path of travel); 49 C.F.R. Part 37 App. D (§ 37.43) (obligation to make alterations accessible applies to the entire altered *area*). Here, the MTA completely demolished and rebuilt each of Middletown's stairways, along with their roofs and railings. SOF ¶ 17. Together, these stairways—which function to take nondisabled passengers from street, to mezzanine, to platform, and back—comprise the station's entire vertical path of travel. SOF ¶¶ 1-3.

    Thus, this Court should find that Middletown Road's entire path of travel was altered during the MTA's renovations.  *See Disabled in Action*, 635 F.3d at 97 (reconstruction of stairways and escalators serving as path between street and stations triggered obligation to make "those portions" of facility accessible via installation of elevators). To find otherwise would be to allow transit agencies to destroy and rebuild station stairways in perpetuity—providing

increased access and usability for patrons who can use stairs—without ever providing an accessible vertical path for people with disabilities who cannot. Such a result would be both nonsensical and antithetical to the ADA's broad remedial purpose. *See 597 Broadway*, 2015 WL 7351540 at *10 (rejecting defendant's contention that the "altered portion" of its facility was merely a reconstructed wall); *see also* H. Rep. No. 485(III), 101st Cong., 2d Sess. at 63 (goal of the ADA that "over time, access will be the rule rather than the exception").

3.  <u>The MTA's Alterations Of Middletown Road's Path Of Travel Indisputably Affected The Usability Of That Path.</u>

There can be no dispute that, in demolishing and rebuilding Middletown Road station's stairways, canopies, and railings, the MTA affected the usability of the station's path of travel. Indeed, it would be absurd to suggest that such extensive work would *not* affect the usability of this path.

Prior to the MTA's renovation work, Middletown Road station's street-to-mezzanine stairs had corroded steel support structures, a crumbling concrete support column, "decayed and cracked" wooden stairs, and cracked or loose treads. SOF ¶ 13. The wood-and-steel canopies that shielded these stairs from the elements were also decayed, rusted, and leaking. (*Id.*)

The station's mezzanine-to-platform stairs  were even worse, with crumbling concrete, heavily corroded steel supports (some of which had rusted through entirely), cracked risers, loose treads, loose guardrail posts, and a guardrail support that was so rusted it had "no connection" with the steel structure below. SOF ¶¶ 12, 14-16.

Defendants concede that in reconstructing these stairways, they brought them into a state of "good repair," and made them safer for passengers to use. SOF ¶ 18. Such improvements indisputably affected the usability of the station's path of travel.

Both the ADA's legislative history and its implementing regulations make clear that courts must construe the concept of "usability" broadly, in order to further the law's remedial purpose. In passing the ADA, Congress specifically directed that "[u]sability should be broadly defined to include renovations which affect the use of facility, and not simply changes which relate directly to access." H. Rep. No. 485(III), 101st Cong., 2d Sess. at 64 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 487. Similarly, in issuing regulations to implement analogous alteration provisions in Title III of the ADA, the DOJ observed that "the [ADA] requires the concept of 'usability' to be read broadly to include *any* change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities." Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed.Reg. 35,544, 35,581 (July 26, 1991) ("Title III Final Rule") (emphasis added); *see also* Department of Justice Title III Technical Assistance Manual at III-6.1000 (noting that replacement of flooring, installation of a new doorway, or relocation of a single electrical outlet may all be alterations that affect usability).

Furthermore, the FTA's formal guidance on this issue states that "a facility or part of a facility does not have to be 'unusable' for [a subsequent] alteration to affect usability," and that even "*resurfacing a platform or a stairway are alterations* that make the platform or stairway safer and easier to use." FTA Circular C 4710.1 § 3.4.2. This interpretation of "usability" is due considerable deference. *Auer*, 519 U.S. at 461.

This approach to the concept of usability has been confirmed by courts in the Second Circuit and elsewhere, *all* of which have adopted an expansive definition of usability. For example, in *Roberts*, the Second Circuit found that updates and renovations to condominium

21

kitchens and bathrooms, such as the installation of new floor tiles, shower tiles, tubs, and cabinets, "changed the usability of the units."[19] *Roberts*, 542 F.3d at 374-75.

In light of the above legislative history, guidance and precedent, there can be no question that the demolition and reconstruction of Middletown Road's existing stairways, railings, and canopies altered the station's path of travel, in ways that affected that path's usability.

## VI.    CONCLUSION

The New York City subway—which weaves together the City's five boroughs and connects millions of people every day to school, work, friends, family, community, culture, and commerce—drives both economic and cultural progress. The greatness of New York City depends, in large part, on the greatness of its subway system. However, this system cannot be truly great as long as over two-thirds of its stations exclude vast numbers of people with disabilities.

By failing to even consider its obligations under the ADA's Accessible Alterations rule the MTA has perpetuated the system's appallingly high rate of inaccessibility, and effectively denied *all* New Yorkers the benefits of a modernized, accessible subway system.

As the Third Circuit observed over 20 years ago, the ADA's Accessible Alterations Rule reflected Congress' recognition that it would be "discriminatory to the disabled to enhance or improve an existing facility without making it fully accessible to those previously excluded." *See Kinney*, 9 F.3d at 1073. Thus, Congress imposed a simple and fair requirement: if an existing

---

[19] Similarly, in *Kinney*, the Third Circuit held that an alteration as minimal as resurfacing a city street with a new layer of asphalt affects usability, because it "makes driving on and crossing streets easier and safer [,] . . . helps to prevent damage to vehicles and injury to people, and generally promotes commerce and travel," thus rendering the street "more usable in a fundamental way." *See Kinney v. Yerusalim*, 9 F.3d 1067, 1073-74 (3d Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994); *see also Disabled in Action of Pa.*, 635 F.3d at 94 (discussing *Kinney*, and holding that, if resurfacing of a road is an alteration affecting usability, "it cannot be that the much more substantial change of a complete replacement of a set of stairs or an escalator is not an 'alteration' unless it is accompanied by major structural modifications").

facility or portion thereof is altered "to make it more usable for the general public, it must also be made more usable for those with . . . disabilities," to the maximum extent feasible. *See id.*; 42 U.S.C. § 12147(a); 49 C.F.R. 37.43(a).

There is no genuine dispute about the material facts. MTA altered portions of the Middletown Road station (specifically, its vertical paths of travel) in ways that affected their usability, thereby triggering the Accessible Alterations Rule. *See* 42 U.S.C. § 12147(a); 49 C.F.R. § 37.43(a)(1). Thus, Plaintiffs respectfully request that the Court grant their motion for summary judgment on this central issue.

Dated:  April 24, 2018             Respectfully submitted,
      New York, New York

                                     DISABILITY RIGHTS ADVOCATES

                                     _____

                                     Michelle Caiola (MC2110)
                                     DISABILITY RIGHTS ADVOCATES
                                     655 Third Avenue, Fourteenth Floor
                                     New York, NY 10117
                                     Tel:  (212) 644-8644
                                     Fax:  (212) 644-8636

                                     *Attorneys for Plaintiffs*