UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRONX INDEPENDENT LIVING SERVICES, a nonprofit organization; DISABLED IN ACTION OF METROPOLIAN NEW YORK, a nonprofit organization; ROBERT HARDY, an individual; and RODOLFO DIAZ, an individual; on behalf of themselves and all others similarly situated,

      Plaintiffs,

– against –

METROPOLITAN TRANSPORTATION AUTHORITY, a public benefit corporation; THOMAS PRENDERGAST, in his official capacity as chairman and chief executive officer of the Metropolitan Transportation Authority; NEW YORK CITY TRANSIT AUHORITY, a public benefit corporation; and VERONIQUE HAKIM, in her official capacity as president of the New York City Transit Authority;

      Defendants.

UNITED STATES OF AMERICA,

      Plaintiff-Intervenor,

– against –

METROPOLITAN TRANSPORTATION AUTHORITY and NEW YORK CITY TRANSIT AUTHORITY,

      Defendants.

**OPINION & ORDER**

16 Civ. 5023 (ER)

RAMOS, D.J.:

  Before the Court are cross motions for partial summary judgment. Plaintiffs—two non-profit advocacy organizations and two disabled individuals who represent a class of similarly

situated individuals—move for summary judgment seeking a determination that the replacement of the stairways at the Middletown Road Subway Station in the Bronx triggered certain accessibility requirements under 49 C.F.R. § 37.43(a)(1). Defendants, Metropolitan Transportation Authority ("MTA"), the New York City Transit Authority ("NYCTA"), and their chief executives move for summary judgment seeking a determination that the applicable regulation is 49 C.F.R. § 37.43(a)(2), not (a)(1). The distinction matters because under § 37.43(a)(1), Defendants must make certain alterations to increase accessibility no matter the cost, while under § 37.43(a)(2), Defendants must make such alterations only if doing so would not be disproportionately expensive.

For the reasons set forth below, Plaintiffs' motion for summary judgment is GRANTED and Defendants' motion for summary judgment is DENIED.

## I. BACKGROUND

Millions of New Yorkers rely on the subway to get to work, school, and their friends and family. To access the subway, riders must go through one of New York City's 472 subway stations. Middletown Road Station is one such station. Defs.' Responses ¶ 1. It is located in the Bronx along the IRT Pelham Line and serves the 6 train. Defs.' Responses ¶ 1. Middletown Road Station is an elevated station; to board a train, riders must climb one set of stairs to reach a mezzanine area and buy a ticket, then climb a second set of stairs to reach the train platforms. Defs.' Responses ¶ 2. This path is the only means by which users may board a train at the Station, as no elevators are available. Defs.' Responses ¶ 3.

In 2003, NYCTA began planning renovations for the station in order to bring it to a "state of good repair," as required under Department of Transportation ("DOT") regulations. Pls.' Responses ¶ 26. These renovations were be part of a larger project to renovate nine elevated

stations along the IRT Pelham Line, from Whitlock Avenue Station at the southern end to Buhre Avenue Station at the northern end. Pls.' Responses ¶ 28. The project design phase for the Middletown Road Station renovations was completed by an NYCTA design team in 2007. Pls.' Responses ¶ 29.

Defendants submitted the design documents and the project master plan to the Federal Transit Administration ("FTA") in November 2007 as part of their request for federal grant assistance with the project. Pls.' Responses ¶ 29. The FTA reviews grant applications for, among other things, compliance with the Americans with Disabilities Act ("ADA"). *See* Federal Transit Administration, Tips for ADA Compliance (Apr. 22, 2014).[1] The FTA may only award grant assistance to projects that have been certified as ADA-compliant. *See* Federal Transit Administration, FTA Fiscal Year 2018 Certifications and Assurances.[2] The project master plan and design documents submitted to the FTA included the scope of the intended renovations. The master plan did not include plans for the installation of elevators at the Middletown Road Station. Pls.' Responses ¶ 31. In fact, no station on the Pelham Line slated for renovations included the installation of any elevators. Pls.' Responses ¶¶ 31, 32.

In 2008, Defendants withdrew their request for FTA funding for the northernmost four of the nine planned Pelham Line stations, including the Middletown Road Station, intending instead to pursue the renovations as part of their 2010-2014 capital plan.[3] Pls.' Responses ¶ 33. In August 2011, Defendants determined that they would limit the scope of the renovations at these

---

[1] *Available at* https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/Tips_for_ADA_Compliance_4-22-14.pdf.

[2] *Available at* https://www.transit.dot.gov/funding/grants/grantee-resources/fta-fiscal-year-2018-certifications-and-assurances.

[3] The five southernmost stations remained part of Defendants' grant request. Pls.' Responses ¶ 34. The FTA fully funded them. Pls.' Responses ¶ 34. The five newly renovated stations did not include elevators. Pls.' Responses ¶ 34.

northernmost four stations, relabeling each from a "rehabilitation project" to a "renewal project." Pls.' Responses ¶ 35. The revised scope of work for the Middletown Road Station included, among other changes, the repair and replacement of the mezzanine's steel framing; the replacement of floors, walls, railings, and platforms; the installation of new lighting on the mezzanine and platforms; repainting; and the replacement of the street-to-mezzanine and mezzanine-to-platform staircases. Pls.' Responses ¶ 37. The revised scope of work did not provide for the installation of elevators. Pls.' Responses ¶ 40.

In March 2012, Defendants resubmitted to the FTA their request for federal funds for the Middletown Road Station renovations, now more limited in scope. Pls.' Responses ¶ 36. Defendants resubmitted funding requests for the other three northernmost stations as well. Pls.' Responses ¶ 36. The FTA granted funding for each station except the Middletown Road Station. Pls.' Responses ¶ 40.

Renovation work on Middletown Road Station took place over a seven-month period that began in October 2013 and ended in May 2014. Defs.' Responses ¶ 4. The station was closed during this time. Defs.' Responses ¶ 5. As part of the renovations, Defendants completely replaced the staircases, bringing them into a "state of good repair" as defined under DOT guidelines. Defs.' Responses ¶¶ 17, 18. Defendants also made various renovations to the mezzanine and platform floors, reconstructing platform edges, replacing concrete platforms, and installing new lighting. Pls.' Responses ¶ 37.

This action was filed on June 28, 2016. Doc. 1. On March 13, 2018 the United States filed a complaint-in-intervention. Doc. 66.

## II. LEGAL STANDARD

Summary judgment is only appropriate where the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, [and] other materials" show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)–(c). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

### III. DISCUSSION

The ADA "provide[s] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). It recognizes that "discrimination against individuals with disabilities persists in . . . transportation" through the "failure to make modifications to existing facilities[.]" 42 U.S.C. § 12101(a). Title II of the ADA, which governs public entities, therefore provides that "no qualified individual with a disability shall, by reason of such disability, . . . be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 12147 of Title II regulates the accessibility obligations of public entities making alterations to public transit facilities like subway stations. The densely

worded section provides that when a public entity makes alterations to an existing public transportation facility that affect or could affect the "usability" of a station or a part thereof,

> it shall be considered discrimination, for purposes of section 12132 of this title and section 794 of title 29, for a public entity to fail to make such alterations (or to ensure that the alterations are made) in such a manner that, *to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs*, upon the completion of such alterations.

This provision is known as the "Accessible Alterations Rule."

Section 12147 also provides that when a public entity makes alterations that "affect[] or could affect[] [the] usability of or access to an area" containing a "primary function,"

> the entity shall also make the alterations in such a manner that, *to the maximum extent feasible, the path of travel to the altered area* and the bathrooms, telephones, and drinking fountains serving the altered area, *are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs . . . where such alterations . . . are not disproportionate to the overall alterations in terms of cost and scope* (as determined under criteria established by the Attorney General).

Thus, Section 12147 recognizes two categories of alterations that can trigger accessibility obligations: those that affect the usability of the station or part of the station, and those that affect the usability of a station area containing a primary function.

The Department of Transportation ("DOT"), and its subsidiary agency the FTA, are the federal agencies charged with implementing the transit-related provisions of Title II. *See* 42 U.S.C. § 12149. Part 49 C.F.R. § 37 contains the implementing regulations. Specifically, section 37.43 contains the implementing regulations of § 12147 of Title II. The two regulations at issue here mirror the distinction made in § 12147 between the two categories of alterations, those that affect "usability" and those that affect the usability of an area with a "primary function," which in turn trigger differing obligations, as follows:

> § 37.43(a)(1) When a public entity alters an existing facility or a part of an existing facility used in providing designated public transportation services *in a way that affects*

6

> *or could affect the usability of the facility or part of the facility*, the entity shall make the alterations (or ensure that the alterations are made) in such a manner, to the *maximum extent feasible*, that the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.
>
> § 37.43(a)(2) When a public entity undertakes an alteration *that affects or could affect the usability of or access to an area of a facility containing a primary function*, the entity shall make the alteration in such a manner that, to the *maximum extent feasible*, the path of travel to the altered area and the bathrooms, telephones, and drinking fountains serving the altered area are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon completion of the alterations. Provided, that alterations to the path of travel, drinking fountains, telephones and bathrooms are not required to be made readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, if the cost and scope of doing so would be disproportionate.

49 C.F.R. § 37.43 (emphasis added). If a public entity makes the type of alterations covered in (a)(1), it must make the altered portions accessible to and usable by disabled individuals "to the maximum extent feasible," regardless of the cost. *See Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 371 (2d Cir. 2008) (stating that the phrase "the maximum extent feasible" requires that accessibility alterations be made regardless of cost). If it makes the type of alterations covered in (a)(2), it must ensure that "the path of travel" to the altered area is accessible to and usable by disabled individuals "to the maximum extent feasible . . . [p]rovided[] that alterations to the path of travel . . . are not required to be made readily accessible . . . if the cost and scope of doing so would be disproportionate."

By their language, § 37.43(a)(1) and (a)(2) are not mutually exclusive—an alteration can both "affect the usability of the facility" and "affect the usability of or access to an area of a facility containing a primary function." *See Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.*, 635 F.3d 87, 95 (3d Cir. 2011) (stating that (a)(2) covers "additional" changes); Department of Transportation, ADA Standards for Transportation Facilities at § 202.3 (2006) (characterizing (a)(2) obligation as "in addition" to general

7

accessibility obligation)[4]; 28 C.F.R. Part 36, App'x C, Section 36.402 (stating, in the Title III context, that "[c]osts are to be considered only when an alteration to an area containing a primary function triggers an *additional* requirement to make the path of travel to the altered area accessible"). Defendants argue that § 37.43(a)(2) should apply instead of § 37.43(a)(1), but no law suggests that either one or the other provision must apply—if both provisions are triggered, both should apply.

The parties agree that the only issue to be determined by the Court on these cross-motions for summary judgment is whether the scope of work performed at Middletown Road Station triggers the obligations in § 37.43(a)(1) or (a)(2).[5] If § 37.43(a)(1) applies, Defendants must make whatever renovations are required no matter the cost. If § 37.43(a)(2) applies instead, then Defendants only need to make the required renovations if doing so would not be disproportionately expensive.

Plaintiffs and the federal government argue that the scope of work performed at the Middletown Road Station triggered the obligations set forth in § 37.43(a)(1). Defendants argue that the scope of work performed triggered the obligations set forth in § 37.43(a)(2) and not (a)(1). The Court finds that § 37.43(a)(1) applies.[6]

---

[4] *Available at* https://www.access-board.gov/guidelines-and-standards/transportation/facilities/ada-standards-for-transportation-facilities/single-file-version.

[5] Defendants' briefing contends that, as a matter of regulatory interpretation, requiring the installation of an elevator upon the replacement of a stairway cannot be squared with the text of § 37.43(a)(1). The parties have represented to the Court multiple times that the sole issue to be decided in these cross-motions is whether the alterations at Middletown Road Station triggered § 37.43(a)(1) or (a)(2). *See* Doc. 80 at 5, Doc. 85 at 24:24–25:1. Consequently, the Court will address this issue only.

[6] In 2015, the FTA issued a guidance that specifically addresses what accessibility obligations a public entity triggers by replacing a staircase. In the guidance, the FTA makes clear that "[w]hen the altered area is the path of travel," like "passageways between platforms, staircases, and escalators," the element of the path of travel undergoing alteration "will be subject to the general requirement of § 37.43(a)(1) that the altered area be accessible to and usable by persons with disabilities, including wheelchair users, to the maximum extent feasible." FTA, Circular C 4710.1 at § 3.4.3. Plaintiffs and the federal government argue that the Court should defer to the guidance's interpretation of § 37.43(a)(1) under *Auer v. Robbins*, 519 U.S. 452 (1997). But because the Court

Accessibility obligations under § 37.43(a)(1) are triggered "[w]hen a public entity alters an existing facility or a part of an existing facility used in providing designated public transportation services in a way that affects or could affect the usability of the facility or part of the facility." The Court finds that Defendants' renewal project, which involved the replacement of the stairways at the Middletown Road Station, clearly met this condition.

There is no dispute that Middletown Road Station is "an existing facility used in providing designated public transportation services." So the sole question is whether Defendants "alter[ed]" the station "in a way that affects or could affect [its] usability" by, among other things, replacing the stairways. DOT regulations define an "alteration" as such:

> Alteration means a change to an existing facility, including, but not limited to, remodeling, renovation, rehabilitation, reconstruction, historic restoration, changes or rearrangement in structural parts or elements, and changes or rearrangement in the plan configuration of walls and full-height partitions. Normal maintenance, reroofing, painting or wallpapering, asbestos removal, or changes to mechanical or electrical systems are not alterations unless they affect the usability of the building or facility.

49 C.F.R. § 37.3. Defendants entirely replaced the stairways at Middletown Road Station with new stairways as part of a major renewal project that also included replacement of walls, floors, railings, and platforms. This amounts to a "reconstruction" or "renovation" of the station, including the stairways, and thus an alteration. Indeed, Defendants do not dispute that their stairway replacement amounted to an "alteration," referring to it as such multiple times in their briefing. *See* Doc. 100 at 14, 15.

Defendants' replacement of the stairways also affected the usability of the facility. "Usability" is left undefined in §§ 37.43(a)(1) and (a)(2), but the Department of Justice, discussing the term in the context of Title III of the ADA, has stated that it should "be read

---

independently arrives at the conclusion that § 37.43(a)(1) applies to the Middletown Road Station renovations, it does not address whether *Auer* deference is warranted here.

broadly to include any change that affects the usability of the facility, not simply changes that relate directly to access by individuals with disabilities." Final Rule, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 56 Fed. Reg. 35544, 35581 (July 26, 1991). Agreeing with the DOJ's interpretation, the Second Circuit found replacements of kitchen floors and bathroom light fixtures to be "alterations" that changed the "usability" of condominium units under Title III provisions analogous to 42 U.S.C. § 12147. *See Roberts*, 542 F.3d at 369.[7] Defendants' replacement of the stairways at Middletown Road Station was clearly an alteration that affected the station's usability under *Roberts*. The alteration thus triggered accessibility obligations under § 37.43(a)(1).

Defendants argue that § 37.43(a)(2), not (a)(1), applies to the alteration because the renovations were to areas of the station that contained a "primary function." But (a)(1) and (a)(2) are not mutually exclusive. Under § 37.43(a)(2), accessibility obligations are triggered when "a public entity undertakes an alteration that affects or could affect the usability of or access to an area of a facility containing a primary function." An alteration can both affect the usability of a facility, which triggers (a)(1), and affect the usability of or access to an area of a facility containing a primary function, which triggers (a)(2). In addition to replacing the stairways, Defendants made extensive alterations to the mezzanine and platform floors of the station. Since these floors are where tickets are bought and trains are boarded, they clearly contain primary functions. Therefore, the Court agrees with Defendants that § 37.43(a)(2) also arguably applies to the renovations made at Middletown Road Station. Plaintiffs do not dispute this, and the government recognizes that § 37.43(a)(2) applies to a less broad set of alterations

---

[7] In *Disabled in Action of Pennsylvania v. SEPTA*, 635 F.3d 87 (3d Cir. 2011), the Third Circuit addressed the question in dispute here—whether the replacement of a stairway at a subway station was an alteration affecting the station's usability—and answered yes. *See id.* at 93–94.

that are "additional" to those triggered under (a)(1), *see* Doc. 106 at 10. But since Defendants moved this Court to hold that § 37.43(a)(1) specifically does *not* apply, their cross-motion for summary judgment is denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED and Defendants' cross-motion for summary judgment is DENIED. The Clerk of Court is directed to close the motions, Docs. 79 and 96.

SO ORDERED.

Dated:     March 5, 2019
             New York, New York

                                                                  Edgardo Ramos, U.S.D.J.