UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRONX INDEPENDENT LIVING SERVICES, a nonprofit organization; DISABLED IN ACTION OF METROPOLITAN NEW YORK, a nonprofit organization; ROBERT HARDY, an individual; and RODOLFO DIAZ, an individual; on behalf of themselves and all others similarly situated, | No. 16-CV-5023 (ER) **PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

                    Plaintiffs,

-against-

METROPOLITAN TRANSPORTATION
AUTHORITY, a public benefit corporation;
JOSEPH J. LHOTA, in his official capacity as
chairman and chief executive officer of the
Metropolitan Transportation Authority; NEW
YORK CITY TRANSIT AUTHORITY, a
public benefit corporation; and ANDY
BYFORD, in his official capacity as president
of the New York City Transit Authority;

                    Defendants.

UNITED STATES OF AMERICA,

                    Plaintiff-Intervenor,

-against-

METROPOLITAN TRANSPORTATION
AUTHORITY and NEW YORK CITY
TRANSIT AUTHORITY,

                    Defendants.

DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017-5621
Tel:  (212) 644-8644
Fax:  (212) 644-8636
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

I.  Introduction ................................................................................................. 1

II.  Procedural History ..................................................................................... 2

III.  Statement of Facts ..................................................................................... 3

    A.  Plaintiffs and Class Members Are Unable to Use the Middletown
        Road Station Because There Are No Elevators. ................................... 3

    B.  The Renewal Project at the Middletown Road Station Involved
        Extensive Construction and Included Complete Replacement of
        All Staircases. ..................................................................................... 4

    C.  Undisputed Reliable Evidence Shows Many Ways that Elevators
        Could Have Been Installed at the Middletown Road Station. ............... 5

        1.  Initial MTA Internal Assessments Described Methods for
            Installing an Elevator. ............................................................ 5

        2.  An Engineering Firm Hired by the MTA — Independent of
            this Suit — Developed Five Proposals for Elevator
            Installation at the Middletown Road Station. ........................... 6

        3.  The MTA's Expert Proposed Two Possible Methods for
            Building Elevators at the Middletown Road Station. ............... 8

        4.  Plaintiffs' Expert Further Proposed Three Ways to Build
            Elevators at the Middletown Road Station. ............................. 9

            a.  Scheme ADA 1 ........................................................... 10

            b.  Scheme ADA 2 ........................................................... 10

            c.  Scheme ADA 3 ........................................................... 10

IV.  Applicable Law ......................................................................................... 11

    A.  Standard for Summary Judgment ......................................................... 11

    B.  Plaintiffs and the Class Readily Establish a Prima Facie Case of
        Discrimination Under Title II of the ADA. ......................................... 11

V.  Argument .................................................................................................... 14

    A.  The Accessible Alterations Rule Required the MTA to Build
        Elevators at the Middletown Road Station During the Renewal
        Project. ................................................................................................ 14

B.      Overwhelming and Uncontroverted Evidence Demonstrates that Plaintiffs Have Met the Burden of Production to Show that the MTA Could Have Installed Elevators at the Station. ........................................... 15

C.      The MTA Cannot Meet Its Burden of Persuading the Court That It Was Virtually Impossible or Technically Infeasible to Install Elevators at the Middletown Road Station. ......................................... 16

        1.      The MTA Bears the Heavy Burden of Proving It Could Not Install Elevators. ................................................................... 16

        2.      The MTA's Pivot to a Quotation from Legislative History Contained in Non-Binding Interpretive Guidance Related to "Technical Infeasibility" Does Not Provide Them the Escape Hatch that They Seek to Evade Liability. ..................................... 17

                a.      The MTA Ignores the Plain Text of the Statute and Regulation and Propounds a Contradictory Interpretation that Would Cause an Absurd Result. ..................... 17

                b.      In Any Event, There Is No Genuine Issue of Material Fact that the MTA Cannot Prove the Factual Assertions It Makes to Support Its Own Affirmative Defense Concerning the Technical Feasibility of B ............................................................... 21

D.      Under the New York City Human Rights Law, Which Prohibits Discrimination Based on Disability in the Management of Public Transportation Services, the MTA Discriminates Against People with Disabilities by Failing to Build Elevators at the Middletown Road Station. ................................................................................... 22

E.      Because the MTA Cannot Prove that It Is Infeasible to Build Elevators at the Middletown Road Station, It Must Build the Elevators. ..................................................................................... 23

VI.    Conclusion ..................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................ 11

*Center for Indep. of the Disabled N.Y. v. Metropolitan Transp. Auth.*, No.
153765/2017 (N.Y. Sup. Ct. June 5, 2019) ................................................... 23

*De La Rosa v. 597 Broadway Dev. Corp.*, 13cv7999 (LAK) (MHD), 2015 WL
7351540 (S.D.N.Y. Aug. 4, 2015) ................................................................ 16

*De La Rosa v. Lewis Foods of 42nd St., LLC*, 124 F. Supp. 3d 290 (S.D.N.Y.
2015) ........................................................................................................ 21

*Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597 (2013) ...................................... 19

*Disabled In Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir.
2014) ........................................................................................................ 12

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ................................ 23

*hip Heightened Independence & Progress, Inc. v. Port Auth. of N.Y. & N.J.*, 693
F.3d 345 (3d Cir. 2012) ...................................................................... 16, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ................. 11

*McElwee v. Cnty. of Orange*, 700 F.3d 635 (2d Cir. 2012) ............................. 12

*Roberts v. Royal Atl. Corp.*, 542 F.3d 363 (2d Cir. 2008) ..................... 13, 14, 15, 16

*Ya Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59 (2d Cir. 2015) ................... 22

**Statutes**

28 C.F.R. § 35.108 ................................................................................... 12

29 U.S.C. § 794 ........................................................................................ 12

29 U.S.C. § 794a ...................................................................................... 23

42 U.S.C. § 12131 .................................................................................... 12

42 U.S.C. § 12132 .................................................................................... 11

42 U.S.C. § 12133 .................................................................................... 23

42 U.S.C. § 12147 ............................................................................. 13, 14, 17

N.Y.C. Admin. Code § 8-102 ............................................................................................. 23

N.Y.C. Admin. Code § 8-107 ............................................................................................. 22

N.Y.C. Admin. Code § 8-502 ............................................................................................. 23

**Rules**

Fed. R. Civ. P. 56 .............................................................................................................. 11

**Regulations**

28 C.F.R. § 35.104 ............................................................................................................ 12

28 C.F.R. § 35.151 ............................................................................................................ 18

36 C.F.R. Pt. 1191 App. B ........................................................................................... 18, 19

49 C.F.R. § 37.9 ................................................................................................................ 20

49 C.F.R. § 37.43 .............................................................................................. 13, 14, 15, 18

49 C.F.R. pt. 37 App. D, § 37.43 ................................................................................. passim

## I.  INTRODUCTION

There are approximately 472 subway stations dispersed throughout Manhattan, Queens, the Bronx, and Brooklyn.  Each station provides an access point into the subway system, which provides millions of riders a convenient and efficient method of transportation between home, work, school, medical care, shopping, and social activities.  Yet less than 25% of these stations are accessible for those with mobility disabilities, including people who use wheelchairs.

The Middletown Road subway station, an elevated station located in the Bronx, is among those inaccessible stations, along with 89% of other 6 Line stations in the borough.  Even after the Metropolitan Transportation Authority and New York City Transit Authority (collectively, "the MTA") performed a $26 million "Renewal Project" that closed the station in its entirety for seven months and included complete replacement of the staircases to the station, along with replacement of walls, floors, and concrete platforms, and reconstruction of both the mezzanine and platforms, people with mobility disabilities are still unable to use the station because the Renewal Project did not include elevators.  As this Court has already found, the construction project triggered the MTA's obligation under the Americans with Disabilities Act ("ADA") to make the station accessible to the maximum extent feasible. Op. & Order Granting Pls.' Mot. for Partial Summ. J. 2, 6, ECF No. 131.  As such, the MTA was legally required to provide vertical access at the Middletown Road station as part of the renovation, unless it was technically infeasible for them to do so.  However, they failed to meet this obligation despite overwhelming evidence that elevator installation could have been accomplished at the station during the Renewal Project in a variety of ways, according to the MTA's own sources and other experts.  Thus, there is no genuine issue of material fact that Plaintiffs have met their burden of production to demonstrate that it was technically feasible to install elevators at the Middletown

Road station, nor that the MTA has failed to meet its burden of persuasion that elevator installation was not technically feasible.

In light of the already-resolved legal issues and overwhelming, undisputed evidence, the MTA cannot defend its decision to forgo the installation of elevators during the Renewal Project. Specifically: (1) the cost of the elevators is not legally relevant to this inquiry, and (2) the MTA has not proven, because it cannot prove, that it was technically infeasible to install the elevators by showing that it was "virtually impossible" to construct elevators at the Middletown Road station during the Renewal Project.

Thus, Plaintiffs now move the Court to find the MTA in violation of the ADA, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law and enter an order requiring them to construct elevators at the Middletown Road station forthwith.

## II.  PROCEDURAL HISTORY

Plaintiffs filed suit on June 28, 2016, and the United States filed an intervenor-complaint in this action on March 13, 2018.  ECF Nos. 1, 66.[1]  The Court granted Plaintiffs' motion for class certification on April 25, 2018, certifying a class of "[a]ll persons with mobility disabilities who cannot currently use the Middletown Road subway station because of accessibility barriers at that station and who would use the station if it were made accessible." Order Granting Class Certification 2, ECF No. 84.

The Court granted Plaintiffs' motion for partial summary judgment on March 5, 2019, holding that the Renewal Project amounted to an alteration that affected the usability of the station and thus triggered the accessibility obligations of 49 C.F.R. § 37.43(a)(1).  Op. & Order 8, ECF No. 131. Specifically, the MTA was obligated to perform the alterations "in such a

---

[1] Plaintiffs' operative complaint is the First Amended Complaint. ECF No. 35.

manner, to the maximum extent feasible, that the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alteration." *Id.* at 7 (citing 49 C.F.R. § 37.43(a)(1)). Moreover, the Court denied Defendants' cross-motion for summary judgment, *id.* at 11, finding that the MTA was obligated to make the accessibility upgrades "no matter the cost." *Id.* at 2.

## III.   STATEMENT OF FACTS

### A.   <u>Plaintiffs and Class Members Are Unable to Use the Middletown Road Station Because There Are No Elevators.</u>

Because there are no elevators at the Middletown Road station and the MTA did not build elevators during the Renewal Project, Plaintiffs and the certified class of people with mobility disabilities cannot access the station to travel to and from their homes, offices, medical appointments, leisure activities, or other tasks and activities of daily life.

Individual Plaintiffs Robert Hardy and Rodolfo Diaz both use mobility aids to walk and move around.  Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶¶ 35, 39.  Their disabilities prevent them from using subway stations that do not have elevators, including the Middletown Road station, which they would like to use. *Id.* ¶¶ 36-37, 40-41.  Bronx Independent Living Services ("BILS") employees with mobility disabilities travel to locations in the vicinity of the Middletown Road station and are therefore harmed by the station's inaccessibility because they must use less reliable and convenient forms of transportation to reach their destinations. *Id.* ¶¶ 26-27.  BILS consumers with mobility disabilities who would use the Middletown Road station if it were accessible are also harmed by the MTA's failure to build elevators at the station during the Renewal Project. *Id.* ¶ 28.  Likewise, members of Disabled In Action of Metropolitan New York ("DIA") would use the Middletown Road station to travel to organizational meetings, meetings with elected officials, and social events. *Id.* ¶ 32.  Members of the certified class also

would use the Middletown Road station to commute, attend community events, and accomplish

daily tasks, but cannot do so because the MTA did not build elevators at the station during the

Renewal Project. *See* Pls.' Mem. of Law. Supp. Mot. for Class Certification 5-10, 16, ECF No.

52 (describing impact of denial of access to the Middletown Road station on named Plaintiffs,

employees and constituents of BILS, members of DIA, and members of the class).

**B.**      **The Renewal Project at the Middletown Road Station Involved Extensive Construction and Included Complete Replacement of All Staircases.**

The MTA performed a renewal project at the Middletown Road station during a seven-

month period from October 5, 2013, through May 4, 2014, during which they closed the station.

PSUF ¶¶ 10, 14; Op. & Order 4, ECF No. 131.  During the approximately ten years between the

beginning of planning for station renovations in 2003 and the commencement of the renewal

project in 2013, the MTA only began to consider the addition of elevators to the Middletown

Road station in June 2012 as part of a request to "provide a rough % of stations that could be

deemed ADA-infeasible" for a list of fifty-five stations.  PSUF ¶¶ 11-13.

The MTA disregarded the need for vertical accessibility at the station despite the

extensive renovations included in the scope of work for the Renewal Project.  The scope of work

included repairing and replacing steel framing in the mezzanine; replacing floors, walls, railings,

and platforms; reconstructing platform edges; replacing concrete platforms; installing new

lighting on the mezzanine and platforms; and replacing all of the staircases at the station.  Op. &

Order 4, ECF No. 131; PSUF ¶ 15 ("The 2013-2014 Renewal Project included remediation or

replacement of many original structural components including selected steel framing members . .

. ." Decl. of Rebecca Rodgers Supp. Pls.' Mot. Summ. J., Defs.' Expert Report at 2, D080701.)

The renovations to the mezzanine included replacing and reinforcing floor beams and girders,

removing and replacing all hangers and posts, replacing wood planks and concrete topping with

a lightweight concrete slab, removing cross bracing below the floor, and replacing stairways and landings.  PSUF ¶ 16.  To replace stairs during the Renewal Project, the MTA completely replaced each of the existing stairways from the street to the mezzanine and the mezzanine to the platforms.  *Id.* ¶¶ 15-16; Op. & Order at 4, ECF No. 131.

### C.   Undisputed Reliable Evidence Shows Many Ways that Elevators Could Have Been Installed at the Middletown Road Station.

There is no genuine dispute of material fact that elevators could have been installed at the Middletown Road station during the Renewal Project. MTA employees, a third-party contractor, and experts on both sides of this litigation presented many ways that elevators could have been built at the Middletown Road station during the Renewal Project.  Each proposal for making the Middletown Road station accessible includes three elevators: the first to transport passengers from the street to the mezzanine, the second from the mezzanine to the northbound platform with trains bound for Pelham Bay Park, and the third from the mezzanine to the southbound platform with trains bound for Brooklyn Bridge – City Hall.  PSUF ¶¶ 19, 44, 46-48, 56, 68-69, 78-86.

### 1.   Initial MTA Internal Assessments Described Methods for Installing an Elevator.

In June 2012, Gricelda Cespedes, a civil engineer who was the program coordination and compliance and ADA officer at the MTA, performed a "guesstimate" of the technical feasibility of installing elevators at the Middletown Road station and concluded that it would be possible to build an elevator from the mezzanine to the station's southbound platform, considering the platform width, the location of the stairways relative to the mezzanine, and the location of the mezzanine relative to the platform.  PSUF ¶¶ 43-44.  She also concluded that if the MTA extended the mezzanine, it would be possible to install an elevator from the mezzanine to the northbound platform.  *Id.* ¶ 44.

Ms. Cespedes performed a second cursory analysis later in 2012 in response to a request from the Federal Transit Administration that included gathering information on the elevation, stairway heights, platform widths, location of the mezzanine relative to the street, and information about the work that would be done during the Renewal Project. *Id.* ¶ 45. This process included taking measurements of the station to confirm the relevant information. *Id.* As part of her review, Ms. Cespedes observed that the Middletown Road station has a "hung mezzanine," which is a mezzanine "underneath the tracks of the railroad where the actual support structure isn't underneath," but rather "comes from above." *Id.* ¶¶ 20, 45. Ms. Cespedes concluded that building an elevator from the street to the mezzanine could be accomplished via a bridge connected to the mezzanine. *Id.* ¶ 46. With regard to the mezzanine-to-southbound-platform elevator, she found that the elevator could be cantilevered off the structure between two staircases. *Id.* ¶ 47. She also affirmed her previous conclusion that a mezzanine-to-northbound-platform elevator could be accomplished by extending the mezzanine. *Id.* ¶ 48. Ms. Cespedes looked for the best location for the elevators from an engineering perspective only: "I look for the best location for the elevators and let DOT tell me whether or not those locations posed a problem . . . . Would they be of a hazard to pedestrians or would they be a hazard to a vehicle." *Id.* ¶ 49 (Rodgers Decl., Ex. E, Cespedes Dep. 107:22-108:14).

2.  <u>An Engineering Firm Hired by the MTA — Independent of this Suit — Developed Five Proposals for Elevator Installation at the Middletown Road Station.</u>

Independent from this litigation and two years after the filing of this case, the MTA retained WSP USA Inc. ("WSP") to perform an accessibility analysis at over 100 New York City subway stations and Staten Island Railway stations throughout the five boroughs, including the

Middletown Road Station.[2]  PSUF ¶ 51.  The MTA prepared a Design Procedures Manual to

guide WSP in its analysis, which advised WSP that because "existing station structures are

typically not capable of supporting loads from elevator installations" at elevated stations in the

New York City subway system, "[t]ypically, the proposed work [at elevated stations] must be

self-supported in order to isolate the new structure from the existing." *Id.* ¶ 52.

WSP prepared five different proposals for building elevators.  *Id.* ¶ 53 (Systemwide

Station Accessibility Analysis: Middletown Road Station at 3).  The MTA evaluated the

proposals based on five factors: (1) "[c]ompliance with ADA regulations"; (2) "[c]ustomer

convenience, circulation, and safety"; (3) "[c]onstructability/cost"; (4) "[c]ommunity impacts";

and (5) "[t]ransit operations."  *Id.* ¶ 54.  After reviewing the five options for elevator installation,

the MTA directed WSP to proceed with an accessibility solution that involved placing the street-

to-mezzanine elevator in an adjacent parking lot on the eastern side of Westchester Avenue, the

mezzanine-to-northbound-platform elevator on the corner of Westchester Avenue and

Middletown Road where a staircase currently exists, and the mezzanine-to-southbound-platform

elevator in the location of another existing staircase on the other side of Westchester Avenue.  *Id.*

¶ 56.  The MTA selected that solution because it met most of their criteria, *id.* ¶ 57, which,

according to the Design Procedures Manual, included clearance around street elevators for

pedestrian circulation, street clearance below elevator pits, accessible routes to platforms,

accessible paths to the elevator from the mezzanine and platform, guidelines for elevator

---

[2] WSP is an engineering firm with extensive experience performing ADA feasibility studies and
other ADA projects for the MTA, including a feasibility study for the 149th Street – Grand
Concourse station complex, a conceptual engineering study for an ADA-compliant walkway
connecting the Livonia Street and Junius Street stations, and ADA improvements at the
Columbus Circle, Times Square – 42nd Street (Shuttle to Grand Central), First Avenue (L
Train), Bedford Avenue (L Train), and Gun Hill Road stations.  PSUF ¶ 50.

machine rooms and hoistways, and station congestion considerations. *Id.* ¶ 55. WSP then further developed the MTA's selected option, detailing a plan that involves rebuilding both street-to-mezzanine stairs, extending the mezzanine to the north and east, extending both platforms, relocating the agent booth, and relocating storage areas. *Id.* ¶ 63.

There is no evidence in WSP's assessment that the other options it developed would be unusually difficult to implement. One of the alternates raised a concern that the southbound platform elevator would impact the visibility of vehicles turning at the corner. *Id.* ¶ 58. Two other alternates placed the street-to-mezzanine elevator in the same parking lot as in the proposal that the MTA selected. *Id.* ¶¶ 59-61. A fourth required acquisition of two properties. *Id.* ¶ 62.

### 3. The MTA's Expert Proposed Two Possible Methods for Building Elevators at the Middletown Road Station.

In conjunction with mounting a defense for the allegations in this suit, the MTA retained Guy Nordenson, a structural engineer, to assess the feasibility of building elevators at the Middletown Road station. PSUF ¶ 64. However, Mr. Nordenson performed his assessment using contract documents prepared after the scope of work for the Renewal Project had already been finalized. *Id.* ¶ 65. Therefore, he did not consider whether the scope of work could have been modified to include elevators. *Id.* ¶ 66 ("additions to the scope of the work during the renewal project would have triggered change orders and other complications in the project that would have made it potentially difficult to implement.") He testified that was because "during the construction of a project like Middletown Station, it's very difficult to change the design once the contract had been awarded and the construction is underway." *Id.* ¶ 66.

Mr. Nordenson considered "a variety of alternatives" for making the Middletown Road station accessible but selected two possibilities: one that he thought "include[d] the minimum number of supports that would impact the sidewalk" and another that he thought "had the least

impact . . . on the existing structural framing." *Id.* ¶ 72.  Mr. Nordenson admitted that an elevator could be built from the street level to the mezzanine level without impacting the load on the station's structural frame, *id.* ¶ 68, and that elevators from the mezzanine to both platforms could be built by either extending the mezzanine and providing structural supports on the sidewalks below or by reinforcing the girders.  *Id.* ¶ 69.  He further identified five mezzanine floor girders that were altered during the Renewal Project in order to accommodate the load of a slab replacement that was included in the scope of work.  *Id.* ¶ 18.  In Mr. Nordenson's opinion, any mezzanine floor girders could be modified or replaced to accommodate elevators.  *Id.* ¶ 70.  Moreover, the bents of the station that support the elevated track infrastructure would not be overstressed by the addition of elevators.  *Id.* ¶ 71.  Mr. Nordenson did not address the sidewalks around the Middletown Road station because he only considered the feasibility of building elevators from a structural standpoint.  *Id.* ¶ 67.  He also opined that his plans for elevator construction could be accomplished without acquiring private property or entering into easement agreements.  *Id.* ¶ 73.

    **4.**    <u>Plaintiffs' Expert Further Proposed Three Ways to Build Elevators at the Middletown Road Station.</u>

Plaintiffs' experts at MDC*Systems* Enterprises, LLC ("MDC") proposed three ways that the MTA could have built elevators during the Renewal Project, based on a review of design drawings prepared before the Renewal Project, other project documentation, and a site visit in October 2018.  PSUF ¶ 75.  MDC examined technical feasibility by analyzing "what changes could have been made to the original existing structure as a part of the Renewal Project to accommodate elevator installation."  *Id.* ¶ 76.  Although MDC's proposals include limited changes to the structural frame of the mezzanine, MDC observed that *the MTA changed the structural frame of the mezzanine in a similar manner during the Renewal Project.  Id.* ¶ 77.

### a.    Scheme ADA 1

MDC's first proposal places a street-to-mezzanine elevator on the east side of Westchester Avenue, north of the existing staircase; a mezzanine-to-northbound-platform elevator at the bottom landing of the mezzanine-to-platform stairs; and a mezzanine-to-southbound-platform elevator at the bottom landing of the mezzanine-to-platform stairs in space currently used for a switch room on the opposite side of Westchester Avenue.  PSUF ¶ 78.  Both of the mezzanine-to-platform elevators would be attached to the existing structure with new structural steel.  *Id.* ¶ 79.  This proposal includes relocating the switch room, expanding the mezzanine on the northbound side to provide sufficient circulation space for passengers, and supporting the new portions of the mezzanine with beams cantilevered over the sidewalk.  *Id.* ¶ 80.

### b.    Scheme ADA 2

MDC's second proposal keeps the first two elevators in the same locations as in the first proposal, but places the mezzanine-to-southbound-platform elevator further south on Westchester Avenue, supported with a pillar in the location where a traffic island exists today.  PSUF ¶ 81.  A corridor on the southbound side of the mezzanine would be included for passenger circulation in the place where the switch room is currently located.  *Id.* ¶ 82.  Like Scheme ADA 1, the second proposal includes relocating the switch room and expanding the mezzanine on the northbound side to provide sufficient circulation for passengers around the first two elevators.  *Id.*

### c.    Scheme ADA 3

In MDC's third proposal, the MTA would relocate the street-to-mezzanine stairs located on the east side of Westchester Avenue, then build the street-to-mezzanine elevator on land adjacent to the street, which would require purchasing or obtaining an easement for the land

needed to make these changes.  PSUF ¶¶ 83-84.  The third proposal includes building a bridge

from the street elevator to the mezzanine.  *Id.* ¶ 84.  The expanded mezzanine would hang from

the existing girders.  *Id.* ¶ 85.  This proposal requires a smaller mezzanine extension than the first

two proposals.  *Id.*  MDC's third proposal places the mezzanine-to-southbound-platform elevator

on the traffic island as in Scheme ADA 2 and places the mezzanine-to-northbound-platform

elevator in the same location as in Schemes ADA 1 and 2.  *Id.* ¶ 86.

## IV.   APPLICABLE LAW

### A.   <u>Standard for Summary Judgment</u>

A moving party is entitled to summary judgment upon a showing "that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).  A dispute as to an issue of material fact is only genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To establish a genuine dispute

sufficient to warrant trial, the nonmoving party must set forth "specific facts showing that there

is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

587 (1986), and "must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Id.* at 586.

### B.   <u>Plaintiffs and the Class Readily Establish a Prima Facie Case of Discrimination Under Title II of the ADA.</u>

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of

such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity."

42 U.S.C. § 12132.  A violation of Title II is established when (1) Plaintiffs are qualified

individuals with disabilities, (2) Defendants are public entities, and (3) Plaintiffs were denied the

opportunity to participate in or benefit from the MTA's services, programs, or activities, or the MTA otherwise discriminated against them because of their disabilities. *Disabled In Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196-97 (2d Cir. 2014). Section 504 of the Rehabilitation Act similarly "prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against 'otherwise qualified' disabled individuals." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012) (quoting 29 U.S.C. § 794(a)).

The first two elements of Plaintiffs' *prima facie* case are undisputed. Individual Plaintiffs Robert Hardy and Rodolfo Diaz, members of organizational Plaintiff DIA, constituents and employees of organizational Plaintiff BILS, and members of the certified class are individuals with disabilities under Title II and Section 504. 28 C.F.R. § 35.108(d)(2)(iii)(D) ("it should easily be concluded that . . . mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function" and "may substantially limit additional major life activities"); PSUF ¶¶ 35, 39. As members of the public, Plaintiffs and class members are qualified to use the New York City subway system, including by boarding and disembarking the subway at the Middletown Road station. The MTA and NYCT are "public entities" within the meaning of Title II and receive federal financial assistance within the meaning of Section 504. 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104; 29 U.S.C. § 794(a); PSUF ¶¶ 1-6. Plaintiffs and the class are being harmed and will continue to be harmed because they cannot use the Middletown Road station. *See supra* Part III.A.

**C.** **The Renewal Project Performed at the Middletown Road Station Triggered the MTA's Legal Obligations Under the Accessible Alterations Rule.**

The Court has already held that 49 C.F.R. § 37.43(a)(1), the Accessible Alterations Rule, applies to the renovations performed at the Middletown Road station. Op. & Order Granting

Pls.' Mot. for Partial Summ. J. 8, ECF No. 131.[3]  As such, the MTA was required under the law

to make the renovations "in such a manner that, to the maximum extent feasible, the altered

portions of the facility are readily accessible to and usable by individuals with disabilities,

including individuals who use wheelchairs, upon the completion of such alterations."  42 U.S.C.

§ 12147(a).  Department of Transportation regulations define "maximum extent feasible" as

"appl[ying] to the occasional case where the nature of an existing facility makes it impossible to

comply fully with applicable accessibility standards through a planned alteration" and

unambiguously require: "Any altered features of the facility or portion of the facility that can be

made accessible shall be made accessible."  49 C.F.R. § 37.43(b).  The accessibility alterations

were required regardless of cost.  Op. & Order, 8, ECF No. 131; *Roberts v. Royal Atl. Corp.*, 542

F.3d 363, 371 (2d Cir. 2008) ("The statute and regulations require that such facilities be made

accessible even if the cost of doing so—financial or otherwise—is high.  Indeed, in promulgating

the implementing regulations, the Department [of Justice] explicitly rejected suggestions that

cost be considered with respect to this provision.") (interpreting parallel provision of Title III of

the ADA).  Therefore, the failure to make the alterations accessible to individuals with

disabilities, including individuals who use wheelchairs, constitutes discrimination under Title II.

42 U.S.C. § 12147(a).

To meet their burden of production, Plaintiffs need only identify a way that the MTA

could have altered the vertical path of travel at the Middletown Road station to make it readily

accessible and usable by individuals with disabilities.  *Roberts*, 542 F.3d at 372.  The burden of

production "is not a heavy one."  *Id.* at 370 (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d

---

[3] The Court ruled that 49 C.F.R. § 37.43(a)(2) may also apply to the Renewal Project, but that
conclusion did not affect the MTA's obligations under § 37.43(a)(1). Order Granting Pls.' Mot
for Partial Summ. J. 10-11, ECF No. 131.

131, 138 (2d Cir. 1995)).  Because Plaintiffs easily meet that "initial burden," *id.* at 375, the

burden then shifts to the MTA to prove that all of the many proposals for installing elevators

"would be 'virtually impossible' in light of the 'nature of the facility.'"  *Id.* at 372 (citing parallel

provision of 42 U.S.C. § 12183).  It cannot do so.

## V.  ARGUMENT

As this Court has already held, the Accessible Alterations Rule required construction of

elevators during the Renewal Project unless it was technically infeasible to do so.  There is no

genuine issue of disputed fact that Plaintiffs have met their burden of production to show that it

would have been feasible to construct elevators at the Middletown Road station because of the

multiple options presented by the MTA's own employees, contractors, and experts.  There is also

no genuine issue of disputed fact that the MTA has failed to meet its burden of persuasion that all

of the many proposals for installing elevators "would be 'virtually impossible' in light of the

'nature of the facility.'" *Roberts*, 542 F.3d at 375 (citation omitted).

**A.**     **The Accessible Alterations Rule Required the MTA to Build Elevators at the**
        **Middletown Road Station During the Renewal Project.**

Because the MTA engaged in an extensive renovation of the station that affected its

usability, including the replacement of all staircases, Op. & Order 10, ECF No. 131, it was

required to do so "in such a manner that, to the maximum extent feasible, the altered portions of

the facility are readily accessible to and usable by individuals with disabilities, including

individuals who use wheelchairs, upon the completion of such alterations." 42 U.S.C. §

12147(a); 49 C.F.R. § 37.43(a)(1).  The sweeping alterations to the paths of travel, floors,

ceilings, platforms, mezzanine, and canopies during the Renewal Project triggered the MTA's

obligation to ensure that Plaintiffs and the class of individuals who use wheelchairs and other

devices for mobility could access the station at the conclusion of the project.  Op. & Order 10,

14

ECF No. 131.  Plaintiffs and the class could only gain access to the station if elevators had been installed.  PSUF ¶¶ 27-28, 32-42.[4]

Requiring elevator construction during the alterations to the Middletown Road station is also consistent with both U.S. Department of Justice and U.S. Department of Transportation ("USDOT") guidance.  The USDOT's interpretation of the Accessible Alterations Rule specifies that the rule "requires that any alteration, to the maximum extent feasible, results in the *altered area* being accessible."  49 C.F.R. pt. 37 App. D, § 37.43 (emphasis added).  That interpretation does not limit the accessibility requirement to individual altered elements in the altered area; rather, it encompasses the entire altered area itself, which here is the vertical path of travel as well as the station mezzanine and platforms.

**B.      Overwhelming and Uncontroverted Evidence Demonstrates that Plaintiffs Have Met the Burden of Production to Show that the MTA Could Have Installed Elevators at the Station.**

Here, multiple sources of undisputed evidence, including the MTA's own employees and contractors, describe several ways that the MTA could have built elevators at the Middletown Road station.  The proposals include analyses prepared by the MTA itself, by WSP under a contract with the MTA, and by expert witnesses on both sides.  Each analysis suggests multiple locations for each of the three elevators that would be required to make the Middletown Road station accessible to individuals who use wheelchairs.  As discussed below, the multitude of proposals from varying sources defeats any argument that elevator construction was "virtually impossible in light of the nature of the facility."  *Roberts*, 542 F.3d at 372 (quotation marks omitted); 49 C.F.R. § 37.43(b) ("the phrase to the maximum extent feasible applies to the

---

[4] The mezzanine of the Middletown Road station is elevated more than ten feet above ground level. Therefore, it is not possible to provide vertical access to people with disabilities without including elevators.

occasional case where the nature of an existing facility makes it *impossible* to comply fully with applicable accessibility standards through a planned alteration." (emphasis added)).

**C.    The MTA Cannot Meet Its Burden of Persuading the Court That It Was Virtually Impossible or Technically Infeasible to Install Elevators at the Middletown Road Station.**

      **1.**    The MTA Bears the Heavy Burden of Proving It Could Not Install Elevators.

The MTA bears a heavy burden to prevail on its anticipated affirmative defense: It must "persuad[e] the factfinder that the plaintiff's proposal would be '*virtually impossible*' in light of the 'nature of the facility.'" *Roberts*, 542 F.3d at 372 (citing parallel provision of 42 U.S.C. § 12183) (emphasis added); *hip Heightened Independence & Progress, Inc. v. Port Auth. of N.Y. & N.J.*, 693 F.3d 345, 353 (3d Cir. 2012) (applying the *Roberts* burden-shifting framework to hold that a public transit authority bears the burden of proving technical infeasibility); *De La Rosa v. 597 Broadway Dev. Corp.*, 13cv7999 (LAK) (MHD), 2015 WL 7351540 at *11 (S.D.N.Y. Aug. 4, 2015) (in Title III context, "[a defendant] cannot defeat facially plausible proposals for doing so [ensuring continued access to the maximum extent feasible] absent evidence that the proposed accommodation would be virtually impossible.").  USDOT regulations implementing Title II of the ADA confirm that "the term 'maximum extent feasible' means that all changes that are possible must be made." 49 C.F.R. pt. 37 App. D, § 37.43.[5]

---

[5] Moreover, the analysis of whether  a renovation has been performed to the maximum extent feasible is "backward-looking," and "asks whether, at the time the . . . renovations were performed, the defendants had made maximally feasible efforts to achieve the requisite level of accessibility." *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 375 (2d Cir. 2008).  Therefore, the relevant question is whether it would have been feasible to build elevators at the Middletown Road station between October 2013 and May 2014.  *See hip Heightened Indep. & Progress, Inc. v. Port Auth. of N.Y. & N.J.*, 693 F.3d 345, 353 (3d Cir. 2012) (remanding for consideration of feasibility as of the time of construction).

**2.** <u>The MTA's Pivot to a Quotation from Legislative History Contained in Non-Binding Interpretive Guidance Related to "Technical Infeasibility" Does Not Provide Them the Escape Hatch that They Seek to Evade Liability.</u>

The MTA's own witnesses readily admit that it was not "virtually impossible" to construct elevators, and the evidence set out above shows the myriad ways it could have been accomplished.  In the face of the undisputed facts, the MTA clings unavailingly to one non-binding phrase derived from legislative history to claim that elevator installation was "technically infeasible."  The MTA claims that *any* alteration of *any* load-bearing structural member, regardless of context or other facts, results in an instant "get-out-of-jail-free card" that relieves it from the obligation of elevator installation.  Defs.' Pre-Mot. Ltr. 2-3 (Apr. 9, 2020), ECF No. 149.  Besides being contrary to the Accessible Alternations Rule and controlling case law presented above, the MTA's argument ignores the text of the ADA and its regulations defining the term "maximum extent feasible" in the implementing regulations and the well-established intent of the ADA to achieve accessibility over time.  Finally, the MTA cannot prove that any beams or girders that needed to be altered during the Renewal Project to accommodate elevators were essential to the structural frame, nor that any alterations to those beams or girders were "virtually impossible" to complete, given that the MTA performed the same types of modifications to other structural members during the Renewal Project.

     **a.**    **The MTA Ignores the Plain Text of the Statute and Regulation and Propounds a Contradictory Interpretation that Would Cause an Absurd Result.**

The Accessible Alterations Rule required the MTA to perform the Renewal Project "in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations." 42 U.S.C. § 12147(a).  USDOT regulations define "maximum extent feasible" as "appl[ying] to the occasional case where the

nature of an existing facility makes it impossible to comply fully with applicable accessibility standards through a planned alteration" and unambiguously requires: "Any altered features of the facility or portion of the facility that can be made accessible shall be made accessible." 49 C.F.R. § 37.43(b).  The interpretive appendix to the DOT regulations similarly defines "maximum extent feasible" as requiring that "all changes that are possible must be made." 49 C.F.R. pt. 37 App. D, § 37.43.  Further, the 2010 Standards for Accessible Design, which apply to new construction and alterations that commence on or after March 15, 2012, 28 C.F.R. § 35.151(c)(3), require that "[i]n alterations, where compliance with applicable requirements is technically infeasible, the alteration shall comply with the requirements to the maximum extent feasible." 2010 Standards for Accessible Design 202.3 Exception 2, 36 C.F.R. Pt. 1191 App. B (hereinafter "2010 Standards").

In contrast to the overwhelmingly clear statutory imperative requiring accessibility whenever possible, the MTA has seized on a potential loophole that arises in the interpretive appendix to the DOT regulations. Defs.' Pre-Mot. Ltr. 2-3 (Apr. 9, 2020), ECF No. 149.  The appendix cites to the Senate Report on the ADA, which interprets the term "maximum extent feasible" as "allow[ing] for the occasional case in which the nature of an existing facility is such as to make it virtually impossible to renovate the building in a manner that results in its being entirely accessible to and usable by individuals with disabilities." 49 C.F.R. pt. 37 App. D, § 37.43 (quoting S. Rep. 101-116).  From the legislative history, it states that:

> [F]or example the term "to the maximum extent feasible" should be construed as not requiring entities to make building alterations that have little likelihood of being accomplished without removing or altering a load-bearing structural member unless the load-bearing structural member is otherwise being removed or altered as part of the alteration.

*Id.* (quoting S. Rep. 101-116).

Completely ignoring the modifying phrase "little likelihood of being accomplished," the MTA inappropriately zeroes in on the specific word choice in the rest of the sentence, which states, "*without* removing or altering a load-bearing structural member *unless* the load bearing structural member is otherwise moved or altered as part of the renovation" to claim that they do not have to follow the law.  *Id.* (emphasis added).  Yet in doing so, the MTA interprets the legislative history quoted in the interpretive guidance in a manner that renders the regulation inconsistent with Title II itself by undermining the requirement that altered areas of stations must be readily accessible to and usable by individuals with disabilities unless it is virtually impossible to do so.  That interpretation of legislative history in an appendix in a way that is inconsistent with the statute itself is improper.  *See Decker v. Nw. Envtl. Def. Ctr.*, 568 U.S. 597, 609 (2013) ("It is a basic tenet that regulations, in order to be valid, must be consistent with the statute under which they are promulgated." (citation and internal quotation marks omitted)).

In addition, the MTA blatantly ignores the regulatory language of the 2010 Standards, which limit the Senate's interpretation of "maximum extent feasible" to items "that ha[ve] little likelihood of being accomplished *because* existing structural conditions would require removing or altering a loadbearing member *that is an essential part of the structural frame*." 2010 Standards 106.5 (emphasis added).  The 2010 Standards further do not attempt to limit the obligation to make facilities accessible based on whether any individual load-bearing member was already going to be removed or altered.  *Id.*

In contrast to the regulatory authority of the 2010 Standards, the MTA treats the possible need to alter any load-bearing structure, regardless of whether it is essential to the structural frame, as solely determinative of whether elevator construction is feasible.  The MTA therefore concludes that elevator construction has "little likelihood of being accomplished" simply because

it does not want to build elevators.  Defs.' Pre-Mot. Ltr. 2-3 (Apr. 9, 2020), ECF No. 149.

However, the interpretive appendix does not excuse noncompliance with the 2010 Standards.

Under USDOT regulations, transportation facilities are not "readily accessible to and usable by

individuals with disabilities" unless they comply with both USDOT regulations *and* the 2010

Standards.  49 C.F.R. § 37.9(a).

 If the MTA's incorrect interpretation were to stand, elevator installation, which always

involves a major structural undertaking, would almost never be required under the law.  This

would upend the intent of the ADA, which specifically seeks to provide access to people who

use wheelchairs for mobility during renovations that affect usability.  This is especially true as to

the New York City subway system, because the MTA admits that "existing station structures [in

the New York City subway system] are typically not capable of supporting loads from elevator

installations."  PSUF ¶ 52 (Design Procedures Manual).  Therefore, if applied to the entire

subway system, compliance with the Accessible Alterations Rule would be excused in the

majority of cases, regardless of the scope of future renovations, gutting the statute's goal of

achieving greater accessibility over time.  Neither the statute nor the regulations contemplate

such an absurd result.  Instead, the regulations explicitly state that the defense of technical

infeasibility is meant to be reserved for "the occasional case."  49 C.F.R. pt. 37, App. D, §

37.43.[6]  Even if there is any ambiguity regarding the correct standard to apply, the "broad

remedial purpose" of the ADA "provides a compelling justification for an inclusive

_____

[6] Nor can the MTA meet its burden of proving that any existing site constraints would have
prohibited elevator construction, as the MTA did not perform an assessment of whether potential
site constraints would definitively render elevator construction "virtually impossible."  As to real
estate concerns, the possibility that the MTA would have needed to purchase land or acquire an
easement does not automatically render elevator construction technically infeasible.  *hip*, 693
F.3d at 354.  Instead, the MTA bears the burden of proving that the landowner would not allow it
to purchase land or acquire an easement for operation of elevators.  *See id.*

interpretation." *De La Rosa v. Lewis Foods of 42nd St., LLC*, 124 F. Supp. 3d 290, 294-95

(S.D.N.Y. 2015) (citing *Castellano v. City of New York*, 142 F.3d 58, 69 (2d Cir. 1998)).

> **b.     In Any Event, There Is No Genuine Issue of Material Fact that the MTA Cannot Prove the Factual Assertions It Makes to Support Its Own Affirmative Defense Concerning the Technical Feasibility of Building Elevators.**

Even if the MTA's hyper-technical interpretation of legislative history is correct, the

mezzanine floor girders that the MTA contends would need to be replaced or altered to build

elevators are not essential to the structural frame, nor would the changes required be of the

magnitude that the legislative history's definition of "technical infeasibility" contemplates.

Moreover, the original renovation project included modifications to the same "load-bearing"

structures that the MTA now contends cannot possibly be altered for the purpose of installing

elevators.

With regard to potential alterations to load-bearing structures, it is undisputed that the

MTA already altered five mezzanine girders during the Renewal Project.  PSUF ¶ 18.  The MTA

determined which girders to alter by calculating whether the replacement of the floor slab during

the Renewal Project would overstress any of the mezzanine floor girders.  *Id.*  Then, the MTA

modified floor girders during the Renewal Project using the same methods that it would have

used to shore up girders for elevator installation.  *Id.* ¶ 77.  Therefore, the MTA easily could have

performed a similar calculation if it had planned to install elevators during the Renewal Project,

then altered all of the necessary girders during the renovation, as the law required.  Thus, it

would not be "virtually impossible" to alter additional mezzanine floor girders to accommodate

elevators, because similar alterations were already performed during the Renewal Project.

Moreover, the mezzanine floor girders that the MTA contends would need to be replaced

or altered to accommodate elevators are not essential to the structural frame.  Gricelda Cespedes

admitted that a "hung mezzanine" such as the one at the Middletown Road station is supported by the bents and girders above, not by the mezzanine floor beams and girders. *Id.* ¶ 20. MDC concurred, stating that the only elements essential to the structural frame were the columns, bents, and track and platform girders that were necessary to ensure the trains could continue to run at the Middletown Road station, and that those elements supported the mezzanine. *Id.* ¶ 87. Because the mezzanine floor girders were not essential to the structural frame, and any necessary modifications to those girders did not have "little likelihood of being accomplished," any changes to those girders would not render elevator construction technically infeasible.

D.   <u>Under the New York City Human Rights Law, Which Prohibits Discrimination Based on Disability in the Management of Public Transportation Services, the MTA Discriminates Against People with Disabilities by Failing to Build Elevators at the Middletown Road Station.</u>

In addition to failing to meet their obligations under the ADA and Section 504, Defendants violated the NYCHRL by denying people with mobility disabilities access to the Middletown Road station. Under the NYCHRL, it is an "unlawful discriminatory practice for any person who is the . . . lessee, proprietor, [or] manager . . . of any place or provider of public accommodation, . . . [b]ecause of any person's . . . disability . . . directly or indirectly, [t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, facilities, or privileges of the place or provider of public accommodation." N.Y.C. Admin. Code § 8-107(4)(a)(1)(a). The NYCHRL must be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal . . . civil and human rights laws, including those laws with . . . [comparably-worded] . . . provisions . . . have been so construed." *Id.* § 8-130(a); *Ya Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) ("interpretations of state and federal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall"

(citation and internal quotation marks omitted)); Order Denying Defs.' Mot. to Dismiss, Hr'g Tr.

12:14-17, *Center for Indep. of the Disabled N.Y. v. Metropolitan Transp. Auth.*, No.

153765/2017 (N.Y. Sup. Ct. June 5, 2019) ("If you look at the ADA and the RA [Rehabilitation

Act], they are less liberal than the most liberal construction that the Restoration Act requires this

Court to provide to situations under New York City Human Rights Law.").

 Under the NYCHRL, "persons" is defined to include governmental bodies or agencies,

such as the MTA and NYCT, N.Y.C. Admin. Code § 8-102, and the MTA and NYCT are

responsible for the operation of subway service at the Middletown Road station.  Moreover, each

individual subway station is a separate place of public accommodation under the NYCHRL.  *Id.*

(defining "place or provider of public accommodation" to include places "where goods, services,

facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or

otherwise made available").  Because the failure to build elevators at the Middletown Road

station denies named Plaintiffs and class members the ability to access the subway system at the

station, the MTA discriminates against people with mobility disabilities in violation of the

NYCHRL.

**E.** **Because the MTA Cannot Prove that It Is Infeasible to Build Elevators at the Middletown Road Station, It Must Build the Elevators.**

 The Court has broad authority to remedy the exclusion of the class of persons with

mobility disabilities from the Middletown Road station.  Equitable remedies are available under

Title II and Section 504 to stop the MTA from violating the law and require affirmative

compliance.  42 U.S.C. § 12133; 29 U.S.C. § 794a; *Henrietta D. v. Bloomberg*, 331 F.3d 261,

280-84 (2d Cir. 2003).  The New York City Human Rights Law also authorizes "injunctive relief

and such other remedies as may be appropriate." N.Y.C. Admin. Code § 8-502(a).  The Plaintiff

Class and the United States seek an order requiring the MTA to install elevators at the

Middletown Road station forthwith, Pls.' Am. Compl. ¶ 139, ECF No. 35; Intervenor Compl. Prayer for Relief ¶ B, ECF No. 66; and providing that the Court shall maintain jurisdiction until all three elevators are constructed.  Such an order is necessary to remedy the MTA's discrimination against the Plaintiff Class.

## VI.    CONCLUSION

As set forth above, Plaintiffs respectfully request that the Court grant their motion for summary judgment and enter an injunction ordering the MTA to build three elevators at the Middletown Road station within the next three years.

Dated:  May 11, 2020
         New York, New York

Respectfully submitted,

DISABILITY RIGHTS ADVOCATES


_____
Michelle A. Caiola
Rebecca J. Rodgers
Rebecca C. Serbin
DISABILITY RIGHTS ADVOCATES
655 Third Avenue, 14th Floor
New York, NY 10017-5621
Tel:  (212) 644-8644
Fax:  (212) 644-8636
*Attorneys for Plaintiffs*