UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRONX INDEPENDENT LIVING SERVICES, a
nonprofit organization; DISABLED IN ACTION OF
METROPOLITAN NEW YORK, a nonprofit
organization; ROBERT HARDY, an individual; and
RODOLFO DIAZ, an individual; on behalf of
themselves and all others similarly situated,

        Plaintiffs,

    v.

METROPOLITAN TRANSPORTATION
AUTHORITY, a public benefit corporation;
THOMAS PRENDERGAST, in his official capacity
as chairman and chief executive officer of the
Metropolitan Transit Authority; NEW YORK CITY
TRANSIT AUTHORITY, a public benefit
corporation; and VERONIQUE HAKIM, in her
official capacity as president of the New York City
Transit Authority,

        Defendants.

UNITED STATES OF AMERICA,

        Plaintiff-Intervenor,

    v.

METROPOLITAN TRANSPORTATION
AUTHORITY and NEW YORK CITY TRANSIT
AUTHORITY,

        Defendants.

**OPINION & ORDER**

16 Civ. 5023 (ER)

RAMOS, D.J.

Despite the fact that more than 100,000 Bronx residents live with a mobility disability, none of the ten subway stations along the four miles between the Pelham Bay Park and Hunts Point Avenue Stations on the 6 subway line are wheelchair accessible.  From October 2013 until May 2014, the Metropolitan Transportation Authority ("MTA") and the New York City Transit Authority ("NYCTA") engaged in an approximately $26.6 million renovation of the Middletown Road Station located along that stretch but did not add elevators to provide wheelchair accessibility.[1]  Not-for-profit organizations working with disabled New Yorkers, Bronx Independent Living Services ("BILS") and Disabled in Action of Metropolitan New York ("DIA"), and their constituents Robert Hardy and Rodolofo Diaz, bring this class action against the MTA, NYCTA and their chief executives (collectively, "Defendants"), alleging that renovating the Middletown Road Station without making it wheelchair accessible violated the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and the New York City Human Rights Law ("NYCHRL").  In 2018, the United States intervened also alleging violation of the ADA.  In 2019, this Court granted Plaintiffs' motion for partial summary judgment, finding that the scope of the work performed at the station triggered an obligation under the ADA to alter it to the "maximum extent feasible" to make it "readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs" regardless of cost.  *BILS v. Metro. Transit Auth.*, 358 F. Supp. 3d 324, 328-30 (S.D.N.Y. 2019) (citing 49 C.F.R. § 37.43(a)(1)).  Now pending before this Court are Plaintiffs' and Defendants' cross-motions for summary judgment.  For the reasons set forth below, both motions are DENIED.

---

[1]  The MTA is a public benefit corporation that provides public transportation in New York and receives federal financial assistance.  Doc. 165 at ¶¶ 1-3.  NYCTA is a subsidiary of the MTA.  *Id.* at ¶ 4.  Both the MTA and NYCTA operate the New York City subway system.

I.        **Background and Procedural History**

The Middletown Road Station is an elevated stop on the 6 subway line located at the

intersection of Westchester Avenue, Middletown Road, and Appleton Avenue in the Bronx.  Doc.

165 at ¶ 7.  Riders enter the Middletown Road Station using stairways located on either side of

Westchester Avenue, which lead to an elevated mezzanine at the center of the station.  Doc. 172

at ¶ 3.  The mezzanine hangs from girders[2] that support the subway tracks running above it.  *Id.*

From the mezzanine, riders purchase fares and enter turnstiles or doors to reach the stairways

leading to the northbound and southbound platforms.  *Id.*  The Middletown Road Station, which

was built in 1919 and became operational in 1920, does not have any elevators.  *Id.* at ¶ 2; Doc.

165 at ¶ 9.  To become accessible, the Middletown Road Station would require three elevators:

one from the street level to the mezzanine, and one from the mezzanine to each of the

northbound and southbound platforms.  Doc. 165 at ¶ 19.

In 2003, Defendants made initial plans to renovate the Middletown Road Station as part

of a larger renovation project that included eight other elevated stations located between the

Whitlock Avenue and the Buhre Avenue Stations on the Pelham Line, none of which included

elevators.  Doc. 172 at ¶¶ 4, 6, 8.  In November 2007, Defendants applied to the Federal Transit

Administration ("FTA")[3] for federal funding for the renovation project.  Doc. 172 at ¶¶ 6-7.

Defendants' application included its master plans for those nine stations, which still did not

include elevators.  *Id.* at ¶¶ 8-9.  Between 2007 and 2012, Defendants discussed the scope of the

---

[2]  A girder is a "horizontal main supporting beam that carries vertical concentrated load."  Girder, Britannica, https://www.britannica.com/technology/girder (last visited Mar. 29, 2021).  The load is "the forces to which a structure is subjected due to superposed weight or to wind pressure on the vertical surfaces."  Load, Merriam-Webster, https://www.merriam-webster.com/dictionary/load (last visited Mar. 29, 2020).

[3] The FTA is a subsidiary of the Department of Transportation ("DOT").  *BILS*, 358 F. Supp. 3d at 328.  Both promulgate regulations implementing the transportation-related provisions of Title II of the ADA.  *Id.*  Plaintiffs dispute that the FTA's approval or denial of renovations at the Middletown Road Station or any other stations is material to whether Defendants have violated the ADA.  Doc. 172 at Global Objections ¶ 3.

project during quarterly meetings, triennial reviews, and program meetings with the FTA. *Id.* at ¶ 7.  In 2008, Defendants withdrew their request for federal funding for four of the nine stations in their application, including the Middletown Road Station.  *Id.* at 11.

Defendants reduced the scope of the planned renovations to those four stations in August 2011 and resubmitted a request for funding to the FTA in March 2012 (the "Pelham Project"). *Id.* at ¶¶ 13-14.  On October 25, 2012, the FTA asked for a narrative analysis and supporting documentation showing why installing elevators at each of the four stations in the Pelham Project would be infeasible.  *Id.* at ¶ 23.  On April 23, 2013, Defendants submitted an infeasibility study for the Pelham Project.  *Id.* at ¶ 24.  With respect to the Middletown Road Station, Defendants represented that installing an elevator from the street to the mezzanine at the northeast corner of Appleton Avenue and Westchester Avenue would require a bridge connecting the elevator to the station.  *Id.* at ¶ 25.  Defendants also explained that an elevator to the northbound platform would block egress from the Middletown Road Station, and that an elevator to the southbound platform would impede traffic turning on Appleton Avenue and its pit would reduce clearance on the street below.  *Id.* at ¶ 26.

Between July 19, 2013 and April 14, 2014, the FTA and Defendants corresponded regarding the infeasibility study.  *Id.* at ¶ 27.  Almost simultaneously, from October 5, 2013 until May 4, 2014, Defendants closed the Middletown Road Station for extensive renovations.  Doc. 165 at ¶ 10.  Defendants repaired and replaced structural steel framing for the mezzanine and the concrete platforms, replaced floors, walls, ceilings, facilities and equipment as needed, including the roof of the mezzanine, the street and platform stairs and their canopies, railings, windscreens, and corroded steel.  Doc. 172 at ¶ 15.  Defendants also reconstructed the platform edges, including new areas for disabled individuals to board trains, installed new mezzanine and

platform lighting, speakers, bird deterrent features, help points, and fire alarm systems, painted,

and incorporated artwork. *Id.* Defendants also added ADA-compliant handrails, toilets, water

coolers, locker rooms, and telephones, installed tactile warning strips on platform edges and

boarding areas for disabled individuals, and replaced existing signs with signs that included

Braille. *Id.* at ¶ 16. These renovations admittedly required modification and replacement of

some load-bearing structures, and the alteration of five mezzanine floor girders. Doc. 165 at ¶¶

17-18. No elevators were installed. *Id.* at ¶ 21. The renovations cost $26,580,235.19. *Id.* at ¶

10. On July 8, 2014, the FTA informed Defendants that the Middletown Road Station was not

compliant with the ADA. Doc. 172 at ¶ 30. Ultimately, the FTA withheld funding for the

Middletown Road Station, but provided funding for rest of the stations in the Pelham Project. *Id.*

at ¶ 33.

On June 28, 2016, Plaintiffs BILS, DIA, Hardy, and Diaz filed a class action lawsuit

against Defendants alleging violation of the ADA, RA, and NYCHRL. Doc. 1. BILS is a

nonprofit independent living center that provides services for, and advocates on behalf of,

disabled individuals to help them live as independently as possible. Doc. 165 at ¶¶ 22-23. DIA

is a civil rights organization run by people with disabilities who work to end discrimination

against people with disabilities. *Id.* at ¶¶ 29-30. Hardy and Diaz are both Bronx residents with

mobility disabilities. Docs. 61 at ¶¶ 2, 6; 62 at ¶¶ 2-3. Hardy is an elected member of DIA's

board and Diaz was formerly employed by BILS. Docs. 61 at ¶ 3; 62 at ¶ 7. Together, Plaintiffs

represent a class of all persons with mobility disabilities who cannot currently use the

Middletown Road Station because of accessibility barriers and who would use the station if it

were made accessible. Doc. 84 at 2. On February 23, 2017, Plaintiffs amended the complaint.

Doc. 35.  On March 13, 2018, the United States intervened alleging that the MTA and NYCTA violated the ADA.  Doc. 66.  On April 25, 2018, the Court certified the class.  Doc. 84.

On March 5, 2019, the Court granted Plaintiffs' motion for partial summary judgment and denied Defendants' cross-motion for partial summary judgment.  *BILS*, 358 F. Supp. 3d at 326. Plaintiffs argued that ADA-implementing regulation 49 C.F.R. § 37.43(a)(1) applied to Defendants' renovations at the Middletown Road Station, which requires "alterations to increase accessibility no matter the cost," whereas Defendants argued that § 37.43(a)(2) applied, which only requires alterations "if doing so would not be disproportionately expensive."  *Id.*  The Court found that Defendants' renovation of the Middletown Road Station "altered the station 'in a way that affects or could affect its usability'" and therefore Defendants were obligated to make the station accessible "'to the maximum extent feasible,' regardless of cost" pursuant to § 37.43(a)(1).  *Id.* at 329-31 (citing *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 371 (2d Cir. 2008)). Although the Court "agree[d] with Defendants that § 37.43(a)(2) also arguably applies" because an area serving a primary function had been altered, it denied Defendants' cross-motion because Defendants had requested that the Court hold § 37.43(a)(1) inapplicable.  *Id.*

On May 11, 2020, Plaintiffs moved for summary judgment.  Doc. 152.  On July 10, Defendants cross-moved for summary judgment and opposed Plaintiffs' motion.  Doc. 162.  In their moving papers, Defendants challenge Plaintiffs' standing to bring this class action.  The parties also vehemently dispute whether the installation of elevators at the Middletown Road Station would have been feasible.  Finally, Defendants argue that the United States' claim for injunctive relief is barred by the statute of limitations and otherwise inequitable.  The evidence relevant to each dispute will be set forth in turn.

### A.      Standing

Defendants challenge whether Plaintiffs have standing to bring this class action.  The

facts relevant to standing were developed at depositions and through declarations by the

individual Plaintiffs, and representatives and employees of the institutional Plaintiffs.

### i.      BILS

BILS has six board members and twenty-one employees, the majority of whom have

disabilities.  Doc. 55 at ¶ 29.  BILS served between 2,700 to 2,800 constituents in 2016.  *Id.* at ¶

5.  Of the approximately 2,200 of its constituents living in the Bronx, 230 have a mobility

disability.  *Id.*  BILS' resources are depleted when staff with mobility disabilities cannot use the

Middletown Road Station because they must then spend more time getting to places near that

station than they would if the station were accessible and spend less time working with other

clients.  *Id.* at ¶ 19.  BILS also expends time and money in the form of staff salaries when staff

investigate and advocate for elevators at the Middletown Road Station rather than working on

other projects.  *Id.* at ¶¶ 26-28; Doc. 166-5 at 60:9-16.

Brett Eisenberg, the executive director of BILS, gave deposition testimony on December

12, 2017 and provided a declaration on February 20, 2018.  Docs. 55; 166-5 at 37:14-15.  He is a

Bronx resident who is confined to a wheelchair and must use elevators at the subway.  Doc. 55 at

¶¶ 2-3.  Eisenberg attests that he and other BILS employees with disabilities are deterred from

using the Middletown Road Station because it is inaccessible.  *Id.* at ¶¶ 6-7.  According to

Eisenberg, BILS employees would use the Middletown Road Station to carry out their

responsibilities for BILS at the Adult Career and Continuing Education Services ("ACCES")

office and nursing homes around that station.[4]  *Id.* at ¶¶ 12-16.  Eisenberg could not name any

---

[4]  The Court takes judicial notice that the nursing homes Eisenberg cited are closer to other, accessible stations.
Doc. 165 at ¶ 26 & n.9; *Guzman v. Mel S. Harris and Assocs., LLC*, No. 16 Civ. 3499 (GBD), 2018 WL 1665252, at

constituent who lived near the Middletown Road Station because BILS does not log its constituents' addresses. Doc. 166-5 at 135:12-36:15, 159:3-60:3. He reasoned, however, that BILS constituents would use the Middletown Road Station if it were accessible because those with disabilities want to use the services that everyone else can use. *Id.*

Diaz, a former BILS employee, gave deposition testimony on December 5, 2017 and provided a declaration on February 23, 2018. Docs. 62 at ¶ 7; 166-4. He is a longtime Bronx resident who is confined to a wheelchair. Doc. 166-4 at 28:8-19, 31:1-20. Diaz performed outreach for the healthy living course he ran at BILS near the Middletown Road Station on approximately three occasions. *Id.* at 78:9-79:16. His closest subway stop is the East 180th Street Station, which has an elevator. *Id.* at 46:14-22. While he admitted that the Hunts Point Station, which is wheelchair accessible, is also closer to his home than the Middletown Road Station, he confirmed that the Middletown Road Station is still nearby. *Id.* at 85:16-86:1, 112:22-13:7. He had an appointment with a new doctor near the Middletown Road Station, and anticipated that his job search might take him near the Middletown Road Station in the future.[5] *Id.* at 87:5-88:3, 91:2-6. He is deterred from going to the Middletown Road Station because it does not have elevators. Doc. 62 at ¶ 20.[6]

---

*6 n.9 (S.D.N.Y. Mar. 28, 2018) ("Plaintiff cites Google Maps webpages that show the distances between locations listed, of which courts may take judicial notice.").

[5] The Court also takes judicial notice that his appointment is closer to the accessible Pelham Bay Park Station than the Middletown Road Station. Doc. 165 at ¶ 40; *Guzman*, 2018 WL 1665252, at *6 n.9.

[6] Defendants argue that Plaintiffs should be precluded from relying on the declarations of BILS employees Anthony Lebron, Crystal Rivera, Jessica Tambor to support standing because none of them were identified in Plaintiffs' interrogatory responses. Doc. 165 at ¶¶ 26 n.8, 42 n.12; Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Because Plaintiffs admit that they failed to identify Lebron, Rivera, and Tambor, and do not argue for their inclusion, the Court will not consider their declarations.

ii.      **DIA**

DIA has 200 dues-paying members, 45 of whom live in the Bronx.  Doc. 165 at ¶ 31. Edith Prentiss, the President of DIA, gave deposition testimony on December 18, 2017 and provided a declaration on February 26, 2018.  Docs. 59 at ¶ 4; 166-8.  She has a mobility disability and cannot use a subway station that does not have elevators.  Doc. 59 at ¶ 3.  As part of her work with DIA, she advocates to New York City and State officials for accessible subway stations and has investigated "transportation deserts" created by the lack of accessibility.  *Id.* at ¶¶ 9, 37.

During meetings with DIA constituents, Prentiss learned that the Middletown Road Station was a transfer hub for people traveling to other destinations.  Doc. 166-8 at 54:22-55:13. Prentiss also learned that the nearest accessible station required two bus transfers between three different buses.  *Id.*  Despite these conversations with constituents, she could not report how many DIA members live or work near the Middletown Road Station.  *Id.* at 67:13-68:1.  In 2017, Prentiss spent thirty-five to forty hours advocating for accessibility at the Middletown Road Station.  Doc. 59 at ¶ 35.  She traveled to New York State Assemblyman Luis Sepulveda's office, also near Middletown Road Station, three times since January 2017 using at least three buses. *Id.* at ¶¶ 12-14.  The trip took an hour and a half to two hours each time.  *Id.* at ¶ 12.  If the Middletown Road Station were accessible, Prentiss would have preferred taking the subway.  *Id.* at ¶¶ 8, 15.  The effort and money DIA spent advocating for the Middletown Road Station's renovation to include elevators could have been spent on other advocacy projects such as inaccessibility at the Brooklyn Botanical Garden and the One-Step Campaign to remove steps in front of stores.  *Id.* at ¶ 40.  More generally, DIA takes calls from its members who encounter service issues as they travel across New York City or need help plotting their routes to accessible

stations.  *Id.* at ¶¶ 41-43.  Fewer accessible stations increase the number of callers and therefore divert DIA's resources from their advocacy work to answer calls.  *Id.* at ¶ 43.  DIA board members Robert Hardy and Daniel Porro, and member Dustin Jones, would use the Middletown Road Station if it were accessible.  *Id.* at ¶ 52.

Robert Hardy gave deposition testimony on November 10, 2017 and provided a declaration on February 23, 2018.  Docs. 61; 166-3.  Hardy is a Bronx resident whose medical conditions render it difficult for him to walk more than half a block and thus confine him to a wheelchair for increased mobility.  Doc. 166-3 at 27:4-30:22.  He is also visually-impaired and, more recently, requires the aid of a personal care attendant to travel outside of his apartment.  *Id.* at 16:9-24, 23:3-5, 33:11-22.  Because of the decline of his mobility and eyesight in recent years, Hardy does not "go too far from [his] apartment" without his aide.  *Id.* at 33:11-22.  Hardy does, however, attend monthly board meetings of the DIA.  *Id.* at 51:10-52:2.  Hardy has been a member of the DIA for six years, and a board member for approximately three years.  *Id.* at 52:23-53:2, 63:3-6.  He takes Access-A-Ride to DIA board meetings and has not taken the subway in at least three years.  *Id.* at 52:6-7, 115:2-5.  He takes buses to Co-Op City and "most anyplace [he] need[s] to go."  *Id.* at 119:11-18.  While he considers traveling to the Middletown Road Station "dangerous" because the street is "torn up," he would use the station with friends or his aide if it had an elevator.  *Id.* at 102:9-106:4, 167:11-68:10.  Although the 180th Street Station is one mile from Hardy's home, and the Middletown Road Station is 1.8 miles from Hardy's home, Hardy believes that the Middletown Road Station is easier to get to because the 180th Street Station is out of the way whereas the Middletown Road Station is directly down the road.  *Id.* at 143:1-44:4, 168:11-15, 168:22-70:7.  He could reach the Middletown Road Station by bus without transferring, making it "[l]ogistically . . . closer" than the 180th Street Station, which

would require transferring between two buses.  *Id.* at 178:7-79:10.  Hardy affirmed in his declaration that he used the Middletown Road Station when he was able to walk but, now that his mobility has decreased, he is deterred from using it because it does not have elevators.  Doc. 61 at ¶¶ 13-14.

DIA Board Member Daniel Porro provided a declaration on February 23, 2018.  Doc. 57. Porro is a lifelong Bronx resident who uses the subway several times a week.  *Id.* at ¶¶ 2-5.  His diabetes diagnosis affects his balance and makes it painful to climb stairs.  *Id.* at ¶ 6.  He thus prefers using subway stations with elevators.  *Id.* at ¶ 7.  Although he uses the Middletown Road Station to visit friends and shop, the lack of elevators makes it painful to use the stairs and difficult for him to bring home packages because of his balance issues.  *Id.* at ¶ 10.  Porro would use the Middletown Road Station more often if it were accessible.  *Id.* at ¶ 11.

Dustin Jones is a DIA constituent who provided a declaration on February 13, 2018. Doc. 58.  Jones has a mobility disability and uses the subway every day.  *Id.* at ¶¶ 3-4.  He has traveled to medical appointments at the Hutchinson Metro Center quarterly since 2011 and, although the Middletown Road Station is close to it, he has been forced to use Access-A-Ride which takes longer and decreases his independence.  *Id.* at ¶¶ 5-7.  Jones also uses the 180th Street Station to reach a storage unit that he maintains but, when the elevator at that station is out of service, he cannot get there because no other nearby stations are accessible.  *Id.* at ¶¶ 8-9.  He is looking for an affordable apartment in the Bronx, which he could find in the area of the Middletown Road Station, but is deterred from doing so because of the lack of accessible stations.  *Id.* at ¶¶ 10-12.

Anthony Trocchia, former DIA president and member of DIA since the 1990s, provided deposition testimony on January 25, 2018.  Doc. 166-7 at 27:3-14, 102:12-14.  He agreed that

advocating for subway accessibility took volunteer time away from advocacy on other issues.  *Id.* at 98:10-20.  He also testified that "[t]he consensus among DIA is that the subway system is not friendly to wheelchair users.  And when the opportunity presents itself to augment the number of accessible stations, we seize upon it."  *Id.*

### B.  Feasability

The parties dispute the feasibility of installing elevators at the Middletown Road Station and the relevance of cost and altering load-bearing structures in evaluating feasibility.  Plaintiffs rely on the MTA Design Procedures Manual, the expert reports of MDC*System*, and depositions and declarations of the individuals that prepared that report.  Defendants rely on the testimony of employees Gricelda Cespedes and Alexander Cohen, New York City Department of Transportation official William Carry, and retained experts Guy Nordenson, Daniel Mitchell, and Ramesh Desai.

### i.  Plaintiffs' Evidence

#### a.  The MTA's Design Procedures Manual

The MTA's 2018 Design Procedures Manual states that elevator installations need to be self-supporting because existing elevated station structures are not typically capable of supporting the load from an elevator installation.  Doc. 165 at ¶ 52.

#### b.  MDC*Systems* Enterprises[7]

In 2018, MDC*Systems* Enterprises ("MDC") was retained by the United States to ascertain whether Defendants would have had to remove or alter the existing structural frame to

---

[7] Defendants argue that Plaintiffs cannot rely on unsworn expert reports at summary judgment.  Doc. 165 at ¶ 75. However, MDC's report is supported by declarations of its preparers and their deposition testimony.  Doc. 171 at 22 n.4.  "[T]he rule that unsworn expert reports may not be considered on summary judgment is inapplicable where the expert ratifies the report in a deposition."  *In re Refco Inc. Sec. Litig.*, No. 07-md-1902 (JSR), 2013 WL 12191891, at *7 (S.D.N.Y. Mar. 11, 2013).

install elevators at the Middletown Road Station at the time of the renovation.  Doc. 156-11 at 60:21-25, 68:7-69:5.  MDC prepared two reports:  the May 10, 2019 Engineering Analysis and the June 24, 2019 response to the report by Defendants' experts, Guy Nordenson and Associates. Doc. 157 at ¶¶ 2-3.  E. Mitchell Swann prepared the portion of the MDC reports related to mechanical engineering.  *Id.* at ¶ 4.  He gave deposition testimony on February 26, 2020 and provided a declaration on May 6, 2020.  Docs. 156-11; 157.  Julian Toneatto prepared the portion of the reports related to structural engineering.  Doc. 158 at ¶ 4.  He gave deposition testimony on January 22, 2020 and provided a declaration on May 5, 2020.  Docs. 166-10; 158.  G. Peter Vander Heide prepared the portion of the reports related to architecture.  Doc. 159 at ¶ 4.  He gave deposition testimony on January 14, 2020 and provided a declaration on May 5, 2020. Docs. 166-9; 159.

Vander Heide testified that the reports did not cover whether load-bearing members would need to be replaced or altered to install elevators because the mezzanine had been "totally reworked" and they could have thus accounted for the additional loads from the elevators by strengthening the girders where needed.  Doc. 166-9 at 92:9-22, 169:3-12.  According to Vander Heide, MDC's designs would have also required adding beams.  *Id.* at 183:18-84:3.

Toneatto admitted that MDC did not perform a complete structural analysis of the site and only determined whether the installation of elevators was possible.  Doc. 166-10 at 107:6-08:2.  He explained, however, that the street to mezzanine elevator would not have added to the load at all and could have been built to further reinforce the mezzanine.  *Id.* at 108:12-25.

MDC proposed three ways that the MTA could build elevators.  Doc. 165 at ¶ 75. Scheme 1 places a street to mezzanine elevator on Westchester Avenue north of the stairs, then the elevator to the northbound platform at the bottom landing of the stairs, and the elevator to the

southbound platform at the bottom landing of the stairs where there is currently a switchroom. *Id.* at ¶ 78. The elevators to the northbound and southbound platforms would be attached to the existing structure with new structural steel. *Id.* at ¶ 79. Scheme 1 would require relocating the switch room, expanding the mezzanine on the northbound side, and supporting that expansion with new beams cantilevered[8] over the sidewalk. *Id.* at ¶ 80.

Scheme 2 places all elevators, except for the mezzanine to southbound platform elevator, in the same place as in Scheme 1. *Id.* at ¶ 81. The mezzanine to southbound platform elevator would be placed farther south on Westchester Avenue and would be supported by a pillar in the traffic island that now exists. *Id.* at ¶ 81. This plan would necessitate a corridor on the southbound side of the mezzanine, relocating the switchroom, and expanding the mezzanine on the northbound side. *Id.* at ¶ 82.

Scheme 3 places the street to mezzanine elevator on private property next to the northbound side of Westchester Avenue, places the northbound platform elevator in the same location as the other proposals, and keeps the southbound platform elevator in the same location as Scheme 2. *Id.* at ¶¶ 83, 86. This renovation would require moving the street to mezzanine stairs on the northbound side, building a bridge from the street elevator to the mezzanine, and buying the affected private property. *Id.* at ¶ 84. MDC's schemes do not show which beams and girders would need to be replaced and do not show where the elevator machine room would be built. Doc. 172 at ¶¶ 122-23.

According to MDC, the way that Defendants altered the structural framework of the mezzanine during the renovation was similar to how Defendants would need to change the structural framework of the mezzanine to add elevators. *Id.* at ¶ 77. Specifically, Toneatto

---

[8] A cantilever is "a projecting beam or member supported at only one end." Cantilever, Merriam-Webster, https://www.merriam-webster.com/dictionary/cantilever (last visited Mar. 29, 2020).

testified that he could "design around" any overstressing added by the elevators by making changes similar to those made during Defendants' renovation of the Middletown Road Station. Doc. 166-10 at 135:7-13.  Vander Heide added that, because Defendants "totally reworked" the mezzanine, Defendants could have placed the load in the appropriate places and just strengthened the girders that they were already changing.  Doc. 166-9 at 92:9-22.

ii.    **Defendants' Evidence**

a.    **Deposition of Gricelda Cespedes**

Gricelda Cespedes, who was NYCTA's program coordination, compliance, and ADA officer from 2011 to 2017, was deposed on January 19, 2018.  Doc. 166-2 at 10:2-16.  Her responsibilities included ensuring designs met ADA standards.  *Id.* at 11:15-12:11.  According to Cespedes, technical infeasibility is not being able to "install an elevator because to do so would be to alter a load bearing structure that you would otherwise not be altering as part of your construction."  *Id.* at 66:14-67:2.  She defined load-bearing structures as carrying the load of a structure and noted that without them, the structure could not support itself.  *Id.* at 114:5-15.  The load-bearing structures at the Middletown Road Station are the floor structure, the support hangers, and the girders, which support the load that hangs from it.  *Id.* at 114:16-23.  She added that for a hung mezzanine that has the tracks above it, which the Middletown Road Station has, "the actual support structure isn't underneath.  The actual support structure comes from above."  *Id.* at 76:20-77:14.  She further testified that, during the renovations at the Middletown Road station, some load-bearing structures were modified or replaced and some structural steel, which was corroded, was repaired.  *Id.* at 37:6-38:3.

Cespedes testified that she performed two feasibility analyses and a site visit with the FTA regarding elevator installation at the Middletown Road Station.  First, in 2012, following the

FTA's request for a feasibility study, she performed a "guestimate" of the feasibility of installing elevators at the Middletown Road Station and concluded that an elevator to the northbound platform was not feasible because it would require extending the mezzanine.  *Id.* at 85:24-86:2, 86:17-22, 88:11-19.

When she later performed a feasibility study for the FTA based on confirmed measurements, she found that installing elevators at the Middletown Road Station was technically infeasible because the elevator from the street to mezzanine would block the street and would require a bridge connecting it to the mezzanine.  *Id.* at 92:19-95:25.  The elevator from the mezzanine to the southbound platform would be placed between two stairways and would have to be attached to the cantilever structure that already leads from the mezzanine to the southbound platform.  *Id.* at 96:2-10.  It would also require extending the sidewalk below.  *Id.* at 115:5-22.  Installing an elevator on the northbound side necessitates extending the mezzanine to connect to the bridge and extending the cantilever structure, thereby altering load-bearing structures that were not already altered during the renovations.  *Id.* at 97:2-14.

Cespedes then performed a site visit with representatives from the FTA.  They determined that if Defendants placed the street to mezzanine elevator on the north side as suggested by the FTA, the elevator would block a private driveway.  *Id.* at 102:20-03:23. Cespedes explained that the FTA's suggestion was not feasible because even if Defendants were to enter into an agreement with the landowner, Defendants would still have to alter load-bearing structures to support that design.  *Id.* at 104:11-24.

### b.    Deposition of William Carry

William Carry, the Senior Director of Special Projects in the Office of the Deputy Commissioner for Policy for the New York City Department of Transportation ("NYCDOT"),

was deposed on August 16, 2018.  Doc. 173-2 at 12:25-13:8.  Carry's role includes evaluating

street geometry:  how the street is laid out, where the curb is, and how the lanes are designated.

*Id.* at 17:16-18:4.  In November 2013, he had been working on a project regarding the buses

below the Middletown Road Station[9] and was asked by Defendants to evaluate elevator

installation at the station.  *Id.* at 20:18-21:2, 23:4-16; 57:23-58:16.  His evaluation was not to

determine feasibility but to review and comment on the design plan for issues of safety, traffic

and pedestrian circulation, impact on other capital projects, and cost.  *Id.* at 53:13-23, 89:25-

91:2.  He determined that any elevators from the mezzanine to the platform would dip below the

mezzanine level and reduce clearance below for traffic on the street, but he never concluded that

such a hazard could not be mitigated by curb geometry.  *Id.* at 56:23-57:22, 91:17-92:2.

### c.    Deposition of Alexander Cohen

Alexander Cohen, NYCTA's director of budget control in the division of capital planning

and budget since 2011, was deposed on November 30, 2017.  Doc. 166-1 at 9:15-17, 12:20-13:2.

Cohen testified that he oversaw the budget for a five-year capital project investing in the subway

and bus systems that included the Middletown Road Station's renovation.  *Id.* at 9:18-10:5.  By

Cohen's calculation, it would have cost an additional $30 million to install elevators at the

Middletown Road Station.  *Id.* at 31:2-12.  His estimate was based on the cost of installing

elevators at other elevated stations from 2015 to 2019 and did not take into account any specific

features of the Middletown Road Station or involve any consultation with any contractors.  *Id.* at

32:2-21.  Two prior estimates for the cost of installing elevators at the Middletown Road Station

performed by NYCTA amounted to $17 million and $22.5 million.  *Id.* at 33:21-36:10.

---

[9]  Carry explained that the buses below the Middletown Road Station had high elderly and disabled ridership, which
was "unsurprising[]" because the Middletown Road Station did not offer an elevator.  *Id.* at 57:23-59:13.

#### d.    Deposition of Guy Nordenson

Guy Nordenson, an expert structural engineer of Guy Nordenson and Associates ("GNA"), was deposed on November 12, 2019.  Doc. 166-12.  Defendants engaged GNA in 2017 to evaluate whether it would have been feasible to install elevators at the Middletown Road Station at the time of the renovation in 2013.  *Id.* at 17:9-17, 34:15-21; 42:9-11.  Nordenson defined technical feasibility as whether "it [is] possible to achieve some particular objective by some technical means."  *Id.* at 27:22-28:13.

Nordenson explained that columns support girders, which support beams, which then support slabs.  *Id.* at 31:12-14, 82:10-24.  He considers girders primary structural elements because they support several beams, and beams as secondary structural elements because they only support a portion of a slab.  *Id.* at 83:8-85:5.  Girders are load-bearing.  *Id.*  A load-bearing structural element is one that, if removed, would have consequences beyond its removal.  *Id.*  Hangers, which are used when the lower structure is hanging from the upper structure, are also load-bearing because they support girders, which in turn support beams and slabs.  *Id.* at 56:3-57:17, 84:24-85:8.  In evaluating the structural consequences of installing elevators, Nordenson focused particularly on the girders upholding the mezzanine.  Docs. 165 at ¶ 67; 172 at ¶ 102.

To perform GNA's analysis, Nordenson reviewed drawings of the Middletown Road Station from 2013 and from 2016, NYCTA's calculations, and created two hypothetical models, Alternates A and B.  Docs. 165 at ¶¶ 65, 72.  Alternate A involved minimal sidewalk supports and Alternate B had the least impact on the existing structural frame.  *Id.* at ¶ 72.  He confirmed that the elevator from the street to the mezzanine contemplated by Alternate B would not overstress the Middletown Road Station's girders.  *Id.* at ¶ 68.  Both would have required removing, altering, or modifying load-bearing members essential to the structural frame of the

Middletown Road Station.  *Id.* at ¶ 73.  In addition, both could be accomplished without easements or acquiring private property.  *Id.* at 73.

   **e.**  **Declaration of Ramesh Desai**

  Defendants also engaged Ramesh Desai of VJ Associates to estimate the cost of installing elevators based on Nordenson's proposals.  Doc. 172 at ¶¶ 79, 81.  Desai estimated that each proposal would have cost $13.1 to 13.5 million dollars in 2013 and would have cost $17.1 to 17.85 million in 2019.  *Id.* at ¶¶ 82, 85.

   **f.**  **Deposition of Daniel Mitchell**

  Daniel Mitchell, a project manager at WSP USA, Inc. ("WSP"), was deposed on October 15, 2019.  Doc. 166-11 at 15:24-16:8.  In 2019, the MTA asked WSP to perform an accessibility study—meaning create a fully accessible route from the street to the platforms—for the Middletown Road Station.  *Id.* at 20:20-21:3, 22:11-24.  Despite the WSP team including a structural engineer, WSP's evaluation was solely architectural and the structural engineer was involved only for the purpose of estimating cost.  *Id.* at 43:12-15, 81:9-23.  Load-bearing members were not within the scope of Mitchell's work.  *Id.* at 44:14-17.

  WSP prepared five conceptual plans for elevators at the Middletown Road station using the following criteria:  (1) ADA compliance; (2) customer convenience, circulation, and safety; (3) constructability and cost; (4) community impact; and (5) transit operations.  Doc. 165 at ¶¶ 53-54.  Defendants determined that Alternate B, which included an elevator located in an adjacent parking lot on Westchester Ave, met most of the criteria. *Id.* at ¶ 56; Doc. 166-11 at 68:22-69:4.  Alternate B would require rebuilding both stairways from the street to the mezzanine, extending the mezzanine in northern and eastern directions, and relocating the agent booth and storage areas.  Doc. 165 at ¶ 63.

### C.        Equitable Considerations

Defendants contend that it would be inequitable to impose a permanent injunction to install elevators at the Middletown Road Station when they have already identified subway stations where accessibility renovations are critical as part of its 2020-2024 Capital Program. Doc. 172 at ¶¶ 87-89.  Defendants' goal was to ensure that no city resident was more than two stations away from an accessible station.  *Id.* at ¶ 88.  Middletown Road Station, which is two stops south of the accessible Pelham Bay Park Station, was not chosen for renovations.  *Id.* at ¶¶ 89-90.  Defendants contend that reallocating funds from the $5.2 billion in the Capital Program to installing elevators at the Middletown Road Station would burden Defendants financially and harm riders.  *Id.* at ¶¶ 91, 95.  Even if there was enough funding to install elevators at Middletown Road Station, Defendants would rather divert that funding to higher priority stations with higher ridership.  *Id.* at ¶¶ 88, 97.

## II.    Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Senno*, 812 F. Supp. 2d at 467 (citing *SCR*, 559 F.3d at 137).  The party moving for summary judgment is initially responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "'the nonmoving party must come

forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to

avoid summary judgment.'"  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504

(S.D.N.Y. 2010) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

      In deciding a motion for summary judgment, the Court must "construe the facts in the

light most favorable to the non-moving party and must resolve all ambiguities and draw all

reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011)

(citation omitted).  However, in opposing a motion for summary judgment, the non-moving party

may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes

Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citation omitted).  "Rather, the non-moving

party must set forth significant, probative evidence on which a reasonable fact-finder could

decide in its favor." *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 256-57 (1986)).

      "When confronted with cross-motions for summary judgment, the Court analyzes each

motion separately, 'in each case construing the evidence in the light most favorable to the non-

moving party.'"  *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y.

Sept. 10, 2013) (quoting *Novella v. Westchester Cnty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see

also Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must

be examined on its own merits, and in each case all reasonable inferences must be drawn against

the party whose motion is under consideration.") (citation omitted).  The Court is not required to

resolve the case on summary judgment merely because all parties move for summary

judgment.  *Id*.

### III.   Discussion

#### A.   Threshold Issues

Defendants challenge Plaintiffs' standing to bring suit and the United States' ability to intervene beyond the statutory limitations period.  Neither argument has merit, and each will be addressed in turn.

##### i.   Standing

 "Each element of standing must be supported with the manner and degree of evidence required at the successive stages of the litigation[.]"  *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 736 (2d Cir. 2017) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  At summary judgment, plaintiffs 'must set forth' by affidavit or other evidence 'specific facts . . . which for purposes of the summary judgment motion will be taken to be true."  *Lujan*, 504 U.S. at 561.  Each Plaintiff has set forth sufficient evidence to support standing at this stage in the litigation.

For an individual to have standing to bring suit, he "must have (1) suffered an injury in fact, (2) that is fairly traceably to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Liu v. U.S. Congress*, 834 F. App'x 600, 602 (2d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).  The Second Circuit has consistently described the injury requirement as a "low threshold" to ensure that plaintiffs have "a personal stake in the outcome of the controversy."  *John*, 858 F.3d at 736 (citations omitted).  Plaintiffs establish an injury in fact by showing "that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Liu*, 834 F. App'x at 602 (quoting *Spokeo*, 136 S. Ct. at 1548).  A particularized injury is one that "affect[s] the plaintiff in a personal and individual way."  *Spokeo*,

136 S. Ct. at 1548.  Though injuries need not be tangible to be concrete, concreteness requires

that the injury "actually exist" rather than be "abstract."  *Id.* at 1548-49.  Where plaintiffs seek

injunctive relief, they must "also prove that the identified injury in fact presents a 'real and

immediate threat' of repeated injury.'"  *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187

(2d Cir. 2013) (citing *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)).

When determining whether an institutional plaintiff has organizational standing in its own

right, "the inquiry is the same as if the plaintiff were an individual."  *Nat. Res. Def. Council*

*("NRDC") v. Dep't of Interior*, 410 F. Supp. 3d 582, 592 (S.D.N.Y. 2019) (citing *Havens Realty*

*Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)).  The injury to an organization can be a

diversion of its monetary or other resources, or an impediment to carrying out its responsibilities,

and need only be "a perceptible impairment of an organization's activities."  *NRDC*, 410 F. Supp.

at 593; *see also Nnebe v. Daus*, 644 F.3d 147, 156-58 (2d Cir. 2011) (finding "scant" evidence of

"infrequent[]" resource diversion sufficient basis for organizational standing at summary

judgment because of a "perceptible opportunity cost" by the organization).

Organizations may also assert associational standing on behalf of its members by

showing

> (a) its members would otherwise have standing to sue in their own right;
> (b) the interests it seeks to protect are germane to the organization's purpose; and
> (c) neither the claim asserted nor the relief requested requires the participation of
> individual members in the lawsuit.

*NRDC*, 410 F. Supp. 3d at 592 (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S.

333, 343 (1977)).  To satisfy the first prong, "non-membership organizations may sue in a

representative capacity when they function effectively as a membership organization[,]" having

"sufficient indicia of membership."  *Disability Advocs., Inc. v. New York Coalition for Quality*

*Assisted Living, Inc.*, 675 F.3d 149, 157 (2d Cir. 2012) (quoting *In re Holocaust Victim Assets*

23

*Litig.*, 225 F.3d 191, 196 (2d Cir. 2000)).  In *Hunt v. Wash. State Apple Advert. Comm'n*, the

Supreme Court found that the Commission, although not a traditional membership organization,

functioned as one because of indicia of membership:  the Commission's constituents elect its

members, may serve on the Commission, and finance it.  432 U.S. at 344-45.  The Supreme

Court held that the Commission satisfied the associational standing test, concluding that "[i]n a

very real sense, . . . the Commission represents [its constituents] and provides the means by

which they express their collective views and protect their collective interests."  *Id.* at 345.

Finally, the third prong is "prudential" rather than constitutional and is aimed at "administrative

convenience and efficiency."  *Alliance for Open Soc'y Int'l v. U.S. Agency for Int'l Dev.*, 651

F.3d 218, 229 (2d Cir. 2011) (citation omitted).

Defendants argue that individual Plaintiffs Hardy and Diaz lack standing because they

have not shown a particularized injury and have expressed no plausible intention of returning to

the Middletown Road Station.  Doc. 163 at 7-10.  Specifically, Defendants reason that Hardy and

Diaz are unemployed, and therefore do not use the subway to go to work, and live nearer to

other, more accessible stations.  *Id.* at 10.  Defendants further argue that Hardy and Diaz only

visited the Middletown Road Station for this case, and that Hardy has not used the subway in

several years due to his worsening vision.  *Id.* at 8, 10.  However, both Hardy and Diaz testified

that the Middletown Road Station is near their homes and averred in their declarations that they

were deterred from using the Middletown Road Station because of its inaccessibility.  They also

both testified to using public transportation frequently.  Diaz testified that he expected to be near

the Middletown Road Station as he searched for a new job and Hardy added that he would use

the Middletown Road Station with the help of his friends or his aide if it had an elevator.  In

*Kreisler v. Second Ave. Diner Corp.*, the plaintiff similarly alleged that he was deterred from

24

entering defendant's diner, which was near his home, and that he frequented similar diners and would like to frequent defendant's diner if only he could access it. 731 F.3d at 188. The Second Circuit concluded that "the fact that the wheelchair-inaccessible entrance deterred [the plaintiff] from accessing [defendant's business] established a concrete and particularized injury" and emphasized that "[the plaintiff] need not attempt to overcome an obvious barrier." *Id.* To the extent Defendants are insinuating that Hardy and Diaz do not want to use the Middletown Road Station and were not actually deterred from using it, that is a credibility determination that cannot be decided on summary judgment. *DIA v. Trump Int'l Hotel & Tower*, No. 01 Civ. 5518 (MBM), 2003 WL 1751785, at *9 (S.D.N.Y. April 2, 2003) (finding similar allegations sufficient on summary judgment and concluding "[w]hether [plaintiffs] actually do wish to eat at Jean Georges and actually are deterred from going there because they have to ask for help with the lifts cannot be decided on a motion for summary judgment."). The Court notes, however, that allegations that they intended to return to the Middletown Road Station if elevators were installed are plausible because they are both Bronx residents who live near to the station and have been to it before. *Trump Int'l Hotel & Tower*, 2003 WL 1751785, at *8.

Defendants also argue that BILS has failed to show standing because it has not expended any resources on the Middletown Road Station and its executive director, Eisenberg, could not identify one client or employee living near it. Doc. 163 at 12. However, Eisenberg testified that the organization has ongoing relationships with the ACCES office and nursing homes near the Middletown Road Station and that BILS employees would use the Middletown Road Station to meet those responsibilities if it were accessible. That the nursing homes are not as close to the Middletown Road Station as they are to others is not dispositive, as BILS employees may prefer to use the Middletown Road Station instead for any number of reasons, including an elevator

outage at the closer stations.  Eisenberg also emphasized that the time BILS staff spent on advocating for accessibility at the Middletown Road Station was a resource that could have been used on other advocacy projects.  This evidence is sufficient to suggest a "perceptible opportunity cost" for BILS.  *Nnebe*, 644 F.3d at 157.

Defendants further reason that because BILS does not have members, it cannot have associational standing.  *Id.* at 12.  Though Defendants are correct that BILS does not have members, it is an independent living center that provides services and advocacy for persons with disabilities and disabled individuals make up more than half of its leadership and staff.  Courts in this District have found similar centers have sufficient indicia of membership to support associational standing.  *Westchester Indep. Living Ctr., Inc. v. State Univ. of New York, Purchase Coll.*, 331 F.R.D. 279, 297 (S.D.N.Y. 2019) (finding plaintiff organization had associational standing because it was "staffed, directed, and driven by the individuals with disabilities that it seeks to serve."); *Brooklyn Ctr. for Indep. for the Disabled v. Bloomberg*, 290 F.R.D. 409, 416-17 (S.D.N.Y. 2012) (finding associational standing where plaintiff organization was a service provider that "managed and directed by persons with disabilities for the purpose of serving persons with disabilities"). [10]  Therefore, BILS has established both direct and associational standing.

Defendants additionally contend that DIA cannot show direct or associational standing because Plaintiffs put forward no evidence that it or its members were injured.  Doc. 163 at 13.

---

[10]  Defendants' reliance on *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693 (2d Cir. 2015) to the contrary is misplaced.  Doc. 177 at 26.  In that case, the Second Circuit reasoned that plaintiff lacked associational standing because its constituents do not elect its members, provide services to the organization, or finance or direct its activities.  *Id.* at 695.  The Second Circuit further found that "regardless of whether [plaintiff] has established an injury-in-fact, third-party standing is not appropriate in this case as a prudential matter" because plaintiff represents its constituents in numerous individual lawsuits.  *Id.*  (citations omitted).  But, unlike the plaintiff in *Mental Health Legal Serv.* whose leadership and budget are wholly determined by New York State, BILS is staffed in large part by its own constituents.  *Id.*  Moreover, Defendants have not alleged that it is imprudent for the institutional Plaintiffs to maintain this lawsuit because of any individual litigations on behalf of their constituents.  *Id.*

However, DIA's president, Prentiss, testified that advocating for the Middletown Road Station to install elevators diverted DIA resources from other advocacy projects such as inaccessibility at the Brooklyn Botanical Garden and the One-Step Campaign.  Prentiss added that DIA employees answer calls from its constituents to help them plan their travels by public transportation and that any accessibility issues mean that they spend more time on those calls than on their substantive advocacy work.  This Court has also already determined that DIA board member Hardy has standing.  Moreover, DIA members Porro and Jones averred by declaration that they would use the Middletown Road Station but for its lack of accessibility.  DIA therefore has standing in its own right, and associational standing on behalf of its members.

Plaintiffs have thus put forward sufficient proof of standing at this stage of the litigation. Defendants' motion for summary judgment is therefore denied as to standing.

### ii.      Statute of Limitations

Because the ADA does not contain a statute of limitations, courts in this Circuit generally apply New York's three-year statute of limitations for personal injury claims to ADA actions. *Purcell v. New York Inst. of Tech.–Coll. of Osteopathic Med.*, 931 F.3d 59, 63 (2d Cir. 2019). Defendants argue that the United States' claim is time-barred because the alterations to the Middletown Road Station were completed in May 2014, but the United States did not intervene until March 13, 2018.  Docs. 163 at 44-45.  The United States counters that the statute of limitations does not apply to its claims.  Doc. 174 at 21-22.  The Court agrees with the United States.

The Supreme Court has long abided by the canon of statutory construction that the United States is exempt from a statute of limitations "unless . . . expressly designated [by the statute], or necessarily included by the nature of the mischiefs to be remedied."  *Weber v. Bd. of Harbor*

*Comm'rs*, 85 U.S. 57, 70 (1873); *see also Block v. North Dakota ex rel. Bd. of Univ. and Sch. Lands*, 461 U.S. 273, 288 (1983); *Guaranty Trust Co. of New York v. U.S.*, 304 U.S. 126, 133 (1938).  As the Supreme Court has explained, "[t]he judicially-created rule that a sovereign is normally exempt from the operation of a generally-worded statute of limitations has retained its vigor because it serves the public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers."  *Block*, 461 U.S. at 290 (citation omitted).  Because the parties do not dispute that the ADA does not set a limitations period, or that the state statute of limitations does not expressly include the United States, the Court finds that the three-year limitations period under New York law does not apply to the United States in this case.  One of the express goals of the ADA is "to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities."  42 U.S.C. § 12101(b)(3).  Under similar circumstances, the Eastern and Northern Districts of New York have found state limitations periods inapplicable to sovereign plaintiffs raising claims under federal statutes lacking statutes of limitations.  *FTC v. Instant Response Sys., LLC*, No. 13 Civ. 976 (ILG) (VMS), 2014 WL 558688, at *2-3 (E.D.N.Y. Feb. 11, 2014) (involving the Federal Trade Commission Act); *U.S. v. Tanski*, No. 04 Civ. 714 (NAM), 2007 WL 1017020, at *6 (N.D.N.Y. Mar. 30, 2007) (regarding the Fair Housing Amendments Act of 1988).

Relying on this Court's decision in *Forsee v. MTA*, Defendants reason that allowing the United States' claim to survive despite the statute of limitations having run would mean that "operators of public accommodations would never have the benefit of a statute of repose."  No. 19 Civ. 4406 (ER), 2020 WL 1547468, at *9 (S.D.N.Y. Mar. 31, 2020) (citation omitted).  But Defendants cite *Forsee* out of context and its holding has no bearing on this case.  *First*, the *Forsee* Court was tasked with deciding whether the limitations period on an alterations claim

under the ADA began running from the time that construction was completed, not whether the statute of limitations applied to the United States. *Id. Second, Forsee* did not involve any sovereign plaintiffs.

Accordingly, the United States' claim is not barred by any statute of limitations and Defendants' motion for summary judgment is denied with respect to their statute of limitations argument.

### B.      The ADA and RA Claims

In enacting the ADA, Congress found that "discrimination against individuals with disabilities persists in such critical areas as . . . public accommodations" and aimed "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." §§ 12101(a)(3), 12101(b)(2). Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132. Similarly, section 794 of the RA prevents disabled individuals from "be[ing] excluded from the participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any program or activity receiving Federal financial assistance" because of their disability. 29 U.S.C. § 794. To establish a *prima facie* case under these provisions,[11] plaintiffs must show that they are disabled individuals under the ADA who "were denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of

---

[11] "[A]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under [the RA] of federally assisted programs and activities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citation omitted). Because neither party argues any distinction between the applications of these provisions in this particular case, the Court will treat them as identical. *Id.*

plaintiffs' disabilities" and that defendants received federal funding. *Henrietta D.*, 331 F.3d at

272. The sole element in dispute in this case is whether Plaintiffs were denied the benefit of

Defendants' public transportation services.

When an existing public transportation facility is altered, in whole or in part, in a manner

that "affects or could affect *the 'usability' of a station or a part thereof*," it triggers statutory

obligations under § 12147 of the ADA known as the "Accessible Alterations Rule." *BILS*, 358 F.

Supp. 3d at 328 (citing § 12147(a)) (emphasis added). The Accessible Alterations Rule states

that it is discriminatory for

> a public entity to fail to make such alterations (or to ensure that the alterations are
> made) in such a manner that, to the maximum extent feasible, the altered portions
> of the facility are readily accessible to and usable by individuals with disabilities,
> including individuals who use wheelchairs, upon the completion of such
> alterations.

§ 12147(a). Section 12147 continues, setting more limited obligations for alterations to

areas containing a "primary function[:]"[12]

> Where the public entity is undertaking an alteration that affects or could affect
> usability of or access to an area of the facility containing *a primary function*, the
> entity shall also make the alterations in such a manner that, to the maximum
> extent feasible, the path of travel to the altered area and the bathrooms,
> telephones, and drinking fountains serving the altered area, are readily accessible
> to and usable by individuals with disabilities, including individuals who use
> wheelchairs, upon completion of such alterations, where such alterations to the
> path of travel or the bathrooms, telephones, and drinking fountains serving the
> altered area are not disproportionate to the overall alterations in terms of cost and
> scope (as determined under criteria established by the Attorney General).

*Id.* (emphasis added).

The DOT regulations implementing these provisions also differentiate between

alterations to the usability of the facility and alterations to the usability of an area with a primary

---

[12] A primary function is defined as "a major activity for which the facility is intended" and includes but is not
limited to "ticket purchase and collection areas, passenger waiting areas, [and] train or bus platforms[.]" 49 C.F.R. §
37.43(c).

function.  *BILS*, 358 F. Supp. 3d at 328.  DOT regulation § 37.43(a)(1) explains the Accessible

Alterations Rule in almost identical terms to the statute:

> When a public entity alters an existing facility or a part of an existing facility used
> in providing designated public transportation services in a way that affects or
> could affect the usability of the facility or part of the facility, the entity shall make
> the alterations (or ensure that the alterations are made) in such a manner, to the
> maximum extent feasible, that the altered portions of the facility are readily
> accessible to and usable by individuals with disabilities, including individuals
> who use wheelchairs, upon the completion of such alterations.

§ 37.43(a)(1).  With respect to alterations affecting the usability of areas with primary functions,

the language of section 37.43(a)(2) also almost identically repeats the statute:

> the entity shall make the alteration in such a manner that, to the maximum extent
> feasible, the path of travel to the altered area and the bathrooms, telephones, and
> drinking fountains serving the altered area are readily accessible to and usable by
> individuals with disabilities, including individuals who use wheelchairs, upon
> completion of the alterations.  Provided, that alterations to the path of travel,
> drinking fountains, telephones and bathrooms are not required to be made readily
> accessible to and usable by individuals with disabilities, including individuals
> who use wheelchairs, if the cost and scope of doing so would be disproportionate.

§ 37.43(a)(2).  The term "path of travel" is defined, in relevant part, as "a continuous,

unobstructed way of pedestrian passage by means of which the altered area may be approached,

entered, and exited, and which connects the altered area with an exterior approach (including

sidewalks, parking areas, and streets), an entrance to the facility, and other parts of the facility."

§ 37.43(d).  An accessible path may include elevators.  *Id.*  An alteration to a path of travel is

"disproportionate to the overall alteration when the cost exceeds 20 percent of the cost of the

alteration to the primary function area (without regard to the costs of accessibility

modifications)."  § 37.43(e)(1).  Alterations that fall into section 37.43(a)(2) therefore require

consideration of costs, whereas alterations falling under 37.43(a)(1) do not.  *BILS.*, 358 F. Supp.

at 329 (*Roberts*, 542 F.3d at 371).

      Plaintiffs argue that Defendants could have installed elevators at the Middletown Road

Station and, because this case is governed exclusively by section 37.43(a)(1), the cost of installing the elevators is irrelevant.  Defendants argue that both sections 37.43(a)(1) and 37.43(a)(2) apply to their alterations to the Middletown Road Station.  Defendants contend that under 37.43(a)(2), they were not required to install elevators because the cost would have been disproportionate to the total cost of the renovation project.  Defendants also assert that they complied with 37.43(a)(1) by making the renovated stairways ADA-compliant.  Defendants further argue that building elevators was not feasible because it would have required altering load-bearing structures not already modified during the renovation.

This Court already decided that Defendants' renovations at the Middletown Road Station were covered by section 37.43(a)(1).  *BILS*, 358 F. Supp. 3d at 330.  However, the Court also found that "(a)(1) and (a)(2) are not mutually exclusive" because "[a]n alteration can both affect the usability of a facility, which triggers (a)(1), and affect the usability of or access to an area of a facility containing a primary function, which triggers (a)(2)."  *Id.* at 331.  Because Defendants have not only replaced the stairways, but have also made "extensive alterations" to the mezzanine and platforms which serve the primary functions of ticket purchasing and train boarding, the Court found that "§ 37.43(a)(2) also arguably applies[.]"[13]  *Id.*  The parties do not cite, and the Court has not found, any case interpreting the application of both provisions in tandem.

Plaintiffs reason that, regardless of the application of section 37.43(a)(2), replacement of the stairways mandated installation of elevators to render the Middletown Road Station

---

[13] Plaintiffs' argument that the applicability of section 37.43(a)(1) is law of the case, Doc. 171 at 16, is true but also undisputed.  *105 Mt. Kisco Assocs. LLC v. Carozza*, No. 15 Civ. 5346 (NSR), 2019 WL 6998008, at *8 (S.D.N.Y. Dec. 20, 2019) ("Under the law of the case doctrine, when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case unless cogent and compelling reasons militate otherwise.") (citation omitted).  Defendants argue only that both sections 37.43(a)(1) and 37.43(a)(2) must apply under the Court's decision in *BILS*, 358 F. Supp. 3d at 331.

wheelchair-accessible under section 37.43(a)(1).  Doc. 153 at 14.  By contrast, Defendants argue

that they complied with both sections 37.43(a)(1) and 37.43(a)(2) by renovating the stairways

themselves to be ADA-compliant.  Doc. 163 at 21-22.  Defendants reason that section

37.43(a)(1) requires only that they make the altered areas accessible, not the entire Middletown

Road Station, and that section 37.43(a)(2) requires that they make the "path of travel" to the

primary function areas accessible.  *Id.* at 16.  Defendants' overly technical reading of the law is

unpersuasive.  Defendants' alterations to the Middletown Road Station included not only the

stairways, but also modifications and additions to the mezzanine, platforms, and various features

that affect usability.  Large swaths of the Middletown Road Station thus qualify as altered areas

that must be made accessible.[14]  Section 37.43(a)(1) requires alterations be made to the

maximum extent feasible to allow for disabled individuals, including people in wheelchairs, to

use the altered areas.  Because most of the Middletown Road Station was altered, most of the

Middletown Road Station would need to be accessible to the maximum extent feasible, including

to those confined to wheelchairs.  Under Defendants' reading of the law, Defendants would have

to make the mezzanine and platforms ADA-compliant for individuals with disabilities except

those who are wheelchair-bound.  Defendants' interpretation of the law would thus write

wheelchair accessibility out of § 37.43(a)(1)—an absurd result given the ADA's broad remedial

purpose and this provision's express inclusion of customers who use wheelchairs for mobility.

Docs. 153 at 20; 171 at 14; *Henrietta D.*, 331 F.3d at 279 (finding that the ADA should be

---

[14]  The cases Defendants rely on are inapposite as they involve more limited renovations.  *See, e.g.*, *Bailey v. Bd. of Comm'rs of Louisiana Stadium & Exposition Dist.*, No. 18 Civ. 5888 (NJB), 2020 WL 814862, at *16 (E.D. La. Feb. 19, 2020) (rejecting argument that alterations to parts of a Superdome meant the whole Superdome required further accessibility alterations); *Mannick v. Kaiser Found. Health Plan, Inc.*, No. 03 Civ. 5905 (PJH), 2006 WL 1626909, at *11, 15 (N.D. Cal. June 9, 2006) (denying plaintiff's summary judgment motion which argued that accessibility alterations to two floors of the maternity ward meant every patient room in the hospital needed to be wheel-chair accessible); *Cherry v. City Coll. of San Francisco*, No. 04 Civ. 04981 (WHA), 2006 WL 6602454, at *9 (N.D. Cal. Jan. 12, 2006) ("[p]laintiffs' submission seems to proceed on the assumption that any partial alteration triggers a federal duty to renovate the entire building.  This is not the law.").

"construed broadly to effectuate its purposes") (citation omitted).  Moreover, inclusion of the

term "path of travel" in section 37.43(a)(2) but not section 37.43(a)(1) does not preclude a path

of travel from being an altered area under section 37.43(a)(1).  Doc. 171 at 14.  In *Disabled in*

*Action of Pennsylvania v. Southeastern Pennsylvania Transp. Auth. ("SEPTA")*, SEPTA altered

only the stairways leading to underground train stations but did not add elevators.  635 F.3d 87,

90-91 (3d Cir. 2011).  The Third Circuit affirmed grant of summary judgment for plaintiff,

concluding that SEPTA had not complied with its obligations under the Alterations Accessibility

Rule and reasoning that  "to excuse public entities from complying with the accessibility

requirements simply because they altered only a *portion* of a facility would undermine the intent

of the ADA."  *Id.* at 97 n.14 (emphasis in original).[15]

The parties' dispute thus comes down to the meaning of the term "maximum extent

feasible."  Plaintiffs reason that Defendants' employees and expert witnesses, as well as

Plaintiff's experts, agree that elevators could have been installed at the Middletown Road Station

and that Defendants cannot prove infeasibility.  Doc. 153 at 14.  Defendants argue that it was

technically infeasible, and therefore not required, to install elevators because it would require

modifying load-bearing girders and beams.  Doc. 163 at 25, 29.

The DOT defines "maximum extent feasible" as applying to "*the occasional case* where

the nature of an existing facility makes it *impossible* to comply fully with applicable accessibility

standards through a planned alteration."  § 37.43(b) (emphases added).  The DOT further

explains that,

---

[15]  Defendants further argue that section 37.43(a)(2) would become superfluous if only section 37.43(a)(1) were
applied to this case.  Doc. 177 at 9.  However, section 37.43(a)(2) would still apply to the remaining stairways from
the street to the mezzanine and from the mezzanine to the platforms.

> [i]n these circumstances, the entity shall provide the maximum physical accessibility feasible. Any altered features of the facility or portion of the facility that can be made accessible shall be made accessible. If providing accessibility to certain individuals with disabilities (e.g., those who use wheelchairs) would not be feasible, the facility shall be made accessible to individuals with other types of disabilities (e.g., those who use crutches, those who have impaired vision or hearing, or those who have other impairments).

*Id.* Appendix D to the DOT regulations, which is meant as "definitive guidance concerning the meaning and implementation of these provisions[,]" also confirms that "the term 'maximum extent feasible' means that all changes that are possible must be made." 49 C.F.R. pt. 37 App. D, § 37.43. The ADA Accessibility Guidelines, as adopted by the Department of Justice with slight variations in 2010, also provide that "where compliance with applicable requirements is technically infeasible, the alteration shall comply with the requirements to the maximum extent feasible." 36 C.F.R. Pt. 1191, App. B, § 202.3(2); *Kirola v. City and Cnty. of San Francisco*, 860 F.3d 1164, 1177 (9th Cir. 2017). All of these provisions suggest that feasibility requires all possible changes to be made and only excuses physically impossible changes.

However, Defendants rely primarily on the legislative history cited in Appendix D to the DOT regulations, which further explains:

> The phrase 'to the maximum extent feasible' has been included to allow for the occasional case in which the nature of an existing facility is such as to make it virtually impossible to renovate the building in a manner that results in its being entirely accessible to and usable by individuals with disabilities. In all such cases, however, the alteration should provide the maximum amount of physical accessibility feasible.

> Thus, for example the term 'to the maximum extent feasible' should be construed as not requiring entities to make building alterations that have little likelihood of being accomplished without removing or altering a load-bearing structural member unless the load-bearing structural member is otherwise being removed or altered as part of the alteration.

*Id.* (citing S. Rep. No. 101-116, at 68).  The example provided by Appendix D therefore tacks feasibility to how likely an alteration is to be accomplished without removing or altering load-bearing structures not already removed or altered during the renovations.

Plaintiffs urge the Court to ignore the example cited by Appendix D, reasoning that it runs counter to every other piece of guidance on the feasibility standard and would exempt the MTA from ever having to make elevated stations accessible.  Doc. 171 at 20.  It bears noting that the MTA Design Procedures Manual confirms that, in general, elevators added to the subway system must be self-supporting because stations cannot carry the additional load.  Therefore reading the feasibility requirement to exclude any alterations that would require altering members of the load-bearing structure unless those same members of the load-bearing structure had been altered by the renovations may mean that large portions of the subway system would forever remain inaccessible to people who use wheelchairs.  Under this interpretation of the law, rather than being "the occasional case," renovation of subway stations without installing elevators would be routine.  § 37.43(b).

However, Plaintiffs' argument ignores the two cases that apply Appendix D's load-bearing feasibility standard.  In *Disabled in Action of Pennsylvania v. SEPTA*, SEPTA argued that Appendix D prevented the installation of elevators at the renovated stations at issue because none of the renovations had affected any load-bearing structures.  635 F.3d at 95-96.  The Third Circuit interpreted Appendix D broadly, finding "that a public entity need not make altered portions of a facility readily accessible if doing so would require removing or altering a load-bearing structural member (unless the movement or alteration is called for by the alterations anyway)[,]" and found that Appendix D did not mean the converse—"that the altered portions of a facility *only* need be made accessible if the alterations in question involve the drastic change of

36

moving or altering a load-bearing member." *Id.* at 96 (emphasis in original). Then in *HIP Heightened Indep. and Progress, Inc. v. Port Auth. of New York and New Jersey*, the Third Circuit vacated summary judgment on behalf of defendants in part because there was "a genuine dispute of material fact over whether a load-bearing member would need to be removed" for plaintiffs' proposed accessibility plan. 693 F.3d 345, 355 (3d Cir. 2012).

Here, as in *HIP*, there is a genuine dispute of material fact over which load-bearing members would need to be altered or replaced for Plaintiffs' accessibility proposals. Plaintiffs' experts contend that the structural changes required to support elevator installation is similar to the structural changes Defendants already instituted during their renovation of the Middletown Road Station. Vander Heide explained that, because the mezzanine was reworked, Defendants could have added elevators without altering any structural support that was not already changed during the renovation. Toneatto similarly pointed out that he would have been able to design around any overstressing to the structural frame of the Middletown Road Station to accommodate elevators. By contrast, defense witnesses Nordenson and Cespedes both stated that load-bearing members that were not already altered would have to be altered to support elevator installation at the Middletown Road Station. However, Nordenson did opine that an elevator from the street to the mezzanine would not overstress the Middletown Road Station's girders. Cespedes also stated that the mezzanine is supported from above. Additionally, the MTA Design Procedures Manual provides that elevators generally must be self-supporting, which would tend to confirm that at least the elevator from the street to the mezzanine would be self-sustaining and meet even a stringent reading of the load-bearing feasibility standard. On this record, the Court cannot grant either party summary judgment.

Defendants also reason that the cost of installing elevators would be disproportionate to the cost of the renovations to the Middletown Road Station.  Doc. 163 at 14.   But the Second Circuit has held that evaluation of the term "maximum extent feasible" does not involve analyzing cost.  *Roberts*, 542 F.3d at 371.  Moreover, "it is consistent with the ADA's nature as a far-reaching anti discrimination statute" to exclude cost from evaluating feasibility because "the ADA does contemplate that, in general, if a public entity cannot afford to make alterations to a public transit facility that include making the altered portions accessible, it should not make alterations at all."  *Disabled in Action of Pennsylvania*, 635 F.3d at 95 n.10.  Even if cost were a factor, Defendants have not sufficiently shown what the cost would have been at the time of the renovations as Cohen's calculations were set in 2015-19 and Desai's calculations were based in 2019.  *Roberts*, 542 F.3d at 375 (finding Title III analysis of feasibility must be backward-looking); *HIP*, 693 F.3d at 352-53 (applying *Roberts* to a Title II case).[16]  In addition, Defendants are devoting $5.2 billion to their current Capital Program.  Although Defendants may believe that the Middletown Road Station is less of a priority for renovation than other stations, that may not reflect their obligations under the law.  Plaintiffs provided testimony that they are deterred from using the Middletown Road Station because it lacks access.  NYCDOT employee Carry testified that ridership at the buses below the Middletown Road Station is disproportionately elderly and disabled given their inability to use the Middletown Road Station, which tends to show that any evaluation of the number of riders currently using the Middletown Road Station may be misleading as to the number of riders who would use the Middletown Road Station if it were made accessible.  Defendants' evidence to support not diverting funds from its Capital Program to the Middletown Road Station is thus by no means overwhelming.

---

[16]  Defendants' reliance on *Speciner v. NationsBank, N.A.* is misplaced as the claims at issue in *Speciner* were under ADA provisions directing consideration of cost.  215 F. Supp. 2d 622, 633-34 (D. Md. 2002).

Accordingly, neither Plaintiffs nor Defendants are entitled to summary judgment on Plaintiffs' ADA and RA claims.

### C.     The NYCHRL Claim

Discrimination claims brought under the NYCHRL must be analyzed "separately and independently from any federal and state law claims" as the NYCHRL is a broader standard. *Mihalik v. Credit Agricole Cheureux N. Am.*, 715 F.3d 102, 109 (2d Cir. 2013).  The NYCHRL makes it unlawful for a person providing a public accommodation "[t]o refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation."  N.Y.C. Admin. Cod. § 8-107(4)(a)(1)(a).

Plaintiffs argue that failure to build an elevator at the Middletown Road Station denies Plaintiffs access to the subway system in violation of the NYCHRL.  Doc. 153 at 22-23. Defendants counter that installing elevators would be infeasible and that the cost would be an undue hardship.  Doc. 163 at 31-32.  "Factors to be considered in establishing an undue burden [under the NYCHRL] include the cost of the accommodation, the facility's size and resources, and the type of operations at the facility."  *Kreisler v. Second Ave. Diner Corp.*, No. 10 Civ. 7592 (RJS), 2012 WL 3961304, at *13 (S.D.N.Y. Sept. 11, 2012).  However, there is a genuine issue of fact with respect to feasibility, *see supra* Part III.B, and with respect to cost.  *First*, Defendants' witnesses provide several wide-ranging estimates for the cost of installing elevators at the Middletown Road Station.  While Cohen testified that it would have cost $30 million to install elevators in 2019, Defendants' other witness Desai averred that it would have cost $17.1 to 17.85 million in 2019.  *Second*, Defendants argue that the cost of installing elevators at the Middletown Road Station would burden NYCTA financially but have not explained why given that the

Defendants currently have $5.2 billion invested in the Capital Program.  *Third*, Defendants reason that even if they diverted funds from the Capital Program to install elevators at the Middletown Road Station, it would harm riders who have more need for accessible stations in other locations.  However, Carry testified that there is high ridership for elderly and disabled New Yorkers at the buses below the Middletown Road Station, which tends to suggest that Defendants' figures for ridership at the Middletown Road Station may be underestimating the potential ridership if the station were made accessible.

Accordingly, both Defendants' and Plaintiffs' motions for summary judgment are denied as to Plaintiffs' claim under the NYCHRL.

### D.    Remedy

Through several cross-references to other federal laws, Title II of the ADA provides that compliance with the law can be effected through the Government terminating federal funding or "any other means authorized by law."  *See* § 12133; 29 U.S.C. § 794a; 42 U.S.C. § 2000d-1. Here, Plaintiffs request a permanent injunction enjoining Defendants from violating the ADA, RA and NYCHRL and the Plaintiffs and the United States request an injunction requiring that Defendants make the Middletown Road Station wheelchair accessible.  Docs. 35 at ¶ 139; 66 at pp. 9.  A plaintiff seeking a permanent injunction must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange*, L.L.C., 547 U.S. 388, 391 (2006).  Defendants challenge whether Plaintiffs and the United States have established the injury prong and equity prongs.  Doc. 163 at 33-36.

Defendants argue that the United States' delay in pursuing its claim from 2007 when it became aware of the planned renovations at the Middletown Road Station until its intervention in this case in 2018 undermines irreparable harm, and that none of the named Plaintiffs can show irreparable harm for the same reasons that they cannot show standing.  Doc. 163 at 33, 42-44. Defendants' arguments fail because here, Plaintiffs have shown standing, *see supra* Part III.A.i., and irreparable harm can be presumed from a statutory violation.  *City of New York v. Golden Feathers Smoke Shop, Inc.*, 597 F.3d 115, 120-21 (2d Cir. 2010) (collecting cases); *Smith v. East West Enters., LLC*, No. 3:17 Civ. 736 (AAT), 2017 WL 6462350, at *2 (M.D. Tenn. Aug. 7, 2017) ("In an injunction action under the ADA, where a disabled plaintiff has encountered a physical barrier to patronizing a defendant establishment, a plaintiff demonstrates the requisite threat of future injury where he establishes (1) a plausible intent to return to the noncompliant establishment, or (2) that he would return, but is deterred from visiting the noncompliant establishment because of the alleged accessibility barriers.").

Defendants also argue that they did not willfully disregard the law, and that the financial burden of an injunction would be substantial and require diverting funding from its Capital Program to the Middletown Road Station, which is less deserving of accessibility than the stations included in the Capital Program.  Doc. 163 at 37, 39-40.  These arguments are also unavailing.  Plaintiffs need not show that Defendants intended to discriminate against Plaintiffs to obtain injunctive relief under the ADA.  *Simonelli v. Univ. of California-Berkeley*, No. 02 Civ. 1107 (JL), 2007 WL 4165958, at *1 (N.D. Cal. Nov. 7, 2007) (noting intent is not necessary for injunctive relief under the ADA).  Additionally, there is a material question of fact as to whether installing elevators is prohibitively expensive.  *See supra* Part III.C.  And, while Defendants may have determined that their resources would be better used making other stations accessible, that

assessment may not reflect their obligations under the law.  *See supra* Part III.B.

Therefore, Defendants are not entitled to summary judgment on Plaintiffs' and the United States' requests for injunctive relief.

**IV.    Conclusion**

For all of these reasons, the Court denies both Plaintiffs' and Defendants' motions for summary judgment.  The parties are directed to participate in a telephonic pretrial conference on **April 22, 2021 at 10:30 a.m.** using the following conference call information:  (877) 411-9748; Access Code: 3029857#.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 152 and 162.

It is SO ORDERED.

Dated:  March 29, 2021
        New York, New York

_____
                Edgardo Ramos, U.S.D.J.